O4H4PADC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            23 Cr. 181 (RA)

5    DARIUS A. PADUCH,

6                                            Conference
              Defendant.
7    ------------------------------x

8                                            New York, N.Y.
9                                            April 17, 2024
                                             2:55 p.m.
10

11   Before:

12                      HON. RONNIE ABRAMS,

13                                           District Judge

14                          APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     NI QIAN
17   ELIZABETH ESPINOSA
     JUN XIANG
18        Assistant United States Attorneys

19   BALDASSARE & MARA LLC
          Attorneys for Defendant
20   BY:  MICHAEL BALDASSARE
          JEFFREY HAWRILUK
21

22

23

24

25

O4H4PADC

1              (Case called)

2              MR. XIANG:  Jun Xiang for the government.  With me at

3     counsel table are Ni Qian and Elizabeth Espinosa.

4              THE COURT:  Good afternoon all.

5              MR. BALDASSARE:  Michael Baldassare and Jeffrey

6     Hawriluk on behalf of defendant Dr. Darius Paduch, who is

7     standing to my left.

8              THE COURT:  Good afternoon to all of you.

9              We have a lot to do this afternoon.  This case is

10    scheduled to begin trial on Wednesday, April 24.  As the

11    parties are aware, I have a host of *in limine* motions.  To the

12    extent possible, I do have some questions on some of them.  To

13    the extent possible I'm going to rule today.  I know it can be

14    tedious to listen to oral rulings, so I apologize in advance.

15    But as you know, briefing wasn't complete until Monday, and I

16    want to get you rulings as quickly as possible.  I'm just going

17    to ask that you bear with me, and of course you will have the

18    transcript from the court reporter.

19             Also, let me just note that unless I hear an

20    objection, I'm going to read the name of relevant cases but not

21    the citation, but then I'm going to ask the court reporter to

22    put in a citation, which I will give him.  So if anybody has an

23    objection to that practice, let me know.

24             So why don't we get started.  Defendant first moves to

25    preclude the government from eliciting expert testimony

O4H4PADC

1    relating to the standard of care.  He argues the testimony on

2    the standard of care should be precluded, one, under Federal

3    Rule Of Evidence 702 because it does not relate to an issue in

4    the case, and, two, under Federal Rule of Evidence 403 because

5    it has low probative value and would confuse the jury.

6            So beyond what's in the briefing, would either party

7    like to be heard on this motion?

8            MR. BALDASSARE:  No, Judge.

9            MR. XIANG:  Not unless the Court has an issue.

10           THE COURT:  The Court denies defendant's motion under

11   Rule 702, an expert witness may testify in the form of an

12   opinion or otherwise if the proponent demonstrates to the Court

13   that it is more likely than not, among other factors, the

14   expert's scientific, technical or other specialized knowledge

15   will help tryer of fact understand the evidence or to determine

16   a fact in issue.  A district court must thus ensure that an

17   expert's testimony is relevant to the task at hand.  In

18   analyzing whether proffered expert testimony is relevant.  The

19   trial court should look to the standards of Rule 401, which

20   provides that evidence is relevant if it has any tendency to

21   make a fact of consequence in determining the action more or

22   less probative than it would be without the evidence.  And

23   those are quotations from the *Amorgianos* case.  *Amorgianos v.*

24   *Nat'l R.R. Passenger Corp.* 303 F.3d 256, 265 (2d. Cir 2002).

25           The Court find expert testimony on the standard of

O4H4PADC

1  care to be relevant, as explained by the Court in the *Hadden*

2  case, *United States v. Hadden*, No. 20-CR-468, Dkt. No. 213

3  12/22/22 Conference Transcript at 4:10 – 4:15 (S.D.N.Y. Dec.

4  28, 2022).  The offenses that are alleged to have occurred took

5  place in significant part during the course of medical

6  examinations.  And the Court finds that testimony regarding the

7  standards of care and/or best medical practices will assist the

8  trier of fact to understand the evidence and/or to determine

9  facts that are at issue in this case.

10      Moreover, violations of New York Penal Law Section

11  1355 underlie the Mann Act accounts here.  Pursuant to New York

12  Penal Law 1355 a person is guilty of sexual abuse in the third

13  degree when he or she subjects another person to sexual contact

14  without the latter's consent.

15      Additionally, a person is deemed incapable of consent

16  when he is patient and the actor is a healthcare provider

17  charged with sexual abuse in the third degreed, as defined in

18  Section 130.55, and the act of sexual conduct occurs during a

19  treatment session, consultation, interview, or examination.

20  Conduct performed for a valid medical or mental health care

21  purpose, however, shall not constitute a violation of any

22  section of this article in which incapacity to consent is based

23  on the circumstances set forth in Paragraph (h) of subdivision

24  3 of Section 130.05.

25      Expert testimony related to the standard of care and

O4H4PADC

whether defendant's alleged conduct was carried out for valid

medical purpose is thus relevant.

Defendant's arguments to the contrary are

unpersuasive, relying on *United States v. Stewart* and *In re*

*Rezulin Products Liability Litigation*.  Defendant asserts that

expert testimony would not be relevant.  Both cases, however,

are inapposite.

In *Stewart* the Second Circuit upheld the district

court's exclusion of expert testimony from a securities law

expert about the legality of a defendant's trade.  In so doing,

the Court explained that the proffered testimony regarding the

legal principles underlying insider trading in their

application to the defendant's trade had the potential to

invade the role of the trial judge in instructing the jury as

to the applicable law as well as the role of the jury in

applying that law to the facts before it.  Here, however, there

is no risk that testimony related to the standard of care or

best medical practices would invade the role of the Court in

instructing the jury as to the law or the role of the jury in

applying the law as to the facts before it.  Indeed, the

government has made clear it does not intend to elicit expert

testimony about what the law requires or expert testimony

regarding specific victims.

*In re Rezulin* is also inapposite.  There, the district

court excluded ethics testimony given that the principle issue

O4H4PADC

1   was whether the defendants breached their legal duties to the

2   plaintiffs in the manufacturing, labeling and marketing of a

3   pharmaceutical drug.  The Court thus held that expert opinion

4   as to the ethical character of the defendant's action simply

5   was not relevant.

6           Here, by contrast, testimony on the standard of care

7   is not ethics testimony.  Moreover, the testimony will assist

8   the trier of fact in understanding the evidence and determining

9   the facts that are at issue.

10          Nor does Rule 403 warrant preclusion.  Under Rule 403

11  the Court may exclude relevant evidence if its probative value

12  is substantially outweighed by a danger of unfair prejudice,

13  confusing issues, misleading the jury, undo delay, wasting

14  time, or needlessly presenting cumulative evidence.  Testimony

15  on standard of care is highly probative, and the Court finds

16  little risk of any unfair prejudice, confusing the issue, or

17  misleading the jury.

18          Defendant argues that the expert testimony on the

19  standard of care will mislead the jury into thinking that it

20  may convict Dr. Paduch simply because it believes that he

21  deviated from the standard of care, and that it will lower the

22  required *mens rea*.  Not only does the Court disagree, but it

23  will instruct the jury of the statutory elements, of course, of

24  the charged offenses, and the government must prove the

25  defendant's violation of 2422 beyond a reasonable doubt.  It is

O4H4PADC

1    well established that juries are presumed to follow their

2    instructions.

3         So that's my ruling on the first issue.  If the

4    defendant wants to propose a limiting instruction, I'm happy to

5    consider.  Just let me know, and get it to me in advance.

6         MR. BALDASSARE:  Yes, Judge.

7         THE COURT:  Thanks.

8         The defendant next moves to preclude the government

9    and witnesses from using the word "victim."  Insisting that the

10   Court should instead require the use of the term "former

11   patient" or a pseudonym.

12        At the outset, let me say that for purposes of this

13   conference I'm going to refer to these former patients as

14   "victims."  In part because they are characterized that way in

15   the indictment and just for ease, so let me just say that.

16        Now, first, defendant argues that barring the use of

17   the word "victim" will protect his entitlement to the

18   presumption of innocence, ensuring that the burden of proving

19   him guilty beyond a reasonable doubt remains with the

20   government.

21        Second, he contends that the limitation will ensure

22   that neither the government nor its witnesses appears to vouch

23   for a witnesses' credibility.

24        Third, he maintains that Rule 403 prohibits

25   characterizing witnesses as victims.

O4H4PADC

1          The government represents that it has no intention of

2     using the word "victim" in its questioning of witnesses.  It

3     also indicates that it does not intend to elicit from any fact

4     witness, testimony that would include the term "victim."

5     Although, it notes it expects one expert witness, Dr. Rocchio,

6     to refer generally to victims of sexual abuse.  Defendant

7     accepts these representations.

8          The government further represents it has no reason to

9     believe that any victim witness will refer to himself other

10    than as "I" or "me."  However, it maintains the right to use

11    the term "victim" in its addresses to the jury.  In addition,

12    it argues that there is no basis to restrict the words

13    witnesses may use in their own testimony.

14          Is there anything the parties wants to add on this

15    issue before I rule?

16          MR. XIANG:  No, your Honor.

17          MR. BALDASSARE:  Judge, of course, the Court

18    articulated our acceptance.  I think the only thing we reserved

19    on was to object, if necessary, during opening or closing if

20    the use of the word "victim," if we found it objectionable.

21    But, other than that, nothing to add, Judge.

22          THE COURT:  To be clear, I'm going to allow the

23    government to use that terminology in their opening and closing

24    statements, and I'll state my reasoning.

25          Courts in this district routinely permit the use of

O4H4PADC

1    the term "victim" including in jury charges and opening and

2    closing statements.  To be clear, with respect to the jury

3    charge, we can talk about that at a later date.  For purposes

4    of the trial, I'm going to allow the government to use the word

5    in opening and closing statements, just like the judges in

6    *Hadden, Maxwell,* and *Dupigny* did, as well as the *Helbrans* case.

7            As the Court in *Dupigny* stated, precluding the use of

8    the term "victim" is both unnecessarily and impractical,

9    consistent with the government's representations and

10   expectation, the Court will thus allow to use the term "victim"

11   in its addresses to the jury, will not restrict the words of

12   witnesses, including Dr. Rocchio may use.  Consistent with Rule

13   403, the Court finds that the use of the term "victim" in these

14   contexts would not be substantially more prejudicial than

15   probative.

16           To be sure, the Court will, of course, instruct the

17   jury the defendant is presumed innocent, and that it is the

18   government's burden and the government's burden alone to prove

19   guilt beyond a reasonable doubt.

20           If there is a particular limiting instruction, again,

21   you want to give on this, let me know.  Frankly, on this one it

22   might be calling too much attention to it to give a limiting

23   instruction.  That being said, if you want me to consider one,

24   please, get it to me in advance so we can talk about it.

25           I now want to address the related issue of the use of

O4H4PADC

pseudonyms at trial.  Of those patient victims -- although it
appears that the parties agree to permitting the victims to
testify under pseudonyms, the Court, just for the record, rules
that victims may do so, that it's appropriate.  It's well
established that permitting witnesses to testify anonymously
does not violate a defendant's sixth amendment rights, see the
*Kidd* case.

As explained by the Court in *Maxwell*, it's quite
common for alleged victims in both cases that have garnered
media attention, and those involving allegations of sex abuse,
to testify or be referred to by a pseudonym or first names.
Courts have allowed this whether or not the alleged victims
were minors or adults or adults testifying about abuse that
occurred when they were minors.  See *Maxwell*, *Raniere*, and also
the *Bannister* case.

Indeed, the Court has a duty to protect a crime
victim's right to be treated with fairness and with respect for
the victim's dignity and privacy.  Moreover, permitting the
victims to testify under a pseudonym furthers the aims of
preventing undue embarrassment, harassment from the press and
third parties, and the deterrence of other alleged victims of
sex crimes from coming forward.  That's my ruling.

I do want to ask a couple of questions though and then
talk about how we are going to refer to them, just for
consistency.  And let me start with *voir dire*.  So does either

O4H4PADC

1     party object to giving the prospective jurors the names, the

2     real names of the victims on a sheet of paper but not reading

3     them out loud?

4             MR. XIANG:  We don't object.  In fact, that would be

5     the government's proposal.  We've conferred with our colleagues

6     who addressed the logistics of that in other related, similar

7     trials.  And I think our proposal would be either we could

8     print out or the Court could print out that list of names that

9     would include the real names of all the victims, the patients,

10    and it be printed out maybe on colored sheets of paper, such

11    that they could be districted to prospective jurors who could

12    look at them, and then because they are on distinctive sheets

13    of paper, they could be re-collected by court staff afterwards

14    so it doesn't leave the jury room.

15            THE COURT:  Any objection?

16            MR. BALDASSARE:  No, Judge, that's fine.

17            THE COURT:  So that's what we will do for purposes of

18    *voir dire*.

19            But for consistency purposes, I also want to talk

20    about how we are going to refer to those people so that, for

21    example, during your jury addresses if you are referring to

22    Victim Number One or Patient Number One, how the jury is going

23    to know who you are referring to.

24            MR. XIANG:  Our intent, your Honor, is not to use the

25    kind of numbering system that thus far has appeared in the

O4H4PADC

1    briefs.

2              THE COURT:  Yes, or the indictment.

3              MR. XIANG:  Or the indictment.  And obviously to the

4    extent umbers those numbers need to be married up with the

5    pseudonyms for the jury's purposes, we are happy to provide a

6    table, and that is uncontroversial.

7              However, our expectation is to use, whenever we are

8    speaking, whenever anyone is speaking, including the witness

9    themselves, to use the pseudonyms.  And basically for each --

10   as to each victim witness, there are a series of questions in

11   direct examination where we would be showing them a photograph

12   of their driver's license or passport with their real name,

13   with their real date of birth.  Nobody would be reading it

14   aloud.  But that would be shown to the jury; it would be shown

15   to counsel; it would be shown to your Honor.  The victim would

16   basically confirm in the course of their testimony, yes, what's

17   on that document is my real legal name.  That's my real legal

18   date of birth.  So to the extent other documents, for example,

19   medical records showing that victim's real legal name come up,

20   that the jury can make the connection that even though the

21   person who is testifying under a certain pseudonym that it's

22   this person.

23              In terms of jury addresses and making sure that the

24   jury is going to be able to match up names with faces, it's our

25   expectation that in the course of each juror's testimony they

O4H4PADC

1    will put into evidence just a headshot of themselves that looks

2    like them.  In our closing slide we essentially would say, hey,

3    remember such and such a victim, again, using their pseudonym.

4    We will throw up in the closing slide their headshot to remind

5    the jury this is who that is.  So I think this is a procedure

6    where basically no one needs to say out loud the real names of

7    any victims that are using pseudonyms.  But the jury, the

8    defendant, counsel, your Honor, would know the real names of

9    each of the victims as they are testifying.

10            THE COURT:  Are you OK with that practice?

11            MR. BALDASSARE:  Yeah, that sounds fine, Judge.  The

12    only thing I want to just think about is how the closings might

13    play out based on the evidence.  But as far as when we are

14    referring to people, if an alias for someone whose real name is

15    "Smith" and the alias is "Jones," I'm only going to say

16    "Jones."

17            THE COURT:  Right.

18            MR. BALDASSARE:  And the rest of what the government

19    laid out is fine, Judge, as far as identifying and with

20    licenses and things like that.

21            THE COURT:  So I want to talk about the request to

22    seal various documents later and address that issue.  Because,

23    again, I do want there to be coordination.  So I'll get to

24    that.  OK.  Thank you.

25            Defendant next moves to preclude the use of the word

O4H4PADC

1    "masturbate."  He argues that the term is not relevant,

2    reasoning that the government seeks to convict him for alleged

3    activity that is not, by definition, masturbation.  He

4    maintains that manipulating another person's genitals for one's

5    own sexual gratification is not, by any definition,

6    masturbation.

7            The defendant further argues that Rule 403 bars the

8    use of the term "masturbation."

9            The government responds that the alleged physical and

10   manipulation conduct meets the definition of third-degree

11   sexual abuse under New York law, the underlying offense here.

12   It also asserts that the conduct is properly characterized as

13   masturbation and use of this term is not excludable under Rule

14   403.

15           Is there anything the parties want to add to this

16   argument before I rule?

17           MR. XIANG:  No, your Honor.

18           MR. BALDASSARE:  Judge, the only thing I would add is

19   given our arguments, and I know you've read every word -- just,

20   we think it's a problem to give them a shorthand word when will

21   there is a definition of what the conduct is and what they have

22   to prove.  So to give them this shorthand word, particularly,

23   since we still think they are misusing it, we are just

24   concerned that the shorthand word is going to get lost or it's

25   going to cause the actual element of the type of conduct to get

O4H4PADC

1    lost.  That's all I would add.

2            THE COURT:  I think the government indicated in its

3    brief that it will ask each witness what that term means, is

4    that right?

5            MR. XIANG:  That's correct, your Honor.

6            THE COURT:  Why doesn't that address your concerns?

7    So it's not the government feeding the term, but it's the

8    witnesses using the term, and the government asking what do you

9    mean by that term?

10           MR. BALDASSARE:  I think, Judge, as long as when we

11   get to the charge conference I will do my best to convince the

12   Court to fashion some sort of an instruction that, I don't want

13   to say undoes the witness testimony, but that protects him.

14   Because we could have 14 different definitions of the word

15   "masturbate."  And if all 14 of those definitions are going to

16   be applied to the same element of the offense, but I would

17   imagine at this point we could just -- I can deal with that at

18   the charge conference.

19           THE COURT:  OK.  Look, if there is a limiting

20   instruction you want me to consider, I'll consider it.  But my

21   inclination is to say it's best to let each of the witnesses

22   define what they mean by it, so that testimony is out there.

23   But I'm happy to address this further at the charge conference.

24           MR. BALDASSARE:  Yes, Judge, thank you.

25           THE COURT:  I do though feel obligated to read my

O4H4PADC

1    reasoning for the record.

2            I find that manipulating another person's genitals for

3    one's own sexual gratification is properly charactered as

4    masturbation.  Merriam-Webster defines masturbation as erotic

5    stimulation, especially of one's own genital organs commonly

6    resulting in orgasm and achieved by manual or other bodily

7    contact.  Exclusive of sexual intercourse by instrumental

8    manipulation, occasionally by sexual fantasies or by various

9    combinations of these agencies, that masturbation involves

10   erotic stimulation "especially of one's own genital organs"

11   indicates that it involves erotic stimulation of more than

12   one's own genital organs.  Again, I'm looking at the

13   Merriam-Webster definition, last visited today.

14           Dictionary.com defines masturbation in part as the

15   stimulation by manual or the means exclusive of sexual

16   intercourse of another's genitals, especially to orgasm.

17           The Oxford English dictionary defines masturbation as

18   to stimulate the genitals of a person, especially manually, for

19   sexual pleasure.  In turn, it defines masturbation in part as

20   the action or practice of masturbating oneself or less commonly

21   another person.

22           Manipulating another person's genitals for one's own

23   sexual gratification false squarely within these definitions.

24   In addition, the government is alleging that when he

25   masturbated for the patients for his own sexual gratification,

O4H4PADC

1    the defendant necessarily sought to arouse his victims.

2              The Defendant cites a Ninth Circuit case, the *Banks*

3    case in support of his interpretation of the term.

4              It's true that the Idaho district court in *Banks*

5    rejected the government's assertion that masturbation may be

6    found if the act were done solely for the purpose of exciting

7    the person performing the act and concluded that the act must

8    be for the purpose of exciting the person being masturbated.

9    That said, the question of whether the definition of

10   masturbation can include an action done solely for the purpose

11   of exciting the person performing the act was not squarely

12   before the Court.  Moreover, the Oxford English Dictionary

13   definition of mutual masturbation and the Webster definition of

14   masturbation, cited by the Ninth Circuit are consistent with

15   defining masturbation as manipulating another person's genitals

16   for one's own sexual gratification.

17             In addition, the district court in *Banks* concluded

18   that masturbation need not contemplate pleasuring the person

19   being masturbated when that person is a child.

20             In any event, the defendant in that case was not tried

21   on 2422 counts and that case is not binding on this court.

22             Moreover, testimony using the term "masturbation" is

23   relevant here.  It describes what allegedly occurred in this

24   case.  Indeed, it is sexual activity under 18 U.S.C. 2422 and

25   it is covered by the alleged underlying violation of New York

O4H4PADC

1    Penal Law 130.55, which makes it a crime to subject another

2    person to sexual contact without the latter's consent.

3            Sexual contact, in turn, is defined under New York

4    Penal Law 130, Subsection 3 as any touching of the sexual or

5    other intimate parts of a person for the purpose of gratifying

6    sexual desire of either party.

7            Finally, the Court does not find any basis to prohibit

8    the use of the term "masturbation" under Rule 403, as the

9    government observes other words that could be used to describe

10   masturbation would be more time-consuming, and this Court does

11   not find substantial risk that the jury would be confused or

12   misled in that they would be led to believe that they can

13   convict the defendant for masturbation.

14           The Court will instruct the jury on legal elements

15   necessary for conviction and "masturbation" is a common term.

16   The Court does not find any substantial risk of unfair

17   prejudice.  Accordingly, the term "masturbation" can be used.

18           All right.  Next, defendant moves to preclude the use

19   of the term "child molestation."  The government agrees not to

20   use the term; is that right?

21           MR. XIANG:  That's right.

22           THE COURT:  And the Court does not intend to use the

23   term during *voir dire* or trial.  I may use it today because

24   it's in some of the case law, but I think this motion is moot.

25           Do we all agree on that?

O4H4PADC

1              MR. XIANG:  Yes, your Honor.

2              MR. BALDASSARE:  Yes, Judge.

3              THE COURT:  All right.  Defendant next moves to

4     prevent the jury from being provided with the indictment.  The

5     government has agreed to craft an indictment that only contains

6     the charging language of the remaining counts of the

7     indictment.

8              And just to be clear, Mr. Baldassare, do you object to

9     anything -- any aspect of the indictment, or do you just want

10    the overview at the beginning redacted or just taken out?

11             MR. BALDASSARE:  It's hard to say, Judge.  I will

12    certainly try to resolve with the government.  Just as I was

13    thinking about it though, the jury is going to have the jury

14    instructions.  There is only one charge in this case.  They are

15    going to have that.  They are going to have some form of a

16    verdict sheet.  So I'm just not sure what an indictment adds to

17    it, other than it is a document that the Court gives to them

18    right before deliberations.  I just think that the verdict

19    sheet, as provided by the government, with our two objections

20    to it, and jury instruction which lays forth -- and

21    respectfully, this isn't a RICO charge.

22             THE COURT:  Right.

23             MR. BALDASSARE:  There is not a conspiracy.  We have

24    one defendant, it's the same count over and over again.  I

25    think that by the time we cut it or redact it or whatever it

O4H4PADC

1  looks like, it's just unnecessary, and I don't think the jury

2  needs yet another articulation of the government's theory of

3  the case.

4          THE COURT:  I'll tell you I'm inclined to agree with

5  you.

6          Does the government want to be heard on this?

7          MR. XIANG:  We don't feel strongly, your Honor.

8          THE COURT:  I'm granting the defendant's motion.  I

9  have a lot of discretion in this area.  Since it sounds like

10 there isn't much disagreement, I'm not going to read my ruling.

11 We will just move on.

12         With regard to defendant's motion to preclude the

13 government from introducing evidence under Rule 413, the

14 government will address this motion alongside the government's

15 motions to admit evidence of defendant's other sexual abuse and

16 abuse, crimes, wrongs, and Acts Under Rules 413, 414, 404(b)

17 and (2) to admit testimony of defendant's former coworkers

18 under Rules 413 404(B)

19         So the government moves to admit evidence of the

20 defendant's other alleged sexual assault and abuse, crimes

21 wrongs and acts under Federal Rules of Evidence 413, 414, and

22 404(b) in addition to the seven victims specified in the

23 indictment.

24         For its case in chief, the government seeks to admit

25 the testimony of ten additional victims of alleged sexual

O4H4PADC

abuse.  It also notes that beyond its case in chief it may seek
to call seven additional witness.  In support of its motion the
government argues that evidence of defendant's sexual assaults
non-statutory victims is plainly admissible under Rule 413.
And with respect to victims 10, 20, and 25, also admissible
under Rule 414.

It further maintains that the evidence is also
admissible under Rule 404(b) arguing that the evidence is
highly probative of defendant's guilt and relevant to his
propensity, character of motive, opportunity, intent,
preparation, plan, knowledge, identity, absence of mistake or
lack of accident.

The government further moves to admit the testimony of
two of defendant's former coworkers at a medical institution
located on Long Island.  The first coworker, an ultrasound
technician is expected to testify about an instance where she
says she saw defendant manually masturbate a patient.  During
this incident the defendant allegedly told the coworker that he
was masturbating the patient in order to induce an erection.

The second coworker is a human resources professional
who was tasked with investigating the event described.  She is
expected to testify that defendant denied that he had
masturbated the patient or that he used the phrase "whack off"
with that patient.  The government seeks to admit the testimony
of the first coworker under Rules 413 and 404(b) and the

O4H4PADC

1    testimony of the second coworker under Rule 404(b).

2         Defendant meanwhile moves to preclude the government's

3    introduction of this evidence under Rule 413.  He argues that

4    Rules 413 and 414 are not satisfied because defendant is not

5    accused of a sexual assault or child molestation as required by

6    Rules 413(a) and 414(a).  Relatedly, he contends that the

7    testimony of the first worker is inadmissible because she did

8    not, in fact, observe a sexual assault.

9         In addition, he argues the evidence should be excluded

10   under Rule 403 contending that the low probative value of the

11   evidence is substantially outweighed by the dangers against

12   which Rule 403 is intended to protect, namely unfair prejudice,

13   confusing the issues, misleading the jury, undo delay, wasting

14   time or needlessly presenting cumulative evidence.

15        Does anyone want to be heard further on this issue?

16        MR. XIANG:  Just very briefly, your Honor.  I won't

17   rehash any of the points that are in the briefs.

18        This is a point that has emerged given the defense

19   recently noticed a false memory expert.  The government

20   received that notice on Monday.  We are reviewing it carefully.

21   But it's clear from that expert notice that the defense will

22   seek to elicit from that expert that one or more of the victim

23   witnesses have false memories, had the memories implanted

24   because of media reports or therapy or conversations with

25   others.  And from the government's perspective that only

O4H4PADC

1    underscores the reasons having non-statutory victims in this

2    case is appropriate under both Rule 413 and Rule 404(b).

3         THE COURT:  Are you concerned about the cumulative

4    nature?  At what point is enough snuff?  I hear your point.

5         MR. XIANG:  We understand that, your Honor.  Let me

6    give your Honor a couple examples of why we think it's

7    appropriate.  Because even though there are seven statutory

8    victims, and even though this is a case that, in the

9    government's view, involves certain patterns of behavior by the

10   defendant, it's not the case that those patterns are exhibited

11   as to all seven of the statutory victims.  There are certain

12   patterns that may be in one or two statutory victims but are

13   also in certain non-statutory victims.  To give the Court a

14   couple examples of this:  Only a few of the statutory victims

15   recall instances in which the defendant inserted his finger

16   into their rectums, and from their perspective or by his

17   telling massaged their prostates in the course of the sometimes

18   also masturbating, meaning touching their penises.

19        Without the non-statutory victims, again, there may be

20   one or two kind of statutory victims that tell that story, that

21   have that memory.  And given what appears to be the defense's

22   theme, there could be arguments that, well, he was doing a

23   routine rectal examine.  They are mistaken about the fact that

24   he was masturbating them at the same time, *et cetera*.  I think

25   that's the sort of pattern that would be susceptible to attack

O4H4PADC

1    were the government precluded entirely from calling any

2    non-statutory victims.

3         THE COURT:  I'll just cut to the chase as to what I

4    was inclined to do, although I'm happy to hear you out as well.

5    I'll tell you what I was inclined to do and see if it changes

6    my inclination, was to allow the testimony of three

7    non-statutory victims along with the two coworkers.  And I can

8    explain why I came to that conclusion.  Do you feel that would

9    address your concerns?

10         MR. XIANG:  Respectfully, your Honor, we do not.  And

11    the sort of kind of highly probative sub patterns, if you will.

12    We just can't get them all out with three.  We tried very hard,

13    as we said in our papers, to make sure we are calling no

14    extraneous witnesses in the case, and it was a very tough call

15    to kind of cut down even to the ten that we've identified for

16    your Honor.  But the other practice is, again, that without

17    non-statutory victims might not be able to come out in a

18    fulsome way to include the defendant's practice of sometimes

19    not wearing gloves while he was examining and masturbating

20    patients.  The defendant's practice to continue to masturbate

21    patients who had potential fertility issues even though they

22    already had their semen and material kind of preserved.

23         These are somewhat specific patterns but again without

24    non-statutory victims, the government's not going to be able to

25    elicit in the full way.

O4H4PADC

1          The defendant would sometimes tell victims, patients,

2    that he was doing this in service of what he called "erection

3    practice" or "masturbation practice."  Again, from the

4    government's perspective that is highly probative to what is

5    going on in the case.  But if we are confined to the statutory

6    victims, that may only come out with one or two victims.

7    Whereas, if we had non-statutory victims it becomes clear that

8    this is not -- to use the 404(b) language -- a mistake or

9    accident or anything else but this is part of deliberate

10   pattern.

11         We hear where the Court is coming from and we

12   understand the idea of ten non-statutory victims seems like too

13   much.  I think if the Court's inclination is to ask us to cut

14   down at least somewhat that number, we would ask for a minimum

15   of at least five non-statutory victims to have some ability to

16   bring out these highly probative patterns of behavior that go

17   directly to the core issue in this case, which is what the

18   defendant's intent was the time he engaged in these practices.

19         And as the Court knows the distinction between

20   statutory and non-statutory victims is not the government's

21   degree of confidence in their memories, it's not the

22   egregiousness  of the conduct, it's simply whether the kind of

23   technical federal jurisdictional elements could be met.  There

24   are kind of certain non-statutory victims who were abused for

25   as long as and in ways that is are very similar to the

O4H4PADC

1    statutory victims.  The only reason they are not charged is

2    they didn't cross state lines or they weren't or we can't prove

3    that they were specifically a minor at the time of abuse, or we

4    learned about them and interviewed them after the deadline that

5    your Honor had set for superseding victims for this particular

6    trial.

7              And so I think there's a suggestion in the defense

8    papers that, well, the government doesn't believe it's

9    statutory victims it's trying to make this case now about

10    non-statutory victims, that's not what this is about.  It's

11    really a case where the defendant did certain things

12    repeatedly, but he didn't do those things as to literally

13    everyone.  He may have done them only to a subset of those

14    patients.  If we are constrained solely to statutory victims

15    plus three, the government really may be hamstrung in its

16    ability to make that clear to the jury.

17              THE COURT:  Do you want to respond?

18              MR. BALDASSARE:  Yes, Judge.

19              First off, we could live with three, but I do want to

20    put this on the record.  What I'm hearing today is if we can't

21    have more than what we charged in our third charging document,

22    we might lose.  Well, respectfully, you took the words right

23    out of my mouth, number one, how much is enough?  Number two

24    they pick their victims.  They picked their alleged victims.

25    If they are worried about it, charge them and prove it.

O4H4PADC

1    Because what I heard today is, well, maybe we couldn't prove
2    that they were minors, well, OK, I get it.  And I understand
3    that 413 and 414 allow for some level of propensity evidence.
4    But the problem is what I heard over and over and over again in
5    the last five minutes was, Judge, we may not be able to prove
6    our case without them.  Respectfully, Judge, at some point they
7    have to prove the case.  And one of the themes I'm going to
8    have on a couple points today is at some point let's try
9    Dr. Paduch for what is in their third charging document.  If
10   they think they can't prove subject matter jurisdiction in this
11   case I completely disagree with that.  I'm not stipulating to
12   anything, but I thought I heard that that people didn't cross
13   state lines or things like that.
14        THE COURT:  I don't think he was saying that as to the
15   statutory victims that were mentioned in the indictment.  I
16   think he was saying the only reason that we didn't charge
17   Mr. Paduch with sexually assaulting these other people is
18   because there was no interstate nexus.
19        Is that fair to say?
20        MR. XIANG:  That's correct.
21        MR. BALDASSARE:  OK.  I understand that.  And some of
22   them, the government said they found out about them too late,
23   well that's not on us.  If the government can't prove this case
24   with from seven plus three, ten, that's the government's
25   problem.  But at some point it's just piling on, and there has

O4H4PADC

1    to be a limit.

2              Judge, I'm just addressing the -- because there was --

3    I just want to make sure I break this out.  So there is, what I

4    would say, are the 413, 414.  And then there is the Medical

5    Institution Number Two in the Eastern District.  So I don't

6    know if the Court wants me to address those now.  Because I

7    thought that you mentioned those as part of this.

8              THE COURT:  So I was going to address together, but,

9    actually, I'll tell you I am going to want a little more

10   specificity, maybe in writing, on why you need five.

11   Specifically, what the facts are that you need this

12   corroboration of or propensity evidence, which is what 413 and

13   414 allow, and why five is not cumulative.  But, you know

14   obviously the law is helpful, but what I really want is the

15   factual -- in addition to what you said today, which was

16   helpful.

17             MR. XIANG:  We are happy to put in a filing on the

18   schedule.

19             MR. BALDASSARE:  And, Judge, whatever they file, we

20   would just quickly, if we think it's necessary, to put some of

21   the alleged need in context, we might just quickly file

22   something for that.

23             THE COURT:  That's fine.

24             So when can the government get me a follow-up letter?

25   It doesn't need to be lengthy.  Again, I really am familiar

O4H4PADC

1    with the law, but I do want a short letter.

2              MR. XIANG:  If we could have until noon tomorrow, your

3    Honor.

4              THE COURT:  That's fine.  And when can you respond?

5              MR. BALDASSARE:  Either by the evening or the next

6    morning, if the Court is feeing generous.

7              THE COURT:  The next evening is fine -- the next

8    morning is more time, not the next evening.  So the next

9    morning is fine, so that's fine.

10             I think what I will do then is I'm not going to read

11   this ruling now.  I'm going to wait and see, and then I'll

12   rule.

13             Is there anything that you all want to say, in

14   addition to your letters, to address the two other coworkers?

15   Is there anything else you want to say with respect to those

16   coworkers that's not in your brief?

17             MS. QIAN:  Your Honor, we can answer any questions,

18   but it seems like defense counsel --

19             MR. BALDASSARE:  Are these the ones from Medical

20   Institution Two in the Eastern District?

21             THE COURT:  Yes, it's the ultrasound technician and

22   then it's the second coworker who followed up and did the

23   investigation.

24             MR. BALDASSARE:  So, Judge, our concern with that, and

25   it's in the papers, and this again goes back to my theme of

O4H4PADC

1  let's try Dr. Paduch for what he is on trial, I think to open

2  up this case to a fulsome even more discussion of Medical

3  Institution Number Two, is just cumulative, it's unnecessary.

4  We don't know who this alleged patient was.  There are

5  people -- look, I never say to a Court or anybody, oh, I'm

6  going to add 500 witness.  But we subpoenaed 14 people from

7  Northwell.  And I'll call five of them cold if I have to.

8  Because one thing I do think, if we are going tell the

9  Northwell story, sorry, if we are going to tell the Medical

10  Institution Two story, I want to tell the whole story.  What I

11  don't want to have happen is we put up something who says, I

12  saw this and nothing else about what happened.  And then have

13  somebody say, he denied using language, and this and that.

14  Then we are going to tell the whole story of that

15  investigation.  We are going to talk to people who said things

16  during that investigation that are exculpatory, and we are

17  going to talk about how that investigation ended.  Because I

18  think to put in these two slivers is monumentally unfair.  I

19  don't think it's necessary.  I'll defend it if I have to, and

20  that's fine.  But I think it's a colossal detour in the law

21  school definition of that word, Judge.

22          THE COURT:  Does the government want to respond at

23  all?

24          MS. QIAN:  Yes, your Honor, just a couple points here.

25  As your Honor knows from the papers, the testimony we are

O4H4PADC

trying to elicit from these two coworkers is limited.  It's about what one person saw happen, and then it's about the defendant's statement as to whether or not it happened.  And then an additional sentence or two of what he said, if anything, regarding his use of crude language to describe masturbating to patients.  We are to not intending to tell the "story" at Institution Two, that's not our intent and that's not what will come out at trial.

We are also -- if the objection here is that an investigation was done, we don't have to use the word "investigation."  It can just be.

And did you subsequently have a conversation with the defendant or Dr. Paduch?

Yes.

What, if anything, did he say about this particular event?

Look, what we are seeking to elicit here and admit is very limited testimony about a particular event.  And, you know, as your Honor knows, I think there is a lot being said about what -- if we can't prove the evidence based on the seven -- prove out the charges based on the seven sexual assault victims then what are we doing here?  The fact of the matter is that the rules of evidence does not limit the government to just eliciting the bare minimum of information. The rules of evidence, under Rule 413 and 404(b), envisions

O4H4PADC

1  that the government would be permitted to elicit and introduce

2  other evidence outside of the charged offense.  And so of

3  course we are permitted to do so and in this particular

4  instance with respect to the two coworkers, we are intending to

5  do so in a very limited fashion.

6         THE COURT:  OK.  So I'm going to reserve ruling on

7  this issue.  I want to decide on the other victim together with

8  this.  Because as I said at the start, I am concerned about the

9  danger of cumulativeness.  And I just want to cite a few cases

10 for you that I reviewed on this.  One from the Eighth Circuit,

11 *United States v. Never Misses A Shot*, 78 F.3d 1017, 1028 n.6.

12 And *United States v. Perrault*, 995 F.3d 748, 769, which is the

13 Tenth Circuit.

14        And the *Never Misses A Shot* case says something to the

15 effect that at some point the witnesses inject cumulative

16 evidence with little additional probative value when viewed in

17 the aggregate.  That's the question, what is this additional

18 probative value?  Why is it necessary?

19        And a quote from *Perrault*, in other words, the

20 marginal return on each additional witnesses' testimony starts

21 to diminish from seven witnesses.  In that case he gave the

22 Tenth Circuit "pause."

23        In any event, there were a number of other cases I

24 looked at like the *Shaw* case out of the North District of

25 California.  I'm reading these sites just so you can get them

O4H4PADC

1    if the transcript is not ready right away.  2023 WL 3899012, at

2    *6.

3              The *Kindley* case from the Eastern District of

4    Arkansas, which is 17-CR-267.

5              *United States v. Carter* 410 F.3d 1017, 1021-22 from

6    the Eighth Circuit.

7              And also *United States v. Crow Eagle* 705 F.3d 325,

8    328.

9              In any event, we will move on from now.  But I will

10   get you that ruling as soon as I can.

11             MS. QIAN:  Your Honor, if I may?

12             THE COURT:  Yes.

13             MS. QIAN:  It sounds like your Honor is now going to

14   reconsider whether or not the two employees' testimony is

15   admissible under this general framework of the number of 413

16   victims.

17             THE COURT:  Yeah, not exactly.  But because I know the

18   analysis is different, and I recognize that.  But I do want to

19   look at it holistically, and let me just say that.

20             MS. QIAN:  I understand.  I just want to point out,

21   and if you have any questions I can certainly elaborate, but

22   the purpose or the probative value of the testimony from the

23   two employees is different than the non-statutory victims.  And

24   I think we laid that out in the papers.

25             THE COURT:  Yes, I'm aware of that, but thank you.

O4H4PADC

1          MS. QIAN:  Thank you.

2          THE COURT:  OK.  The government next moves for a

3   ruling permitting it to offer an iCloud note written by

4   defendant containing sexual language, URLs from pornography

5   websites visited by defendant, sexually explicit photographs

6   possessed by defendant including of himself, and a screenshot

7   of a text message containing sexual language.

8          Does either party want to be heard on this further, if

9   not --

10         MS. COLSON:  I will add, your Honor, if the Court is

11  inclined to limit the number of 413 victims down from five or

12  even three, the value of this corroborative documentary

13  evidence is all the more important, but the rest, I think, is

14  laid out in our papers.

15         THE COURT:  Thank you.

16         The government's motion is denied expect with respect

17  to what I will refer to as doctor-patient pornography.  I will

18  tell you what my reasoning is.

19         Under rule 404, evidence of any other crime, wrong, or

20  act is not admissible to prove a person's character in order to

21  show that on a particular occasion the person acted in

22  accordance with the character.  This evidence, however, may be

23  admissible for another purpose such as proving motive

24  opportunity, intent, preparation, plan, knowledge, identity,

25  absence of mistake, or lack of accident.  Extrinsic acts

O4H4PADC

1    evidence may be critical to the establishment of the truth as

2    to a disputed issue, especially when that issue involves the

3    actor's state of mind, and the only means of ascertaining that

4    mental state is by drawing inferences from conduct.  Moreover,

5    the Second Circuit evaluates Rule 404(b) evidence under an

6    inclusionary approach and allows evidence for any purpose other

7    than to show a defendant's criminal propensity.  When other

8    evidence is offered to show knowledge or intent in particular,

9    as opposed to other non-propensity purposes such as proof of

10   identity or corroboration of witnesses, such evidence must be

11   sufficiently similar to the conduct at issue to permit the jury

12   to draw a reasonable inference of knowledge or intent from the

13   other act.  Evidence of other acts need not be identical to the

14   charged conduct to show knowledge or intent pursuant to 404(b)

15   so long as the evidence is relevant in that it provides a

16   reasonable basis for inferring knowledge or intent.  If the

17   other act evidence does not provide a reasonable basis for

18   inferring knowledge or intent, it's offer for that purpose

19   should be rejected on grounds of relevance.

20          At the outset, to the extent the defendant argues that

21   the first amendment bars the use of this evidence, the Court

22   disagrees.  As explained by the Ninth Circuit in the *Curtin*

23   case, a defendant cannot use the first amendment or any other

24   constitutional principle to exclude relevant evidence from the

25   reach of 401 or 404(b) on the specific ground that the evidence

O4H4PADC

1    is reading material or literature otherwise within

2    constitutional protection in another setting.

3          The Court also denies the defendant's request for Rule

4    104 hearing, finding it to be unnecessary.

5          With that said I'm going to address each piece of

6    evidence in turn.  I will note that I looked at the evidence

7    myself.  I didn't just rely on the government's description of

8    it.

9          First, with respect to the iCloud note wherein the

10   defendant in part describes some of his sexual fantasies with

11   his then boyfriend, I understand now husband.  Although the

12   iCloud note mentions watching pornography with his partner and

13   masturbating together and stimulating his partner's prostate in

14   some ways does mirror the alleged assaults.  In the note he

15   also describes how flight was, his romantic feelings towards

16   his then boyfriend and the desire to set up two friends on a

17   date.

18         In my view, on balance it's of limited probative value

19   in any event to the extent it would be admissible under 402 or

20   404(b).  Any probative value is substantially outweighed by

21   danger of unfair prejudice.  The Court thus excludes the note

22   pursuant to Rule 403.

23         With respect to the URLs that contain pornography, the

24   videos or photographs were not available themselves but their

25   titles were:

O4H4PADC

1          Exhibit B: "Abusing My Straight Friend," and "Straight

2     Guy Caught by Friend while Cumming and Keeps Going,"

3          Exhibit C: "Busted Wanking by Mum,"

4          Exhibit D: "Busted.  Caught twice while I JO" and

5     "Caught a Boy Jerking in the Classroom,"

6          Exhibit E: "Caught Jacking Off My Flatmate Comes in

7     the Room. I don't care,"

8          Exhibit F: "Caught roommate: Don't Stare At me,"

9          Exhibit G: "Cute Straight 19-year-old Jerks and Cums

10     in Front of His Friends" and "Jerking In Front of Friends,"

11          Exhibit H: "Gay Guys Fucked In Sleep - Gay Creeps

12     Video 21,"

13          Exhibit I: "Russian Boys Fuck,"

14          Exhibit J: "WTF, Straight Best Buddy Cum on Car

15     Window,"

16          Exhibit K: "Young Straight Meet Gay in Toilet for Sex

17     Craigslist Hook Up,"

18          Exhibit W: "boys beyond bars Dr Svc Prisoner."

19          Doctor is "DR" and service is "SVC."

20          I didn't read the exhibit numbers, but I'm going to

21     ask the court reporter to put them in.

22          These are limited probative value.  The government

23     asserts they are relevant because they reflect the defendant's

24     fantasies and that these fantasies are mirrored in his alleged

25     conduct towards victims.  But the URLs are not sufficiently

O4H4PADC

similar to the conduct at issue so as to permit the jury to
draw a reasonable inference of knowledge, motive or intent.
The most probative of the URLs, in my view, is "Boys Behind
Bars, Doctor Service Prisoner" given its references to a
doctor.  But this URL referencing a prison setting is, in my
view, insufficiently similar to the conduct at issue.

It's true that the Second Circuit has upheld the
district court's admission of child pornography where the
defendant is charged with crimes pertaining to engagement in
illegal sexual activity with a minor.  Holding the similarity
or some connection requirement is satisfied because of a direct
connection exists between child pornography and pedophilia.

That said, although some of the URLs include a
reference to boys in their title, such a references is
insufficient to establish the videos could contain child
pornography or imitations of child pornography.  See the *Harvey*
case.

*United States v. Harvey* 991 F.2d 981, 985 (2d Cir.
1993)

In other words, I'm not persuaded that the use of the
word "boys" in this context necessarily refers to minors as
opposed to young men.

To the extent the URLs are relevant, their probative
value is substantially outweighed by unfair prejudice.  The
Court thus denies the government's motion to admit the URLs

O4H4PADC

1    pursuant to Rule 403.

2            The government also moves to admit several sexual

3    photographs from defendant's iCloud account of adolescents and

4    young adults.  First, the government seeks to admit photographs

5    of adolescents or young adult men masturbating.  To be clear,

6    my understanding is that the government cannot definitively

7    state that these individuals were under age.

8            Is that accurate?

9            MS. COLSON:  That's correct, your Honor.

10           THE COURT:  OK.  The Court reviewed each image.

11   Although the government asserts that there is a possibility

12   that the individuals depicted are under the age of 18, as just

13   noted, it's represented it can't definitively determine whether

14   these photographs contain child sexual abuse materials,  and it

15   does not intend to argue at trial that they in fact depict

16   children or constitute child sexual abuse materials, nor are

17   the photographs imitations of child pornography.

18           Accordingly, the Court find the probative value of the

19   photographs to be limited, which in any event is substantially

20   outweighed by a danger of unfair prejudice.  So I'm denying the

21   government's motion with respect to Rule 403.

22           Second, the government moves to admit two sexually

23   explicit photographs that appear to reflect someone dressed as

24   a doctor together with his purported patients.  One photograph

25   appears to depict a video screenshot of a man in a white

O4H4PADC

1    doctor's lab coat examining the rectum of a nude male bent over

2    at the waist with several naked adolescents or young men

3    standing in line behind him.  Another photograph is of a nude

4    male standing behind a privacy curtain in what looks like a

5    doctor's examination room.  The government contends that the

6    defendant's motive and intent are at issue, and that these

7    photographs would be highly probative of such.

8            Just to be clear, it is this what appears to be

9    pornography as opposed to a photo that you have any reason to

10   believe the defendant took himself?

11           MS. COLSON:  The first, your Honor, of the doctor

12   examining a young man bent over appears to be pornography and

13   may in fact may be a still from the "Doctor Servicing Boys

14   behind bars."  It's not clear.  They were presented to us

15   together.

16           The second appears to be a patient caught unaware.  I

17   do not know whether that is a patient of the defendant, a

18   picture that was sent to him, a picture visited from a porn

19   site, but it is clearly a patient, I would say.

20           THE COURT:  Do you want to be heard?

21           MR. BALDASSARE:  Yes, just briefly.

22           First of all, there is no evidence that any of the

23   patients is in any of these photographs, number one.

24           Number two, there is no evidence that my client took

25   either of the photographs.

O4H4PADC

1          Number three, this is no evidence that my client sent

2     any of these pictures, as far as I know.  I don't think there

3     is any evidence of that, nor is there any evidence that he

4     showed them to anyone, as far as I know.

5          Now what I would also say is these pictures are gay

6     porn, period, end of story.  The picture of the doctor with the

7     men lined up is clearly a staged photograph.  The picture of

8     the individual behind the privacy screen, I just respectfully

9     submit that cannot be interpreted or viewed as any

10     surreptitiously taken photograph.  I think these are staged

11     pictures of gay pornography.  And as I've seen in the 3500

12     material so far, I've not seen anything about these pics other

13     than that they found him, I believe both on his phone.

14          And also, Judge, we conducted a reverse image search.

15     It took us about four seconds to find the nude male behind the

16     privacy screen on about five Tumbler accounts.  Most of them, I

17     think, are not live.  Now, that doesn't mean it's the end all

18     be all, it's still an image.  That one appears to be a still

19     from a video that I think we couldn't access, and we were also

20     being very careful while we were doing this.  But those

21     pictures are just out there on the internet.  That's our view

22     of them, and I have not seen anything in the 3500.

23          THE COURT:  My ruling is the same assuming everything

24     you said is entirely accurate.  I view these photos as

25     different in kind and more probative of intent than the other

O4H4PADC

pornography photos that you might also or I think did in your

papers describe as gay porn.  And I'll read my ruling as to

why.

          Unlike the URL, for example, or the other photographs,

the other still shots, the Court find these photos to be highly

probative of the defendant's intent and motive.  The Second

Circuit has long acknowledged that prior act evidence is

generally admissible to prove that the defendant acted with a

state of mind necessary to commit the offense charged.  These

photographs are probative of the defendant's state of mind.

          Moreover, the government required to establish only a

similarity or some connection that a prior act is relevant to

one of the elements of the crime charged.  The photographs are

substantially similar to the conduct at issue and a similarity

between the other act and a charged offense will make the other

ability highly probative as to the defendant's intent of the

charged offense.

          For example, in the *United States v. Brand*, 467 F.3d

179, 197 (2d Cir. 2006) the defendant was charged with

traveling across state lines for the purpose of engaging in

illegal sexual with a minor and attempting to entice a minor to

engage in illegal sexual activity.  The Second Circuit upheld

the district court's admission of images of child pornography

that were in the defendant's possession, finding that the

images provided a glimpses into the defendant's sexual interest

O4H4PADC

in the children and as such were highly probative of whether he

wanted to have sex with the victim.  That's the *Brand* case.

        Indeed, with respect to adult pornography other courts

have recognized that the permissible use of pornography when it

is similar to the charged sexual offenses, like in the *Ingram*

case, in the Fourth Circuit found no abuse of discretion when

the district court permitted the government to produce evidence

of pornographic videos showing violence against women who are

sleeping, unconscious, or restrained where the defendant is

charged with murder, and the victim was murdered in the early

morning in her bed and the defendant's semen was discovered on

her bed sheets.  This is the *Torrez* case from the Fourth

Circuit.

        *United States v. Torrez*, 869 F.3d 291, 301 (4th Cir.

2017.)

        Similarly, the Sixth Circuit found no abuse of

discretion when a district court admitted search history and

websites permitting to rape-related pornography where the

defendant was charged with kidnapping the victim for the

purpose of sexually assaulting her.  Explaining that evidence

showing that the defendant had a sexual interest in rape

pornography is probative of the defendant's intent in

inveigling and holding the victim.

        *United States v. Ingram*, 846 F. App'x 374, 380(6th

Cir. 2021).

O4H4PADC

1       The defendant argues that adult pornography is legal

2   and fantasizing of committing a crime is not itself a crime.

3   While true, the Federal Rules of Evidence clearly contemplate

4   that evidence of uncharged conduct, even if perfectly legal,

5   may be relevant to proving a material fact in a criminal case.

6   And the simple fact that defendant possessed and retained the

7   photographs is relevant to his intent.  It's a quote from the

8   *Sumner* case.

9       *United States v. Sumner*, 522 F. App'x 806, 810-11

10  (11th Cir. 2013).

11      Indeed, in *Sumner* the 11th Circuit upheld the

12  admission of photographs whether the actual minors or adult

13  women who appeared to be minors because they were indicative of

14  the defendant's sexual interest.  Here, the doctor-patient

15  pornography is very similar in kind to the defendant's charged

16  offenses and probative of the defendant's intent and motive.

17  Accordingly, the Court find the photographs are admissible

18  pursuant to Rule 404(b).  And the probative value of the

19  photographs is not substantially outweighed by danger of unfair

20  prejudice, in my view.  The photographs are not worse or more

21  shocking than the charged conduct.  That's a quote from the

22  *Sheltra* case.

23      *United States v. Sheltra*, No. 21-2960-CR, 2032 WL

24  2618965, at *3.

25      The Court will instruct the jury that testimony

O4H4PADC

regarding the photographs may only be considered with regard to

defendant's intent and motive and that he is not on trial for

possession of pornography.  See the *Ruiz* case from the 11th

Circuit.

     *United States v. Ruiz*, 701 F. App'x 871, 875 (11th

Cir. 2017)

     If defense counsel would like to propose any limiting

instruction, the Court will consider it.

     I should note, I know we have been going for a while.

Does court reporter or anyone else need a break or can we keep

going?

     MS. QIAN:  The government is fine.

     THE COURT:  Just raise your hand if you feel like you

need a break.  I know this is a little bit tedious, as I said,

to listen to oral rulings, but it's important, nonetheless.

     The government also moves to admit sexually explicit

photographs that appear to be of the defendant himself.  And

they appear to be photographs that he himself took.  All are

sexually suggestive and a number clearly show, you know, the

defendant's penis or an erection beneath his pants.

     Do you have a sense -- this is a question for the

government -- if all of these photographs were taken at the

defendant's workplace, and were they taken close in time?  Do

you have metadata or anything that can say this was right after

this appointment with X patient?

O4H4PADC

1          MS. COLSON:  Your Honor, these were geo-tagged to

2   Weill Cornell.  So we have reason to believe they were taken at

3   work and they were during the charged period.  More specific

4   than that we don't have.

5          THE COURT:  OK.

6          MS. COLSON:  I just want to ask one question.  I think

7   your Honor moved past the URLs but left out one particularly

8   probative URL which was "Doctor Fucking Teen."  Did your

9   Honor --

10         THE COURT:  Yeah.

11         MS. COLSON:  I think to the extent --

12         THE COURT:  I did not, let me look back.  I don't

13  remember specifically that one.  I don't know that -- I didn't

14  know that.  I must have missed that one.  I have a list of the

15  other ones.  It wasn't in the exhibits, is what I'm hearing

16  from my clerks.  I know I didn't see it.

17         MS. COLSON:  Your Honor, I think it was mentioned in

18  our motions, and we are happy to provide it.

19         THE COURT:  I'm not ruling on that one because I

20  didn't see it other than you saying it today.

21         MS. COLSON:  Sure.

22         THE COURT:  And I assume again we are just talking

23  about the URL, the name itself.

24         MS. COLSON:  Correct, your Honor.  I think based on

25  the reasoning you just applied, the evidence which you are

O4H4PADC

1    admitting, it would apply with even stronger to force to this

2    URL.

3            I would also ask, your Honor, with respect to the

4    iCloud, I take your point that it's filled with other details.

5    We would, of course, be able to redact that.  I'd also note

6    that it's more than simply mutual masturbation or watching

7    porn.  The porn is sort of a sideshow.  It's really a play by

8    play, your Honor, of what the defendant did to these patients.

9    As nitty-gritty as get a Fleshlight vagina.  I'm going to walk

10   in on you.  I'm going to use a vibrator on you and myself.

11   Your Honor, it is incredibly probative, and we would argue that

12   the details that are extraneous, potentially more prejudicial

13   in the sense that they references a private relationship can be

14   extracted.  They don't need to be referenced to his then

15   boyfriend now husband.  The fact that he lays out his sexual

16   fantasies, and, of course, we have to prove that he was doing

17   certain conduct, not for medical care, but rather to gratify

18   his fantasies.  So we have no way but, sort of, victim

19   testimony but more, sort of, probative documentary evidence to

20   get a read on what those fantasies were.  It's a play by play

21   of specific conduct, a pattern of conduct, and it's not --

22           THE COURT:  The pattern of conduct with respect to --

23   I know I understand at least that his alleged conduct with

24   respect to each victim or patient was distinct.  But when you

25   say "playbook" I think it would be helpful for me if you can

O4H4PADC

1  maybe provide in that letter you are submitting.

2          MS. COLSON:  Sure.

3          THE COURT:  More information to me about what you

4  expect certain patients to testify to so that I can look at it

5  and ask the question, is this unusual in some way?  How similar

6  is this --

7          MS. COLSON:  We will, your Honor.

8          THE COURT:  -- or is this just sexual fantasy with a

9  loved one?

10          MS. COLSON:  I think the point I am making in addition

11  to offering to sort of sanitize it in a way that just lays out

12  the fantasy, whether they are to a loved one or anyone else,

13  the operative question is, what were the fantasies?  So we have

14  that in mind in knowing what he did to these particular patient

15  was in fact a reflection of satisfying those fantasies.

16          As I said we can redact the fact that it's to a loved

17  one.  We can pseudonymize that person, whatever it is.  Even if

18  it were written to a loved one, to a personal friend or someone

19  who is not a patient, it's still relevant in so as it outlines

20  what the fantasies were so that it's impossible to extrapolate

21  what he was doing was not medical care but rather an enactment

22  on those fantasies.

23          THE COURT:  I understand that.

24          Does it matter, from your perspective, if those

25  fantasies were unique or unusual or, sort of, how specific they

O4H4PADC

1    were --

2              MS. COLSON:  They are highly specific, your Honor.

3    And if we didn't get into the nitty-gritty enough, that is on

4    us, and we would appreciate the opportunity to include that in

5    our briefing.

6              THE COURT:  Yes.

7              MS. COLSON:  Perhaps with a proposed redaction of what

8    the, sort of, sanitized, so to speak, language of the iCloud

9    note might say.

10              THE COURT:  I will allow that.

11              Do you want to be heard in response?

12              MR. BALDASSARE:  Yes.

13              If the government wants to resist, I'm fine.

14              Number one, that note is getting very close to trying

15    him for being gay.  I'm going to try to say this in this forum

16    the best way possible.  Tell me how two gay men have sex that's

17    not listed in that note?  That's how gay men have sex, period,

18    end of story.  There is nothing weird about it, nothing odd

19    about it.  It's not I want to dress unlike a doctor, and I want

20    you to shave your body to look like an eight-year-old boy.  The

21    description in that note is how gay men have sex.  I'm not

22    going to reiterate here, but that's all it is.  I don't

23    remember a Fleshlight being mentioned in that note.  I could be

24    wrong, but that's how I remember it.  But that's how gay men

25    have sex.  And sanitizing the note makes it worse.  The note is

O4H4PADC

1   the note.  You correctly described that note.  The portion of

2   the note they want to keep out, I just find it amazing that

3   they think it's probative of anything with respect to the note.

4           Secondly, on the "Doctor Fucking Teen," I think that's

5   a dead link.  Again, 18, 19, 13, 14, 15, there is almost as

6   many teens that are legal as are illegal.  And I think your

7   ruling should apply equally to that.  Since it's a dead link,

8   we have no idea --

9           THE COURT:  All the URLs were dead links.  For the

10  URLs all of them were.  I separately saw the photos that I

11  described thus far, and will describe here.  But for the URLs,

12  my understanding is they were all dead links.

13          MR. BALDASSARE:  I thought "Doctor Fucking Teen" was

14  also a URL.  I could be wrong about that.

15          THE COURT:  I didn't see that so I want to see what we

16  are talking about.

17          MR. BALDASSARE:  Lastly, Judge, with respect to the

18  pictures.

19          THE COURT:  Yeah.

20          MR. BALDASSARE:  So there is really sort of two

21  categories, one or two of them appear -- show Dr. Paduch, there

22  are a couple of those.  I understand the government contends

23  there is a geo-tag.  I looked at it, I'm not waiving any

24  authenticity or any accuracy.  There is a geo-tag on some of

25  them, the timeframe I don't remember about, if the government

O4H4PADC

1    says it's during the relevant timeframe.

2              My question is that there a lot of other ones that

3    simply appear to be a man's hand in a -- grabbing a fully

4    clothed either erect penis or large, not-erect penis.  I just

5    don't know how many of them we need.  I don't think we need any

6    of them.  I think, frankly, the charges in this case are

7    silly -- that is silly compared to the charges in this case.

8    And, Judge, they are pictures that are probative of nothing,

9    nothing at all.  They are more tame than I think you would find

10   on every guy in college's phone.  And they want to use those

11   pictures, which, by the way, I don't even know they can prove

12   that the suited pictures are my client.  They want to use those

13   to prove that he sexually assaulted children.  I just think if

14   the Court wants to let in the ones that he is in, obviously,

15   you have our motion on that.  But are we really going to show

16   you-know-what pics to this jury when everything is clothed and

17   a hand grabbing it?  I just don't understand at what point that

18   becomes probative of anything.

19             THE COURT:  Does the government want to respond?

20             MS. COLSON:  Sure, your Honor, I will take those in

21   turn.  And I apologize if we didn't have the exact exhibits.

22   The URL we referenced is on page 30 of our initial motion, the

23   URL for a video entitled, Doctor Fucking Teen.  We will be sure

24   to get you whatever exhibit.

25             THE COURT:  OK.

O4H4PADC

1          MS. COLSON:  As to the specificity of the iCloud it is
2    certainly beyond two gay men having sex.  This is not a trial
3    that is designed to shame, cast any aspersion on that, of
4    course it is not.  It is something so much more highly specific
5    than that.  It is beyond porn.  As I said, "I want to get a
6    Fleshlight vagina and a vibrator to try on and on myself when
7    we jerk off."  Then there is a reference to, "I want to come
8    home and see you continue jerking off to your porn."  We have
9    victims who are going to talk about the fact that the defendant
10   prescribed them a Fleshlight vibrator and specifically asked,
11   did you get that?  When can we use that?  One victim will say
12   he watched me use it in front of him.  Your Honor, this is not
13   two gay men having sex.  More than that, other victims will
14   say, he caught me by surprise.  He caught me unaware.  That is
15   part of his fantasy.  It is not just the act of two men having
16   consensual sex.

17          As to the photos of the defendant's erect penis,
18   highly probative.  One, they are geo-tagged to Cornell.  So I
19   suppose the only two options are that is the defendant or that
20   is somebody else in the defendant's office.  So either one is
21   highly probative.  More than that we have --

22          THE COURT:  Is any sexual activity that Dr. Paduch
23   engaged in at that facility probative in your view of him
24   sexual assaulting his patients?

25          MS. COLSON:  Your Honor, I would say in this case the

O4H4PADC

1    fact of him clutching his erect penis is highly probative for a

2    particular reason in that we have communications between him

3    and Minor Victim Three, in which he texts the victim and

4    instructs him to, in sum and substance, stroke it slowly as I

5    am doing now.  Your Honor, it's highly probative of intent that

6    he is communicating with the victim about masturbating while

7    signaling to him that he is essentially engaging a mutual

8    masturbation session.  The fact that he derives sexual pleasure

9    and gratification at work while thinking about his patients is

10   really, really important here.

11             THE COURT:  Yeah, but that last piece, how do you know

12   he is thinking about his patients, right?  That's why I was

13   asking the question about timing.  Other than being in the

14   office, which I recognize, I appreciate your argument with

15   respect to that.  How do you know he is thinking about his

16   patients?

17             MS. COLSON:  I think it's circumstantial evidence,

18   your Honor.  As well as it is circumstantial evidence of the

19   fact that he is thinking about them, A, the victim

20   communication I just outlined.  We have two victims that will

21   say that while he is using a vibrator on them, again, that is

22   something that he catalogs as some of his sexual fantasies,

23   both noticed he was erect beneath scrubs or suit pants.  This

24   is a photo of that precise rendition.

25             MR. BALDASSARE:  Judge, the pictures of him, if it is

O4H4PADC

1    him, first of all, we would know I guess from the geo-tag where

2    it is.  But I just keep hearing this, he thinks about

3    masturbating.  He thinks about masturbating at work.  He

4    touches his penis at work.  I don't understand how any man

5    thinking about masturbating, actually masturbating, taking a

6    picture of himself, *et cetera*.  I don't understand how it's

7    probative of anything.  Again, there is no evidence that he

8    showed any of these pictures to anyone.  There is no evidence

9    that -- there is none other than the one where you can see him

10    where he is.

11         THE COURT:  The one where he is looking in the mirror.

12         MR. BALDASSARE:  Yeah, the mirror picture, yeah.  The

13    other ones are fully clothed with a hand on -- again, I don't

14    even know if they are all erect penises.

15         And lastly, Judge, let's read the note out loud.

16    Let's read the whole note out loud.  Because two gay men

17    masturbating with each other, sounds to me, and I'm trying to

18    say this as respectfully as possible, there are certain

19    activities that sex between men are limited to, that's one of

20    them.  I don't understand how that shows deviance.

21         As far as the Fleshlight, Judge, maybe we could go on

22    Amazon and read all the reviews.  There's evidence of a link

23    from Amazon.  This isn't something we go down to the seedy

24    basement and buy.  They are on Amazon.  They are out there.  I

25    don't understand how talking about a Fleshlight, which, by the

O4H4PADC

1    way, could be -- are, in fact, some designed to look like a

2    woman's genitals, and some are designed to look like a set of

3    male genitals.  So, again, I just think we are coming

4    dangerously close to trying to convict Dr. Paduch for

5    fantasies, and I'll return to this when we get to the jury

6    question here, for being gay.  And I just think it is under

7    403, I just don't think it's probative of anything.  And I also

8    don't know how many of the trouser pants they intend to

9    introduce.

10         THE COURT:  What?  Sorry, I didn't hear you.

11         MR. BALDASSARE:  The fully clothed ones of a hand on

12    either on a penis in a pair of pants.  I just don't understand

13    what that is probative of.

14         MS. COLSON:  I'll just say one last thing, your Honor.

15    This is not about whether fantasies are deviant.  This is about

16    what the fantasies are, whether deviant, conventional, not

17    conventional, we are not here to judge that.

18         THE COURT:  That I get with respect to the iCloud and

19    the detailed accounts.  But if he is taking a picture of

20    himself in the mirror with an erection or he is taking a

21    picture either of himself or someone else with an erection, why

22    is that not exactly what you just said you are not talking

23    about, which is just him being aroused?

24         MS. COLSON:  I think, your Honor, it's relevant with

25    his intent with respect to patients in so far it could be

O4H4PADC

married to the fact that he communicates to his patients about

being aroused at work and thinking about him while he's doing

it.  Specifically, that's commination with Minor Victim Three.

And likewise those other minor victims who will say they saw

him aroused at work.  We are not, sort of, planning to argue --

THE COURT:  What did he say with respect to Minor

Victim Three, aside from someone -- aside from patients saying

they saw him aroused during his examinations of them?

MS. COLSON:  In the context of whether this patient

purchased the Fleshlight that he advised him to get.  He asked

whether -- inquired of his masturbation habits, and then

advised him or instructed him to, in sum and substance, stroke

it slowly, and then he said, what do you think I'm doing now in

my office.

I'm looking at my colleague --

THE COURT:  I thought that was to boyfriend?  I

thought the, I love stroking off, as I'm doing now in my

office, LOL.  It's ECF No. 74 motion *in limine*, page 29.  I

thought that was to his boyfriend.

MS. COLSON:  Your Honor, that is different screenshot.

Frankly, I am not sure that has made it to our final exhibit

list, so that's a separate issue.

We are talking about a communication that was between

the defendant and one of his minor victims in which he says,

and my colleague corrected me, "I'm working from home.  What do

O4H4PADC

1   you think I'm doing now?"  So the idea is that while working

2   and treating patients he is "stroking it slowly" and inviting

3   the patient to do that alongside with him.

4           MR. BALDASSARE:  Judge, I would just add, and the

5   government can correct me, I don't think that alleged victim

6   was a minor.  I know they call him the minor.

7           MS. COLSON:  At the time he was not a minor.

8           MR. BALDASSARE:  That individual was not a minor at

9   the time that that text was --

10          THE COURT:  Yeah, I don't believe that I have seen

11  that one either.  I'm not sure why.  So I'm going to reserve

12  ruling on that particular correspondence unless I hear more as

13  to the relevance of the photographs that he apparently took of

14  himself or other people at work, but not -- there was no

15  indication they were his patients.  I'm going to exclude those,

16  the ones where you either see an erection in his pants like the

17  one where he was taking in the mirror or the ones where you

18  could actually see a male penis.  They are limited probative

19  value and highly prejudicial.  In the *Hinkel* case, for example,

20  the First Circuit considered the district court's admission of

21  photographs which demonstrated the defendant's sexual

22  practices, some of which showed his erect penis.  And the Court

23  held that in those circumstances the prejudicial impact of

24  those photos would be patently substantial.  And I find here

25  that the probative value of these photographs is substantially

O4H4PADC

1    outweighed by danger of unfair prejudice, so I'm excluding

2    them.

3            That said, again, if there is more information that

4    makes these photographs more probative, for example, an

5    indication they were taken close in time to one of the

6    appointments or while he was texting with one of the patients

7    or something that connects it to his care of patients, then

8    I'll revisit that, but that's my ruling on that.

9            Again, I don't believe that we have seen the text

10   message you referenced a minute ago, so I'm not ruling on that,

11   about the one that texts with the patient or whether it's text

12   or emails or whatever that correspondence.  I'd like to see

13   that in your letter.  I'm not ruling on that.

14           I am, though, excluding what I understand, was the

15   screenshot of the text message with his boyfriend saying I love

16   stroking off to it as I'm doing right now in my office, LOL.

17   Again, unless I hear more about any kind of connection in time

18   or otherwise, to him being sexually aroused by his alleged

19   abuse of his patients, I think it's of limited probative value.

20           Did you want to be heard on that?

21           MS. XIANG:  No, your Honor, not on that specifically.

22   And we hear your Honor's rulings and with respect to the, kind

23   of, open items we can file additional things.

24           I just wanted to put on the record that we assume if

25   in the course of the trial, arguments are advanced by the

O4H4PADC

1  defense that then puts certain issues of intent, absence of

2  mistake, *et cetera* an issue that the government could at that

3  point --

4          THE COURT:  If the door is open, yeah, I agree.  I

5  think that's right, so yes.

6          MR. BALDASSARE:  Judge, I'm sorry.  Where did we end

7  up on the note to his now husband?  Because that was out and

8  the government brought it up --

9          THE COURT:  On the note to the husband, what I asked

10  for is more detail about how he is alleged to have abused

11  patients in a way that was so similar to the course of action

12  that he described in that correspondence.

13          MR. BALDASSARE:  I would ask the government

14  respectfully to also explain what's different about it that

15  makes it something other than two gay men having sex.

16          THE COURT:  Fair enough.

17          MR. BALDASSARE:  Thank you, Judge.

18          THE COURT:  Moving on, the motion to permit the

19  government to ask leading questions during the direct

20  examination of Minor Two.  Under Rule 611 it notes that while

21  it will endeavor to develop his testimony with open-ended

22  questions when feasible, it wishes to transition to leading

23  questions if it becomes apparent that doing so is necessary to

24  elicit testimony.  In support of its motion, the government

25  indicates that Minor Victim Two is diagnosed with a genetic

O4H4PADC

condition and suffers significant cognitive and speech delays

supported by medical records.  It further states that based on

hours of meetings with Minor Victim Two, it believes that if

posed open-ended questions, he would struggle to answer and

would only provide one word or clipped answers.

The defendant opposes the government's motion on the

basis it's premature, and he argues that the government cannot

establish that Minor Victim Two requires special treatment

concerning he has failed to provide documentary support with an

objective and indicia of reliability.  He further observes that

studying under an individualized education plan does not

necessitate leading questions and that Minor Victim Two

graduated from college with honors.

Does anyone wanted to be heard further on this?

I'm denying the motion but without prejudice.  So

basically I want to make the decision at trial pursuant to Rule

611(c) leading questions should not be used on direct

examination except as necessary to develop the witness'

testimony.  The language in Federal Rule of Evidence 611

expressing a preference for non-leading questions, however, is

only precatory.

Generally, trial judges are afforded a large degree of

discretion in overseeing the examination of witness.  The

government cites various situations in which courts have

permitted leading questions, including, among others, instances

O4H4PADC

where the victim was nervous or reluctant, cognitively

impaired, or experienced sexual assault.  The government's

analysis, however, focuses only on Minor Victim Two's cognitive

and expressive impairments and accordingly so does the Court's.

On certain occasions courts have authorized leading questions

on direct examination where a witness is cognitively impaired.

In the *United States v. Callahan*, for example, the Court

permitted direct questioning when there was evidence that a

witness was cognitively impaired, suffered a traumatic brain

injury in a car accident, had learning issues, and was

receiving federal disability benefits due to an intellectual

disability.

Similarly, in the *Goodlow* case the Court recognized

Federal Rule 611(c) does not preclude frequent use of leading

questions during the direct examination of an intellectually

disabled adult who is the victim of sexual abuse.

That said, courts in this district have often denied

without prejudice motions to ask leading questions, pending a

witness's presentation on the stand.  So the Court finds

reliable the medical records indicating expressive language

challenges.  Nonetheless, I think it's premature before I

actually see him.  So the government can renew its motion once

Victim Two begins to testify.  You can simply ask a question

like, may I lead?  And so I think I stated the law here, but if

I find that it's justified I will let you do that.

O4H4PADC

1      The government next moves to preclude the defendant

2  from offering any of his out-of-court statements for their

3  truth, including any statements containing patient medical

4  records.  It argues that such statements are hearsay under

5  Federal Rule of Evidence 802 and if offered by the defendant,

6  do not come within any hearsay exception.

7      The defendant argues that the Court should permit him

8  to introduce relevant medical records because they fall

9  securely within the business record exception.

10      Just clarify, what are we talking about here?  We are

11  talking about medical records that Dr. Paduch filled out?  This

12  is not -- go ahead.

13      MR. BALDASSARE:  I think what we are talking about are

14  the notes that the doctors -- that any doctor dictates after an

15  examination, and there are narratives there.  Our position is

16  that the government's position is that somehow those are

17  untrustworthy or a big pack of lies, when we already have a

18  business record certification when they are made for medical

19  treatment and when there is absolutely no reason to think that

20  his narratives are false.  That is, again, you know, the

21  government always makes the point, we are only putting in a

22  little bit of evidence, but sometimes that's the problem with

23  Medical Institutions Two and with these notes.  For example,

24  they marked, I think, 300 pages of -- as by our count -- of

25  medical records.  But for some patients, you know, 50 pages

O4H4PADC

might be 50 of 1500 pages.  Now, am I looking to put 1500

pages, one at a time, in front of a jury?  No.  But I do think

that there are pages that need to be in there to tell the

complete story.

I think what the government wants to put in are -- and

I'll let them, of course speak, for themselves -- are the

patient summaries to show they were there on that date.  That's

OK, but their whole case is going to be about what happened

during these visits.  And we have contemporaneous notes from a

doctor that are very different from police dictating something

after a prison fight.  So that's I think what the dispute is

about.

I could tell you already, Judge, that, traffic

permitting, when we get back are going to serve them, pursuant

to our agreement, with our premarked trial exhibits for every

alleged victim.  We are marking all of the entire medical

record because I don't know what we may want to use.  I'm not

going to try to put in however many thousands of pages.  But

until I hear something -- I don't know, his narratives may well

be highly relevant.  In fact, in some instances we think they

may be actually exculpatory.

THE COURT:  What I feel I need, is I need more

information about what that looks like.  Because part of what

I'm looking at is, does this indicate a lack of

trustworthiness, right, under Rule 803(6).  And so is there a

O4H4PADC

1    way for me to get more information to kind of hone this so I

2    can look at the records we are talking about, whether it's now

3    or during a trial?

4         MR. XIANG:  I'm happy to address that question and

5    maybe the issue more broadly.

6         So the defense is right that the issue here are the

7    kind of narrative portions of the medical records.  I don't

8    think there is a dispute between the parties that the bulk of

9    the medical records, when it comes to when folks visited, what

10   tests they took, what medication they are prescribed, there is

11   no dispute that stuff is medical records that come in under the

12   business records rule.

13        I think what the defense should not be permitted to do

14   and what the cases make clear is when there is narrative

15   summary written by Dr. Paduch saying patient presents

16   complaining of such and such, here is what I did.  And that's a

17   kind of typed you have narrative summary.  We can give all sort

18   of examples to the Court if helpful.

19        What defense should not be permitted to do, and what

20   it sounds like the defense is endeavoring to do is to say,

21   ladies and gentlemen, he didn't type, I masturbated this

22   person.  These are contemporaneous notes.  Therefore, you

23   should consider these notes for the truth.  And this bears not

24   only on the regular business records rule, which is 803(6) but

25   also the kind of absence of business records rule, which is

O4H4PADC

803(7), the absence of something in the business records under
certain circumstances can be offered to show that thing didn't
happen.  Both of those rules, 803(6)(E), and 803(7)(C) have
these residual trustworthiness clauses.  It's not simply you
check off the business records boxes, and it's good to go.

     And the reason for that, as a the Supreme Court
explained in the *Palmer* decision, which we cited and as Second
Circuit explained in the 2010 *Kaiser* decision which we cited,
which is there may be circumstances where even though a type of
document, a type of report, ordinarily would be created in the
order course of business *et cetera*, *et cetera*, that the record
maker, under those specific circumstances, has a reason either
to lie or to omit.

     And one example that's pertinent this in this case,
your Honor, some of these will say patient permitted to self
stimulated or something along those lines, or patient achieved
erection through injection of medication, which I think the
testimony and the evidence at trial will show is how you are
supposed to get patients erect when there is a medical need for
them to be erect.  I think it would be improper for the defense
to say, look, you can infer from those notes written by the
defendant that he did not get them erect by masturbating them
himself with his hands.  Because the point that's being made in
all these cases -- the cases I cited and the various, kind of,
prison cases is -- ask the question, if the thing happened, if

O4H4PADC

1   he masturbated them, would he have any incentive to memorialize

2   that accurately in these types of documents in the analog in

3   the prison cases?

4        If a prison guard in the course of an interaction with

5   a prisoner assaulted or raped that prisoner, would anybody have

6   any expectation that that rape or assault would be accurately

7   reflected in that prison guard's account of that prisoner

8   encounter, that's directly analogous.

9        We understand, of course, that both provisions put the

10  onus on the party opposing it, meaning the government, to show

11  an absence of trustworthiness or to show that there is a

12  sufficient basis for the Court to conclude that there is a

13  question of trustworthiness.

14       So we get that prior to your Honor hearing the

15  victim's testimony, it may be premature, and we get that.  But

16  what we are saying after hearing Victim One, say, look, on X

17  and Y occasions, he masturbated me to the point where he

18  ejaculated, ejaculated on his body.  I don't think it would be

19  permissible under the trustworthiness clauses for either the

20  existence or absence of business records the defendant can go

21  visit by visit and say, well, Dr. Paduch never wrote that down

22  and say to the jury, you should consider that for its truth, it

23  never happened.  That's classic hearsay, that's self serving,

24  your Honor.  And that's untrustworthy for the exact reasons

25  that Supreme Court and Second Circuit recognized in analogous

O4H4PADC

1    contexts.

2    THE COURT:  So you are trying to get in these medical

3    records to show dates and then you want to use medical records

4    for some purposes but don't want him to use them for this

5    reason?

6    MR. XIANG:  Yes.  Yes, we understand this idea of rule

7    of completeness.  Our understanding of the rule of completeness

8    is what would not be OK for us to do, and we are not

9    endeavoring to do is to use a portion, for example, of his

10    narrative summary from a certain day, and say, well, you can't

11    use the rest of that narrative.  We are not doing that.  If

12    there were any statements of him of this sort that we are

13    offering for the truth, as a party opponent statement as to a

14    particular visit, we will, of course, not object to the

15    defendant seeking to admit the entire narrative or the entire

16    set of records from that day.  Like, we are not trying to use

17    this as both a sword and a shield.  But for a number of these

18    victims, some of these medical records go hundreds of pages,

19    thousands pages, span many, many years.  And certainly the rule

20    of completeness does not mean if the government offers this to

21    nail down, for example, a date in which a patient had a

22    surgery, then under the rule of completeness that means that

23    two visits ago or two visits later when the defendant says this

24    person self stimulated or I got this person erect solely

25    through the administration of medication that that somehow has

O4H4PADC

to come in under rule of completeness.  One doesn't have to do with the other.

         I think the government is really not expecting in its direct examination to do deep dives into any medical records. To the extent, we offering them in our case in chief it is for a very limited purpose to show, among other things, that the defendant knew the states where the patients resided, which is an aspect of the interstate showing that the government needs to make, that the defendant knew the ages of the patients that he was treating, and just to kind of nail down, I hope in a noncontroversial way, that certain patients were seen from X year to Y year, but they had five visits or 50 visits.  That is the reason for which the government is offering medical records.

         And if there are other aspects of the medical records apart from these self-serving narratives the defense seeks to say put in, we are not objecting.  If for whatever reason there some defense theory that will turn on how many times somebody was prescribed testosterone and how many surgeries the defendant performed on such and such a person, and those facts are documented in the records, we are not going to be objecting to those things.  What we are objecting to is the narrative summaries written by the defendant himself offered for the truth of either because they didn't say, I masturbated them, therefore I didn't, or to say because I said they achieved

O4H4PADC

1    erection or ejaculation in some way, that that's the only way

2    they ever ejaculated in the office.  That's the government's

3    motion.

4           MR. BALDASSARE:  Judge, here is what I'm hearing.  I'm

5    still not hearing why these are unreliable, and here's why

6    because on the one hand they are saying, well, there is no

7    reason he would ever put in if he was committing a crime.  On

8    the other hand, they don't want to put in what they do say.

9    And the fact remains they are business records.  There is a

10   certification for them, and the rule of completeness isn't that

11   they want to use part of his statement.  The rule of

12   completeness is a document.

13          Now, do I want 60,000 pages?  No.  But there is every

14   reason to believe these are accurate documents.  What the

15   government just said is here is the first alleged victim, and

16   when that person says he masturbated me.  You, Judge, find that

17   you believe that person, and therefore the records don't come

18   in.  I haven't heard any law for that.

19          I don't know if we are having a 104 hearing.  I'm not

20   trying to be disrespectful, but where is it that the Court said

21   I think Victim One is telling the truth, and it's not in there.

22   Therefore, I make a finding that it's out.  These records were

23   for years and years, right.  They are reviewed; they are on

24   file; they are looked at by insurance companies.  There is

25   every reason to believe that he had every reason to be

O4H4PADC

1  accurate.

2          Now, if he raped patient in a room, of course that's

3  not going to be in there.  I get it.  But the fact is that's

4  all I'm hearing.  Every other indicia of this being an accurate

5  record is there.  There is no reason to believe that he was

6  lying in these statements that were made for medical purposes.

7  They were looked at a thousand ways from Sunday.  He knows

8  people can see them.  I get it, they want it to nail down

9  dates.  OK, everybody wants something in this case, that's

10  fine.  But what we are not going to do is have records that

11  contradict testimony and say, well, they are business records.

12  They are made years ago.  We think he might have lied in them

13  except when he was selling telling the truth and then we don't

14  want to tell the jury.  It makes no sense.

15          And I understand maybe it has to be made as a call

16  closer to the trial.  I'm sure we can agree on one set of maybe

17  one patient, there are some that don't have a 15-year span.

18  And maybe it has to be made at the time.  But I disagree that

19  there can be a finding made that these are unreliable just

20  because they disagreed, because they are contrary to the

21  government's theory of the case, that makes no sense.

22          THE COURT:  I do think it would be helpful if I had

23  some more specifics.  I don't know if you think this is

24  something we should brief beforehand or something to deal with

25  at the time.  I really don't like to keep juries waiting.  So I

O4H4PADC

1    don't like to decide legal issues while a jury is waiting.  But

2    what would you propose, putting aside a full-blown hearing,

3    what would you propose in terms of how I can look at what we

4    are talking about and specifically and make a determination?

5              MR. BALDASSARE:  I would say for us, Judge, I think it

6    is important to have it done before the trial starts.  I know

7    that I'm sure we can find one patient's full set of medical

8    records.

9              Here is where we're going to have a problem.  We are

10   going to have a problem when a witness says that I was

11   masturbated, and I wasn't given collection cup.  And then, the

12   narrative or the medical records show that sperm was sent out

13   to be tested.  So they want the witness to let the jury draw an

14   inference that somehow this ejaculation was untested or

15   inappropriate, *et cetera*, *et cetera*.  I think even think a

16   doctor may talk about that.  They are OK with labs going in.

17   But what they don't want is the rest of the story.

18             And we can -- I would love to have it resolved -- but

19   respectfully, however it gets resolved, one side or the other

20   is going to be objecting to something when it comes in in the

21   context of the testimony.  Because I do think the context

22   matters.  I just don't think the Court can say, oh, I believe

23   that person therefore they are out.  I'm not even sure I have a

24   suggestion after saying all that, to be honest.

25             THE COURT:  Do you want to respond?

O4H4PADC

1          MR. XIANG:  Yes, your Honor.

2          As to your Honor's specific question of examples of

3     this, we are happy, in our upcoming briefing to the Court,

4     whether on the same or a different schedule, give some examples

5     is to your Honor of the narrative that we are talking about.

6          In terms of mechanics, it's actually not complicated.

7     Apart from these defendant-authored self serving narratives, we

8     are fine with the totality of the medical records coming.  So

9     mechanically the only question is do they come in completely,

10    or do they come in with certain portions, that the government

11    contends are self serving hearsay, redacted.  That's really the

12    only difference.

13         THE COURT:  I thought your theory was the self serving

14    hearsay is kind of everything because it's the absence -- I

15    actually don't know.  Because, again, I don't know exactly what

16    we are talking about in the records.  If it's the absence of

17    saying he did what he did.  It sounds like they are going to be

18    more specific lines of cross-examination that you want to

19    prevent.

20         MR. XIANG:  We are happy to send your Honor an example

21    of what these things look like.  But these are the sort of

22    medical records we all have in our lives, a long chronological

23    narrative of every medical thing or interaction that the

24    patient has with the hospital system.  The narrative portions

25    are not, in terms of number of pages and space, a huge portion

O4H4PADC

of these things.  A lot of these are:  Patient called the

office, you know, appointment canceled, or prescription renewed

as to this dosage or whatever, labs, tests.  We are not

objecting to any of that stuff.

As to patient encounters with Dr. Paduch, there is

specifically a field that -- I forget, the title is narrative

or something along that -- where it's basically a field for him

to type.  Like, here is when the patient came in.  Here is what

I did; here is what they did.  That is what I'm talking about.

THE COURT:  To Mr. Baldassare's point, how am I

supposed to make that assessment in that indicia of

untrustworthiness without making a credibility assessment of

whether I believe the victim versus Dr. Paduch?

MR. XIANG:  I don't think it's different than any

other evidentiary issue.  In those cases I cited in this

context there was -- I'm sorry, your Honor, there's a fly.

The Court needs -- let me put it this way, the

existence of the business records hearsay exception -- and I

think this is a fair statement of the law -- is that under

ordinary circumstances, where records are made in the ordinary

course regularly and there is no reason to falsify those

records, I think there is a purpose with the trustworthiness

clauses then they can come in for their truth.  And the view of

that is, well, it's because other folks in the business need to

rely on them.  Parties that deal with that business need to

O4H4PADC

rely on them and because people need to rely on them, everybody

has an incentive to be truthful.  What we are saying is that

may well be true as to most business records and most of these

business records, but on the specific fact of did Dr. Paduch,

did the defendant masturbate the patients himself.  On that

fact he has zero incentive to be truthful ever.  It doesn't

matter how long ago that happened because this conduct, in the

government's view and the government's evidence will show, is

criminal, is not medical practice.

        To give your Honor an example, say we were talking

about a bank case where the allegation is that the person who

is responsible for putting in the money, kind of, back into the

vault every night, stole some money in the course of performing

his duties.  And say there is some basis to believe whether

it's an eyewitness or video of whatever else, that every night

he pocketed some of the money.  I don't think under the

business records rule the trustworthiness clauses would be

satisfied if that person said, look, it was my job every night

to write a receipt about how much money I put in there.  And so

therefore, I should get to put in those receipts for the truth

of the matter that I put all the money back in.  That's

precisely the reason that this, I'll call it a self serving

carve out to the business record rule exists.  And that's

what's going on here.

        THE COURT:  In your letter, and I know this is getting

O4H4PADC

1   bigger, so if you need more time, let me know.  Just give me an

2   example or two and I will look at it.  Especially, if it's more

3   specific than just, he didn't mention that he masturbated a

4   patient but having to do with what happened with a specimen or

5   something else, and I will rule.

6         I'm going to move on for now.

7         The government next moves to preclude the defendant

8   from offering evidence or argument on the failure commit other

9   bad acts.  It argues that evidence or arguments that he did not

10  sexually abuse patients other than the victims is irrelevant

11  and unfairly prejudicial.

12        So this is another area I feel like I need to get a

13  better sense of things.  What are you concerned about, that

14  Dr. Paduch will call other patients to say, no, he did never

15  did this to me?

16        MS. COLSON:  Exactly.

17        THE COURT:  Do you intend to do that?

18        MR. BALDASSARE:  Well, I don't know.  But I would

19  say -- here is what I would say, Judge.  If I were going to do

20  that, I would raise it with the Court first.  But I don't know

21  if I could commit to doing it or not doing it now.  I'm also

22  not sure that that may -- I'm also wondering how the government

23  would think that this motion would apply to their own

24  witnesses.  It's a difficult question to answer.  Some of the

25  patients have years and years of history with him.  Whether or

O4H4PADC

1    not I would look to call a freestanding witness is something I

2    haven't decided yet.

3              THE COURT:  I mean, look, I'm going to read you a few

4    quotes on the law.  But, you know, the rules of evidence

5    including Rule 404(b) are precedent.  This is from the *Mustfa*

6    case.  Clearly prohibit good acts evidence to demonstrate a

7    defendant's propensity not to engage in charged crimes.  So it

8    follows that evidence of a failure to commit other bad acts may

9    not be used to demonstrate a defendant's propensity not to

10   engage in charged crimes.  See the *Dawkins* case or the *Hadden*

11   case, that conference transcript.

12             So unless I hear something that I'm not hearing now, I

13   would be inclined to grant the government's motion to the

14   extent that you are seeking to offer evidence or argument of

15   the failure to commit other bad acts to demonstrate a

16   propensity not to commit the charged crimes.  As to Rule 406

17   and 405(a), courts are cautious in permitting the admission of

18   habit or pattern of conduct evidence under Rule 406 because it

19   necessarily engenders the very real possibility that such

20   evidence will be used to establish a parties' propensity to act

21   in conformity with its general character, thereby thwarting

22   Rule 404(b)'s prohibition.

23             Second, character evidence has long been admissible

24   only in the form of reputation and not in the form of

25   recitation of good or bad acts.  That's from the *Benedetto*

O4H4PADC

1    case.

2          *United States v. Benedetto*, 571 F.2d 1246, 1249-50 (2d

3    Cir. 1978)

4          Although a character witness may give general

5    testimony concerning the defendant's reputation.  And I don't

6    know if we are talking about character evidence or you

7    literally want to just call another patient.  But although a

8    character witness may give general testimony concerning the

9    defendant's reputation for pertinent trait of character or the

10   witnesses' opinion of the defendant with regard to that trait,

11   evidence of a person's character or character trait is not

12   admissible to prove that on a particular occasion a person

13   acted in accordance with that character trait.  And that's from

14   the *Inniss* case.

15         *United States v. Innis*, No. 18-CR-134, 2019 WL

16   6999912, at *7.

17         Finally, the Court, of course, maintains the authority

18   to prohibit evidence proffered under Rule 406 and 405(a)

19   pursuant to Rules 401 and 403.

20         With that said, I'd be inclined not to let you do it.

21   If you have a more specific argument as to why this lawsuit

22   doesn't, I will hear you out.

23         MR. BALDASSARE:  Two things, Judge, it's a tough legal

24   standard for the defense, not surprisingly.  All I would say is

25   I understand the Court is inclined to deny it.  I would just

O4H4PADC

1    ask, I've learned over the years, you never know how evidence

2    is going to go in.  You never know what people are going to

3    say.  You never know what the government is going to argue.  I

4    would just ask it be without prejudice if we need to make an

5    application later.

6            THE COURT:  So the motion is granted without

7    prejudice.

8            The government next moves to preclude

9    cross-examination on conduct related to the sex lives of Victim

10   7 and 11 and a campus security encounter of Victim Three.

11           In particular, it seeks to preclude cross-examination

12   on Victim 11's current open relationship with his romantic

13   partner.  Victim Seven's encounters with a sex surrogate after

14   he stopped seeing the defendant for treatment.  And Victim

15   Three's detention and removal from a college campus by campus

16   security.  It argues that such evidence would be irrelevant and

17   have no bearing on witness credibility.

18           It further contends the testimony would be highly

19   inflammatory and embarrassing for the witnesses if aired in a

20   public courtroom.

21           Additionally, the government moves to preclude

22   cross-examination of a registered nurse with regard to an

23   automobile accident, the nurse's sexual history, and the

24   nurse's personal opinions of what happened in this case.  The

25   government asserts that such evidence would be irrelevant,

O4H4PADC

1    having no bearing on witness credibility and is unfairly

2    prejudicial.

3         So the Court grants the government's motions in part.

4    Specifically, it grants the motion with respect to Victims

5    Three and Eleven.  As to Victim Seven, it grants the motion but

6    only with respect to his encounters with the sex surrogate and

7    references to the surrogate.  But I'm going to allow questions

8    that go to the ongoing correspondence or relationship between

9    Dr. Paduch and that alleged victim.

10        MR. BALDASSARE:  Judge, just before you move on, this

11   may be one where the defense might ask to make a submission.

12   Because the problem with the sex surrogate is that this

13   individual -- Dr. Paduch, and the text messages might be

14   helpful to see on this.  I'm not giving away trial strategy or

15   anything the government doesn't know.  This individual is going

16   to take the stand and say that Dr. Paduch did all these

17   horrible things to him.  But that after he was no longer his

18   doctor or around the time it terminated, Dr. Paduch suggested a

19   sex surrogate.  And the patient says, essentially, thanks.

20   It's more detailed and it's over a lot of texts but he said,

21   this person, who alleges that my client did all these terrible

22   things to him, after he is no longer his doctor or right as it

23   ends says I'm going to take your advice and then says thanks

24   for giving me the advice and then says you are great; you are

25   the best.  I think it goes to credibility.  I'm not looking to

O4H4PADC

1  embarrass anybody.  I'm not going to ask what happened with the

2  sex surrogate.

3      THE COURT:  Why can't you do that without the mention

4  of the sex surrogate?  Again, I'm happy to look at the

5  specifics if you want me to, the specific correspondence, so

6  it's clear he is still seeking his medical advice and is

7  thanking him afterwards.  Why do you need that piece that this

8  individual deems embarrassing?

9      MR. BALDASSARE:  If I can ask the patient a line of

10 questions that elicit at a certain time, did you ask Dr. Paduch

11 advice or did he give you advise to seek certain course of

12 medical treatment, because it is important that he didn't

13 follow him and go out and buy a Ferrari instead of a

14 Lamborghini.  It's that you asked him.  He gave you a

15 suggestion for a specific course of medical treatment.  Did you

16 take him up on that?  Yes.  Did he help you?  Yes.  And maybe

17 some redacted texts, I'm fine with that.

18     THE COURT:  Any objection from the government?

19     MR. XIANG:  We are fine with that, your Honor.

20     THE COURT:  So that's my ruling with respect to Victim

21 Number Seven.

22     Under Federal Rule of Evidence the cross-examination

23 should not go beyond the subject matter of the direct

24 examination and matters affecting a witness's credibility.

25 Additionally, a district court is accorded broad discretion in

O4H4PADC

controlling the scope and extent of cross-examination.
Although, the sixth amendment's confrontation clause gives a
defendant the right not only to cross-examination but to
effective cross-examination.  It does not follow that the
confrontation clause prevents a trial judge from imposing any
limits on defense counsel's cross-examination of government
witnesses.

        To determine the propriety of cross-examination, as
with other determinations of admissibility of evidence, courts
balance prejudice versus probative value.  That's *Watson v.
Greene.*

        Accordingly, a court may impose reasonable limits on
cross-examination to protect against harassment, prejudice,
confusion and waste.  The Court, moreover, has a duty to
protect the witness from questions which go beyond the bounds
of proper cross-examination merely to harass, annoy, or
humiliate him.

        With respect to evidence probative of credibility, the
Court may, on cross-examination, allow specific instances of a
witness's conduct to be inquired into if they are probative of
the character for truthfulness or untruthfulness of a witness.
And as you always, under Federal Rule of Evidence 402, evidence
must be relevant as measured by Rule 401 to be admissible.

        As to Victim 11, the Court finds that the evidence of
his current open relationship would be irrelevant, including

O4H4PADC

1    respect to truthfulness.  Even if the evidence had probative

2    value, it would be substantially outweighed by the prejudice.

3    To introduce evidence of his current open relationship status

4    may well humiliate him.

5         In addition, the Court observes that this evidence is

6    inadmissible pursuant to Federal Rule of Evidence 412, which

7    provides that evidence offered to prove that a victim engaged

8    in other sexual behavior or evidence offered to prove a

9    victim's sexual predisposition is not admissible in a

10   proceeding involving sexual misconduct.  None of the sections

11   set forth in 412(b)(1) apply here.  And notably Rule 412 aims

12   to safeguard against the invasion of privacy, potential

13   embarrassment, and sexual stereotyping that is associated with

14   public discourse of intimate sexual details and the infusion of

15   sexual innuendo into the fact finding process.

16        With respect to Victim Seven we already talked about

17   it.  So I don't think we need to discuss that further.  We have

18   an agreement on that ruling.

19        You know with regard to the -- based on what I know

20   about Victim Three's encounter, the government's motion is

21   granted unless I hear any additional facts.  I find that the

22   campus security incident is not relevant including with respect

23   to Victim Three's character for truthfulness.  Testimony on

24   that matter also poses a high risk of unfair prejudice.

25   Further, his encounter does not fall under Rule 609, which

O4H4PADC

describes circumstances in which evidence of a criminal

conviction may be used to attack a witness's character for

truthfulness.  The government represents that Victim Three's

encounter with campus security did not result in an arrest.

The government's motion is granted.

        With that said, as I said, if there is further

investigation and there is some reason that there are facts

that I don't know about, I'll hear them out.

        Is the government still seeking to call the nurse?

        MR. XIANG:  Yes, your Honor.

        THE COURT:  With regard to the nurse, the Court grants

the government's motion with respect to the automobile incident

including the aggravated assault conviction.  Pursuant to 609,

evidence of a crime that in the convicting jurisdiction was

punishable by imprisonment for more than one year must be

admitted, subject to Rule 403, in a criminal case in which the

witness is not a defendant.  The government represents that the

nurse was sentenced to a term of five years' imprisonment.

However, the nurse was convicted in the late 1990s and in

prison for about three months.  So accordingly, under Rule

609(b) the evidence is admissible only if its probative value

is supported by specific facts and circumstances substantially

outweighs its prejudicial effect.  The Court does not find the

probative value of the conviction is substantially outweighed

by its prejudicial effect.  It also find that evidence of the

O4H4PADC

automobile incident, outside of that, which falls under 609
would be substantially more prejudicial than probative.

Although, the defendant argues that the nurse may have
lied about the conviction.  The government has represented that
it made the requisite disclosures.  So unless you have a good
faith basis for asking that question, I don't see why it would
be appropriate.

MR. BALDASSARE:  Just two quick things, one is our
investigation continues.  The government, I think, agrees that
if we are able to demonstrate that the nurse lied about this
conviction to maintain a license, it's a whole different
ballgame.  If that comes to light, we will deal with it.

The second thing is we made great pains in our filing
to say we had more of a reason to suspect that he might not
disclose it to the government.  We specifically said we were
not implying that the government failed to turnover *Giglio*.
And the government responded sort of as if we were saying that.
So I want to be clear because I know this a serious issue.  If
I'm going to accuse the government to be running afoul of
*Brady, Giglio* --

THE COURT:  You are going to be clear about it.

MR. BALDASSARE:  I would like to think I would.  I'm
saying the opposite.  Everyone will know if I do that, and I
hope I never do so.

THE COURT:  I don't want you asking about suggesting

O4H4PADC

1  that there is a lot about the medical license unless you have a

2  good faith basis and if you do, let me know what it is.

3           MR. BALDASSARE:  Yes, Judge.

4           THE COURT:  And with respect to the civil lawsuit, the

5  government has conceded that the defendant is free to

6  cross-examine the nurse about the lawsuit as it pertains to

7  biases.

8           In terms of the nurse's sexual history, the Court

9  grants the government's motion and finds his sexual history

10  would be irrelevant, and even if it had probative value it

11  would be substantially outweighed by the prejudice.

12           MR. BALDASSARE:  Judge, on that one, I think the

13  parties are in agreement that the only reason we had is this

14  comment about "sucking off" and the government said they did

15  not intend on eliciting that testimony.

16           THE COURT:  Is that's right?

17           MR. XIANG:  That is correct, your Honor.

18           I think the only circumstances under which we would

19  even go in that ballpark is if there is cross-examination

20  about, for example, the -- there was workplace friction between

21  the nurse and the defendant and HR issues, *et cetera*.  We are

22  not eliciting any of that on direct examination.  But if that's

23  the subject of cross, and there is cross, well, you didn't like

24  my client; is that right?  Then I think that does open the door

25  to why didn't you like the defendant?  And that may elicit

O4H4PADC

1    those types of answers.  Again, that that is not why we are

2    calling, and we don't intend to elicit it in the first

3    instance.

4              MR. BALDASSARE:  Judge, I can't commit to not saying a

5    witness is biased against him because he didn't like him.  But

6    what I can say is this, I think I know what the witness is

7    concerned about specifically.  I'm not going to stand up here

8    and say we can't try Dr. Paduch because he is gay, and then say

9    I'm going to go after their witness or anything like that or

10   anything.  I just -- I'm not going to go into anything like

11   that.  And if they want to say, well, the friction was because

12   he said are you sucking people off, I guess we will deal with

13   it at the time.  But if the witness is biased because he

14   doesn't like Dr. Paduch for some reason and they want to elicit

15   that, that's fine.  We will see where it goes.

16             THE COURT:  If we need to touch base about this again,

17   you will let me know.

18             With respect to the nurse's personal opinion, is that

19   something, Mr. Baldassare, you were intending to elicit.

20             MR. BALDASSARE:  No, Judge.  I didn't even know about

21   that until I had the nice surprise in the 3500.

22             But what I would say is I think the parties should

23   agree that shouldn't come in one way or the other.  My only

24   concern, after reading some other parts of the 3500, is we

25   might get the opposite that I think Dr. Paduch, you know, as to

O4H4PADC

```
1    somebody else.  I'm just saying that I think as long as the
2    witness's testify as the government thinks, I think we will be
3    fine on that.
4              THE COURT:  All right.  Good.
5              And then, also, with respect to the nurse, the
6    government has represented that it didn't offer the nurse
7    immunity or non-pros, but as I understand it, there was like a
8    queen for the day, standard proffer used during the meeting
9    with the nurse.  Were you going to suggest that something else
10   was offered?
11             MR. BALDASSARE:  Well, I'm certainly not going to
12   suggest that anything was offered that wasn't.  But I will say
13   that the 3500 material does establish repeated requests by this
14   witness for either -- for either immunity or for queen for a
15   day.  Although, obviously, as a nurse he wouldn't phrase it
16   that way.  But he did get to a point where this individual got
17   an appointed federal public defender to deal with this.  I
18   don't think it should be off base -- and, look, the 3500 says,
19   the government said you don't need immunity, but I think he
20   gave them information under a queen for a day, and he got a
21   federal public defender appointed.  I think that should be fair
22   game.
23             THE COURT:  What specifically, that he got a lawyer?
24             MR. BALDASSARE:  Not so much -- I don't want to hold
25   that against anybody.  But the fact that he refused to meet
```

O4H4PADC

with him without some form of legal protection about what he

said in those meetings.  Now, whether it was a demand for 3500,

which the government rejected, and the government repeatedly

said, you don't need it; you don't need it.  But this witness

was sort of adamant to the point where he you wound up with an

appointed -- I don't know how that happened, but I know how it

happens in other cases.  Where the government has a witness and

they, say, well, we've got to get this guy a public defender.

And they ask, a court, could have been you, I don't know.  All

I know is a federal public defender starts showing up at these.

And I do think it is fair game to ask a witness that he refused

to meet or talk to the government without some form of legal

protection for what he said.

THE COURT:  What's the government's position?

MR. XIANG:  Let me clear up some facts first.  The

appointment of counsel, the Federal Defenders, was prior to any

discussions about proffer agreements, immunity agreements,

period.  The reason that the government raised that as a

possibility with this particular witness, who like the other --

some of the other witnesses here, was represented by a civil

side plaintiff's firm, was that unlike the patient witnesses,

this was someone who worked with and for the defendant.  In the

course of a discussion with the government, and this was

reflected in the Jencks Act material, which we are happy to

produce.  The witness said, in sum and substance, look, I have

O4H4PADC

1    a general mistrust of prosecutors because of what happened to

2    me in the drunk driving incident.  So in the course of that

3    conversation, the government said, look, there are no promises.

4    No agreement is being extended to you.  There is this concept

5    of immunity agreements in the world.  And if we were ever in a

6    position to need to talk about that, we can talk about that.

7    That was the extent of what the government said to that

8    witness.

9        And the government also said, to the extent you have

10   concerns about today, just to set you at ease, why don't we do

11   a proffer agreement.  We don't think you need it.  No reason

12   why we don't think you need it.  But if you want it, if you

13   think it's a good idea, we're happy to do it.  And that's what

14   we did.

15       Since then the government communicated to that

16   witness' counsel, look, this is not the sort of scenario where

17   we are usually offering proffer agreements.  This is not

18   someone who has any exposure from our perspective.  This is not

19   someone we are looking to sign up as a cooperator, *et cetera*.

20   So going forward we don't think he needs a proffer agreement.

21       Counsel's response was, look, I get your prospective.

22   It's just so he is not jittery, so he is not nervous, it's for

23   his peace of mind.  Those have been documented in the 3500 that

24   have been provided to the defense.

25       If they want to cross him on, look, haven't you had

O4H4PADC

1    proffer agreements, we have no objection to that.  If they want

2    to do that, it's true, and he will answer however he wants to

3    answer for that.  They should not be able to cross on, didn't

4    the government offer an immunity agreement at some point.

5    Didn't you feel you needed an immunity agreement?  I think

6    those questions would be misleading, and that's not what

7    happened here.

8         MR. BALDASSARE:  Judge, I certainly would never ask

9    him did the government offer you immunity because I have no

10   good faith basis to ask it, and in fact I know the opposite is

11   true from their 3500.

12        As far as a general distrust, if I want to do that I

13   think I can do that without going anywhere near the auto

14   accident.  I do think the fact that he got a proffer agreement

15   or agreements -- I'm not sure if it's one or re-dated -- I

16   think it's fair game.  I get that the government doesn't think

17   he needed it, what matters is he wanted it, and what he was

18   thinking.

19        THE COURT:  Yeah, but it's also his lawyer suggesting

20   that in these circumstances, I mean that's what I think I just

21   heard, that it would comfort him.  It's not that necessarily

22   that he needed it legally.

23        MR. BALDASSARE:  I don't know, Judge.  Obviously,

24   people are declining our requests to talk.  What I can say is I

25   think that the federal PD, the criminal defense attorney

O4H4PADC

1  doesn't show up until there are one or two or the government

2  can tell me.  It's not like he is there from Jump Street.

3          Even if the lawyer -- even if the lawyer is there, but

4  he doesn't come in until later, and I think at the very

5  beginning even before the PD was involved, the nurse was asking

6  about immunity and was being told exactly as the government

7  represented it today.  So I don't know that it was the

8  federal -- I don't think the federal PD was on the scene.  And

9  even if he did take his lawyer's advice, I think at some point,

10  you know, that goes -- it's something that is fair game.

11          THE COURT:  So what's the government's position as to

12  whether the nurse can be asked, you asked for immunity, you

13  want immunity, didn't you?  Not you were offered it but --

14          MR. XIANG:  I don't think -- I don't think as phrased

15  that way that would be fair.  I'm forgetting the exact word,

16  but the sum and substance of what the witness said in that

17  initial telephone conversation was, look, I'm feeling nervous.

18  I've talked to prosecutors before, and I feel like I was misled

19  in those prior conversations.  The witness is not a lawyer the

20  witness is not versed in immunity agreements or what any of

21  those terms mean.  In response to those types of concerns being

22  raised -- and this is before -- we've spoken with this witness

23  a number of times.  The government said, look, you can talk to

24  your lawyer about this.  If there is some need, from a legal

25  perspective, for this thing called an immunity agreement, we

O4H4PADC

1    can talk about that down the line.  We can assuage those types

2    of concerns.

3           I think if the question were posed, look, Witness, did

4    you seek some sort of assurance from the government that they

5    wouldn't come after you, something like that, we would have no

6    objection to that question.  But I don't think that the term

7    immunity or immunity agreements should be injected into

8    cross-examination.

9           MR. BALDASSARE:  Here is the problem, Judge.  I wasn't

10   on the call.  So I don't know who used the word "immunity"

11   first.  I don't know what this person said.  I should be able

12   to cross him based on what I have in the 3500.  If the

13   government thinks I ask a question that I have no good faith

14   basis for or worse that's in bad faith, they can object.

15          THE COURT:  Why don't we leave it at that for now.

16          OK.  I want to talk quickly about sealing.  I want to

17   talk a little bit about sealing for a minute, and then I want

18   to talk about the *voir dire* in the proposed preliminary

19   instructions.

20          I looked at the exhibits that the government seeks to

21   seal, like the medical records, driver's license and phone

22   records.  And you will let me know if there are other

23   documents.  I'm granting the motion in part.  I'm going to let

24   you seal them, but I do think many of these documents don't

25   need to be sealed completely but need to be redacted.  Even if

O4H4PADC

1    it's you are redacting a patient's name on medical records or

2    maybe some other information that's irrelevant.  But if there

3    are exhibits that have information that is really not -- I'm

4    balancing it against the privacy, of course, but has relevant

5    information that goes to the defendant's guilt, I think that

6    should be public.  So I wanted to give you a head's up on this.

7    Because I know that may take a paralegal's or whoever else's

8    time over the next couple days.

9          So I'm just going to read the law, and we can talk

10   about the parameters.  There is of course a public right of

11   access under both the common law and the first amendment.  The

12   common law right of public access to judicial documents is

13   firmly rooted in our nation's history.  The presumption of

14   access is based on the need for federal courts to have a

15   measure of accountability and for the public to have confidence

16   in the administration of justice.

17         In light of these important considerations, the Second

18   Circuit has articulated a three-part test for evaluating

19   whether documents submitted to a federal court may be sealed.

20   First, the court must determine whether the documents at issue

21   are judicial documents.  Second, the Court must assess the

22   weight of the common law presumption of access it attaches to

23   those documents.  Third, the Court must balance competing

24   considerations against the presumption of access, such as the

25   danger of impairing law enforcement or judicial efficiency and

O4H4PADC

1    the privacy interests of those resisting disclosures.

2            With regard to the right of access under the first

3    amendment there are two different approaches for determining

4    whether the public and press should receive first amendment

5    protection in their attempts to access certain judicial

6    documents.  The first approach considers whether the documents

7    have historically been opened to the press and general public

8    and whether public access places significant positive role in

9    the functioning of a particular process in question.

10            The second approach considers the extent to which the

11    judicial documents are derived from or are a necessary

12    corollary of the capacity to attend the relevant preceding.

13    Ultimately, the Court must make specific rigorous findings

14    before sealing a document or otherwise denying public access.

15    Trial exhibits are judicial documents.  Indeed, the public has

16    an especially strong common law right of access to evidence

17    introduced at trials.  That's from the *Amodeo* case.  The public

18    also has a qualified first amendment right to trial exhibits

19    because they are derived from the relevant proceedings and are

20    a necessary corollary of the capacity to attend the trial.

21            Notwithstanding the presumption of access under both

22    the common law and first amendment, a document may be kept

23    under seal if countervailing factors in common law framework or

24    higher values in the first amendment framework so demand.

25            In determining the weight to be accorded an assertion

O4H4PADC

of a right of privacy, courts should consider the degree to
which the subject matter is traditionally considered private
rather than public as well as the nature and degree of injury.
And in balancing competing considerations against the
presumption of access.  The privacy interests of innocent third
parties should weigh heavily in a court's balancing equation.

Moreover, when considering the first amendment right
of access, courts have similarly found that the privacy
interests of innocent third parties can constitute higher
values that may justify sealing.

Now let's talk about the specifics.  Just to the
medical records, courts have often found that victim's privacy
interests in their medical records outweigh the public's right
of access.  That said, again, the question is can they be
redacted instead of sealed to allow information regarding their
course of treatment or conditions or whatever else may be
relevant.

MR. XIANG:  So the answer, your Honor, is
respectfully, no, and there is both a substantive and
mechanical reason for that.

I'll start with the substantive reason, which is that
based on how these records were produced to the government,
many of them are not limited to visits with the defendant.
Many of these, I think for a number of victims, are literally
these folks' entire medical histories throughout their lives

O4H4PADC

1    with the particular health network at issue.

2            So among other things it will include things like

3    sexually transmitted disease tests that they themselves

4    requested or concerns about their partners having those types

5    of issues, all manner of private medical concerns.  And so it's

6    not clear to us why a person's entire medical history --

7            THE COURT:  My point is that you can redact things

8    that are not relevant that I think have a real privacy

9    interest.  But are you saying that none of their medical

10   records are at all -- that there are privacy issues with

11   respect to everything that outweighs the public right of

12   access?

13           MR. XIANG:  We do, Your Honor.

14           And to give your Honor an example in other context.

15   Sometimes in the course of criminal cases, the defendant's own

16   medical health and/or mental health become an issue for

17   competency motions, for motions to adjourn a proceeding or

18   adjourn sentencing because someone is ill or whatever.  And

19   typically what has happened has been that the parties have

20   tried to litigate those issues as much as possible in briefs or

21   filings that are partially redacted, as your Honor suggests.

22   But the underlying medical records, the underlying exams of

23   doctors, *et cetera,* those things have been, not *ex parte*, the

24   parties have seen them, but they have been under seal and

25   provided to the Court in an email or otherwise.  But those

O4H4PADC

types of medical records are not filed on ECF.  And, in fact,

the government understand that private medical records are one

of the *per se* categories under the local rules or the Court's

rules that need not be filed and should not be filed publicly

and made available to the public.

THE COURT:  What's the defense position?

MR. BALDASSARE:  Judge, I don't want to embarrass

anybody.  I could stand here and say, well, once we get out --

I think I'm in agreement with the government.  But I will tell

you if there were a magic way to get out the names, the social

security numbers and addresses, whether or not there is STDs in

there I don't think matters -- here is what concerns me, and

20, I'm just trying to be reasonable here because it really

doesn't make a different to me or my client.  But if I want to

use them or they want to use them, there is just a monumental

danger of either an error, because we have all seen these

documents.  There are names; there are last name names; there

are socials.  The other problem is I also don't know how

sometimes you redact a PDF and it could be unredacted by people

who know what they are doing.  In most cases I don't worry that

much.  And, again, these people are accusing my client, so I

have my own thoughts.  But it is fraught with peril.

But my question is do we file these, like, now, or is

it only after they have gone into evidence?

THE COURT:  My understanding is the government was

O4H4PADC

asking that these all be sealed.  I assume after they were

admitted into evidence so that they weren't public documents at

that point.

I will hear you out on how you envisioned it.

MR. XIANG:  Yes, your Honor.  I think that was the

government's expectation that these medical records, and if

they were sealed, we could use them in unredacted form that

would be viewable to the parties, viewable to the defendant and

your Honor and the jury.  But to the extent they will being

published, in the course of the case that we would simply turn

offer kind of the gallery-facing screen so as someone's medical

records are being reviewed by the parties and by the jury and

your Honor, they are not being displayed for the public and the

press.

And that goes to the mechanical challenge that I

alluded to before, your Honor.  I think when we envisioned this

pseudonym procedure that I described before, the idea was it

would be evident to all of us and the jury that, say John Smith

someone's real name, that to the extent the medical records

says "John Smith," the jury will know it's the medical records

for the person on the stand right now even though he is

testifying under some John Doe pseudonym.

Once we start redacting names and identifiers were the

medical records then I think it would be very confusing to

everyone, including the jury whose medical record it even is.

O4H4PADC

1    As the defense pointed out, it is also a monumental technical

2    feat to do this.  It would not be "control F."  There is every

3    permutation of someone's first name, last name, initials, date

4    of birth, socials, all over these records.  And in our

5    experience, if you are doing that level of line by line,

6    paragraph by paragraph, item by item redaction, PDFs will crash

7    *et cetera*, *et cetera*.

8              THE COURT:  Go ahead.

9              MR. BALDASSARE:  The other thing I was going to add to

10   that, as we are talking about that, I don't know we would ever

11   redact them from the jury, the other problem is as far as being

12   able to figure out who these people are, I don't think it would

13   be that hard because they are going to be up there giving

14   testimony under whatever name.  These things are going to be in

15   Exhibit 2, Exhibit 3.  If somebody pulls Exhibit 2 and 3, they

16   know who that person is.  They figure it out.  Now they have

17   quite a bit even if they redact it.  We are OK with it.

18             THE COURT:  Consistent with the *Monge* case, I am

19   finding that the victim's privacy interest and the medical

20   records outweighs the public right of access and also for all

21   the other practical reasons that you mentioned and concerns.

22             So when you admit it, I mean, are you going to be

23   saying this will be admitted under seal at the time that you

24   seek to admit or just at the end of the day every day we will

25   confirm what is under seal and what isn't, consistent with my

O4H4PADC

1    ruling today?

2          MR. XIANG:  Consistent with your Honor's ruling, our

3    intent and our suggestion, if the defense is OK with it, is

4    it's only two series of exhibits.  So to the extent we are

5    seeking to go admit them or they are seeking to use them on

6    cross-examination, we would always say the word "sealed

7    exhibit."  So we would normally say "Government Exhibit 1," as

8    to sealed exhibits we would say "Sealed Government Exhibit 1."

9          And that would be a signal to the Court, we understand

10   there has been some discussions offline between us and your

11   Honor's staff, the Court has graciously offered to basically

12   turn off the gallery-facing screen wherever they hear the word

13   "sealed exhibit" from either party.

14         THE COURT:  All right.  With respect to the driver's

15   licenses, unless I hear an objection I'm inclined to seal all

16   of them in full.  Given that once the information that would

17   protect the victim's identity is redacted, essentially the

18   whole license would be redacted.  So it doesn't make sense, so

19   I'm granting the motion to seal, citing *BakeMark* that case.

20         For phone records, can they be redacted?

21         MS. COLSON:  Your Honor, it's just two single pages of

22   phone records, and they belong to a patient parent.  I think

23   the issue there is that I suppose we could redact her phone

24   number and her name.  But as I am remembering the record, the

25   phone number repeats in every entry.  So similar to what you

O4H4PADC

1   say about license it becomes sort of a sea of black.  It's just

2   two single pages, her phone record and her husband's, one page

3   of each.  So we ask that those single pages be redacted because

4   at a certain point you lose the purpose.  Excuse me, be sealed,

5   I apologize.

6           THE COURT:  I grant that motion and find that the

7   victim's privacy interest or the family members of those

8   victims in their phone records outweigh the public right of

9   access, warranting redaction.

10          I was going to turn now to jury selection.  I know

11  it's late, and I'm sorry for that, but I do think it's

12  important we address this.

13          In terms of letters on the remaining motions that we

14  talked about but haven't decided, do you want to get me a

15  letter by the end of the day tomorrow and then defense counsel

16  could get me his letter by the end of the day Friday.  Does

17  that give you all enough time?

18          MR. XIANG:  Yes, your Honor, thank you.

19          THE COURT:  That's what we will do, and then I will

20  rule early next week.

21          So I believe my clerk provided you with a proposed

22  jury questionnaire.  Do you want to -- do you have any

23  objections?  Who would like to be heard first?

24          MR. BALDASSARE:  So, Judge, yeah, I have basically

25  two -- on the jury questions, I do have quite a few questions

O4H4PADC

1    or requests.  But I'm wondering given the hour -- I'm happy to

2    stay -- but I'm wondering if some sort of a markup wouldn't be

3    more efficient for the Court.

4           One thing I did want to flag for the Court, and I can

5    make a fulsome factual record on this, we have got to figure

6    out a way, Judge, just given the statics from this district and

7    elsewhere, we have to figure out a way because the jury is

8    going to find out that my client is gay; they are going to find

9    out that he is married, and they are going to find out that

10   they adopted.  I could tell you the biases studies, the

11   violence studies, we have got to figure out a way to ferret how

12   the people who are going to stop listening when they hear about

13   same sex marriage.  I can propose some questions.

14          That also raises some questions I have about how the

15   Court could do *voir dire* in this case.  Again, I know I'm sort

16   of all over the place, but here is my point.  My point is no

17   one is going to stand there and say I answer yes to the

18   question about being homophobe.  I think in some respects,

19   given some of the questions I think we have to ask and given

20   there's so many about sexual abuse, I don't think it would add

21   too much time if we just did *voir dire* of each person.  I mean,

22   it might add an hour, 20 seconds walking up and back.  Because

23   nobody is going to stand up there and say the fact that the

24   defendant is married to --

25          THE COURT:  For sensitive questions -- I'm not going

O4H4PADC

1    to do all of *voir dire* outside the hearing of the public, if

2    that is what you are suggesting.

3        MR. BALDASSARE:  I'm just trying to figure out a way

4    that somebody -- when we get to the questions, if -- and I

5    think we have to have two or three questions on this -- I just

6    want to figure out a way where the people who have a problem

7    with it are not going to feel compelled to say it in public.

8    Because otherwise those people are all going to lie.

9        THE COURT:  Look, I'm open to other suggestions.  One

10   thing we could do is do it the way I normally do it.  I hand

11   out the questionnaire.  I walk through it with the first juror

12   in public with a couple of the questions, as you saw.  And

13   specifically say if you want to talk about this add sidebar, go

14   ahead.  And once we are done I go to proposed Junior Number Two

15   and say, do you have any yes answers in the questionnaire.  I

16   think that is the most efficient way of doing it.

17       That being said, if at the end of each person who

18   hasn't otherwise asked to come to sidebar I can ask that person

19   to come to sidebar and say, you know, do have you any hesitancy

20   see about any of these questions, or something to that effect.

21   But we can't have jury selection in private.

22       MR. BALDASSARE:  The other thing I thought about --

23   that was sort of one way was to make sure that people can say

24   that in private.

25       The other one was to ask, for example, where I was

O4H4PADC

1    going to try to insert a few questions to get to people who

2    were going to have a problem with sexuality or my client's

3    marriage or things like that, is maybe saying if you answered

4    yes to any in Section 3 or something like that, where those

5    questions are.  I don't know.  I know that the government

6    probably doesn't want me to look like I'm trying to curry favor

7    or say this poor guy has a family.  But the truth is these are

8    hot-button issues and --

9         THE COURT:  How would the jury know he has a family?

10         MR. BALDASSARE:  Because I think that we have to

11    ask -- I think we have to say the defendant is gay.  The

12    defendant is married, and the defendant and his husband adopted

13    a son.

14         THE COURT:  Why do you have to say that?

15         MR. BALDASSARE:  I could give you the studies.

16    Because there remains ranging hatred of gay men.

17         THE COURT:  But then why raise it then?

18         MR. BALDASSARE:  Because I think that people, if they

19    are allowed to say that in private, I think will say what a lot

20    of people say which is that I'm against same sex marriage.  And

21    I don't want those people on the jury.

22         First of all, I think we have to ferret this out.  The

23    studies, even just a recent study from New York, state these

24    are not just one-sided articles from advocacy groups.

25         THE COURT:  What is it in the evidence that you expect

O4H4PADC

1    to come in that will indicate that he is gay or has a child or

2    is married?

3         MR. BALDASSARE:  Sure.  So there are a lot of

4    testimony that he said that Dr. Paduch said this to me, said

5    that he was married.  He lied to me.  He said he didn't have

6    any kids.  He lied to me about this --

7         THE COURT:  Will come in through patient testimony, is

8    your view.

9         MR. BALDASSARE:  For sure.

10        And one of the alleged victims goes into this whole

11   long thing that is important, right, that has to come out, but

12   it's going to come out, Judge.  I just think the jury has to

13   know it.  I can't envision a trial where list sexuality and his

14   marriage don't come out.

15        By the way, we are running a huge risk if we don't vet

16   that and something comes out.  There are people --

17        THE COURT:  Let me ask you a question since it is so

18   late.  I'm happy to stay, but I feel bad particularly for the

19   court reporter.  Are you all free on Friday afternoon?  Could

20   we meet on Friday?  Or, you know, sometime on Friday to go over

21   the remaining issues?  I'm happy to do it now.  And you could

22   send me your proposed markup in advance, and we can talk about

23   it.  Since I won't have the complete set of letters on the

24   remaining issues, I won't rule on them.  But we can talk more

25   about *voir dire* and the preliminary instructions.

O4H4PADC

1          MR. XIANG:  The government is available on Friday

2     afternoon.  The government is happy to continue now or not,

3     however the Court pleases.

4          THE COURT:  Mr. Baldassare, do you have a preference.

5          MR. BALDASSARE:  We can make ourselves available on

6     Friday afternoon.  We were actually going to be at MDC anyways,

7     so we can just leave there a little earlier and come here.

8          My only preference is I think it might be more

9     efficient if I make the suggestions on that document rather

10    than going --

11         THE COURT:  So why don't you do that tomorrow.

12         MR. BALDASSARE:  Yep.

13         THE COURT:  Why don't you get it to me, I don't know,

14    can you do it by --

15         MR. BALDASSARE:  I'm in trial prep brain.  What day is

16    today?

17         THE COURT:  Today is Wednesday.

18         If you could get it to me midday tomorrow.  Do you

19    want to talk to each other about that and see if you could

20    reach agreement?

21         MR. BALDASSARE:  I'm happy to send it to the

22    government first thing in the morning.  I think there may be

23    agreement on some, I don't think on all, but on some I do.

24         THE COURT:  So why don't we do that.  I'll get your

25    copy, and I'll have a chance to look at it before Friday

O4H4PADC

1    afternoon.  And then I can generate a new draft, and we can

2    talk more about it.  I don't know what the government's

3    position is on this specific issue with respect to Dr. Paduch's

4    marital status and family.

5         MR. XIANG:  We are happy to engage with the defense on

6    that issue.  I'm very cognizant of time.  Why don't we do that

7    and plan to discuss that issue on Friday, if that's OK with

8    your Honor.

9         THE COURT:  That's fine.

10         MR. XIANG:  While we are here, just some housekeeping

11   issues.

12         THE COURT:  Sure.

13         MR. XIANG:  We just wanted to put on the record that

14   part of the expert notice as to Dr. Strange we received no

15   other expert notice from the defense, and we take that to mean

16   they will not be endeavoring to elicit any expert testimony

17   from anyone, including the defendant himself.

18         THE COURT:  Is that right?

19         MR. BALDASSARE:  I could tell the Court at this time

20   we are not looking at any other experts.  If we do, I

21   understand that everybody is going to be upset.  But if I have

22   to do it I will.  But at this time I can say we are not.

23         The expert testimony issue with regard to Dr. Paduch I

24   just find to be a fascinating one.  The government raised, it

25   feels like a year ago.  It goes something like this:  If

O4H4PADC

```
 1   Dr. Paduch -- this is how I think it goes -- if Dr. Paduch
 2   testifies and he wants to say "I did what I believed was
 3   medically appropriate" that they view that as expert testimony,
 4   that he should not be able to give it, and that they might
 5   wasn't a Daubert hearing of him before he could testify.  We
 6   talked a little bit about the law.  I never went back to it.
 7   There is Seventh or Eighth Circuit case the government has that
 8   goes that way, but I just can't imagine a world where a
 9   defendant in a case like this, where everybody -- now that we
10   are going to have an expert on standard of care, where he
11   couldn't testify if his own defense.  Because to me, I think it
12   wouldn't even be expert testimony.  It might go to his mens
13   rea, and what he thought he was doing.  So that's my thought on
14   that.  I don't know if it's premature.  Obviously, there are
15   certain decisions that aren't made yet.  But that's how that
16   issue shook out.  We have no other experts to notice at this
17   time, that's it.
18            THE COURT:  What's the government's position?
19            MR. XIANG:  I want to be very clear, we are not
20   seeking to preclude the defendant from testifying, full stop,
21   period.  We are simply stating for the record --
22            THE COURT:  Including about whether his actions were
23   in furtherance of appropriate medical care?
24            MR. XIANG:  All I wanted to put on the record is we
25   were aware of case law supporting the view where the defendant
```

O4H4PADC

1    offers opinions like that that expert notice would be

2    appropriate.  That said, I think it's quite a separate question

3    of whether we would ever seek to *Daubert* or preclude the

4    defendant from testifying or offering testimony.  I'm not

5    taking a position on that.  I'm just putting on record that the

6    only expert disclosure we have is Dr. Strange and that is what

7    we were aiming at.

8         THE COURT:  So I think you got your answer on that.

9         MR. BALDASSARE:  The only thing I'm confused about,

10   Judge, is it the government's position if Dr. Paduch is going

11   to testify that what he did, he believed to be medically

12   appropriate, they want a Rule 16 notice of that now?

13        THE COURT:  I don't think so.  Was that your position?

14   I didn't think so.

15        MR. XIANG:  That's not our position.  Apart from

16   Dr. Strange we received nothing else, and that's what we

17   understand to be the case.

18        THE COURT:  All right.  So just lastly, on the

19   proposed *voir dire*, I understand your point about markups;

20   that's fine.  And, look, if it's not going to work you can send

21   me different red lines, but to the extent you can reach

22   agreement on things, that would be better.  So what time do you

23   think you can send me something tomorrow, some kind of markup,

24   ideally a joint one.

25        MR. BALDASSARE:  I think I could get to the government

O4H4PADC

1    by 9:00 tomorrow if they are around.  We could talk and then we

2    could get to the Court by noon as far as where we are on that.

3            THE COURT:  And then you want to meet on Friday at

4    3:00.  Does that work for everyone?

5            MR. XIANG:  It's fine for the government, your Honor.

6            THE COURT:  Does that give you enough time to get back

7    from the MDC?

8            MR. BALDASSARE:  Could I just have a second, Judge.

9            MS. COLSON:  Your Honor, if we are producing him for

10    this conference he won't be at MDC.

11            THE COURT:  Obviously, I wasn't thinking.  Of course.

12            (Discussion off the record)

13            MR. BALDASSARE:  It's fine, Judge.  They will writ him

14    over.  We will figure out a way to see him, and we won't see

15    him Friday so he can be writted over, and we can do it at 3:00.

16            THE COURT:  OK.  And then, again, when we have a

17    schedule for the follow-ups to the various motions that we

18    talked about.  I'm going to get the government's by the end of

19    the day tomorrow, and the defense by the end of the day Friday.

20            Anything else we need to discuss now from your

21    perspective?

22            If you have any problems with the preliminary

23    instructions that you wanted to red line, feel free to send

24    that to me as well.  If not, we could talk about it on Friday.

25            MR. BALDASSARE:  I did on that, judge.  I have studies

O4H4PADC

1    if the Court's interested.  If it's the Court's practice every

2    time, I know I'm going to lose this one.  But I just don't

3    think jurors should take notes in this case.  It's one

4    defendant; there's one charge.  There are lots of studies that

5    cause me concern.  One is that as the trial goes on, studies

6    show they take fewer and fewer notes, which means if I put on a

7    case it's going to get less attention.

8            The other problems are people who can write the

9    fastest end up with better notes.  People who are writing are

10   distracting other jurors.  It takes away -- the government has

11   said this, the government is very concerned, not that they

12   don't believe their witnesses, but they know this case is going

13   to turn a lot on credibility.  And I think if anything that

14   takes the jury away from watching and listening, I don't think

15   this is an appropriate case.  And that was just one -- that was

16   really I think the only thing I had with respect to that.

17           THE COURT:  Look, I do disagree.  I think for some

18   people just being able to write down an exhibit number, for

19   them in terms of their memory it's helpful.  But I'm happy

20   either in the preliminary instructions to strengthen up the

21   statements I made as well as in the jury instructions at the

22   end of the trial about, you know, notes.  And at the beginning

23   I'll just say remember, what's much more important is for you

24   to pay attention, pay close attention, don't feel any pressure

25   to take any notes at all.  The most important thing is that you

O4H4PADC

1   are paying attention.  I'm happy to beef that up.

2            MR. BALDASSARE:  I have one other issue, it's not with

3   respect to the initial instructions.

4            MR. XIANG:  Your Honor, we are happy to defer the bulk

5   of our housekeeping until Friday.  There are only a couple of

6   them that are somewhat time sensitive.

7            THE COURT:  Sure.

8            MR. XIANG:  We have served a Rule 902, 11, 13 and 14

9   notice under the Federal Rules of Evidence to the defense to

10  offer the Weill Cornell medical records that are outside the

11  subject of dispute, certain phone records, the fact that an

12  iCloud extraction was done in the ordinary course.  Obviously,

13  the purpose of the certification is to obviate the need to call

14  purely custodial witnesses.  I'm just putting on record we have

15  not received an objection to any of those certifications.

16           THE COURT:  Do you have any objections?

17           MR. BALDASSARE:  In all candor I haven't really

18  focused on them.  I'm going to look at them.  I will give them

19  an answer by the morning.  The only one that might be an issue,

20  is there is an issue with respect to one extraction and our

21  ability to sort of read what was extracted.  I'll talk to them

22  about that.  But I will look at those tonight.  I just didn't

23  focus on them with everything else.

24           THE COURT:  If Mr. Baldassare gets back to you in the

25  morning, is that sufficient?

O4H4PADC

1          Why don't you at least let them know which one you

2     think you will want them to call and they can start getting in

3     touch with that individual.

4          MR. BALDASSARE:  If I look at them tonight, I imagine

5     that's something we can do first thing on our call tomorrow.

6          THE COURT:  OK.  All right, first thing tomorrow you

7     will know the answer to that question with respect to all the

8     document custodians.

9          MR. XIANG:  Thank you.

10          We talked today, and there's been already litigation

11     as to some sexual conduct topics or evidence as to certain

12     victims that your Honor had already ruled on.  Apart from those

13     issues, we have received no other notice under Rule 412, which

14     is the rule that governs the ability of defense counsel to

15     inquire about victims' past sexual behavior, sexual conduct.

16     So we assume that apart from those issues, those topics will

17     not be inquired into as to any victims.

18          MR. BALDASSARE:  I have no intention of doing that

19     now.  I also like to think I have a good instinct of when I

20     should ask the Court before I go down a road if I think a door

21     has been opened, I will bring it up.  As I stand here now, I

22     have no reason to serve any 412 notices.

23          MR. XIANG:  Respectfully, your Honor, the rule

24     requires notice 14 days before trial including a motion served

25     on the victims themselves.  This is not a rule that

O4H4PADC

1    contemplates a kind of figure it out as the trial goes on and

2    maybe I will do it.  If he hasn't served notice, a hearing may

3    be required under certain circumstances.  So our position is

4    apart from the issues that have already been litigated and

5    discussed, 412 questions and 412 evidence should be off the

6    table.  That's what the rule contemplated.

7        MR. BALDASSARE:  Judge, it could be off the table.

8    All I know none of the witness will talk to me.  I have no idea

9    other than what they have given me, what they are going to say.

10   I understand the rule, and if I want to ask a question and I

11   ask you and you say I can't because I didn't serve the 412

12   notice, so be it.

13       THE COURT:  It sounds like counsel is on notice that

14   he will likely lose any such request.  If he provides me a

15   reason along with case law as to why there should be an

16   exception to that rule, I'll consider it.  But he is on notice

17   that he shouldn't be asking any of those questions because

18   notice has not been provided.

19       MR. XIANG:  Understood, your Honor.  And we take that

20   to mean that it would the nobody be permissible for the defense

21   to ask the question, draw an objection that is sustained in the

22   presence of the jury.

23       THE COURT:  Correct.

24       MR. BALDASSARE:  Right, I'm not going to do that.  Not

25   going to open on it, and not going to do it.

O4H4PADC

1          THE COURT:  And obviously you are not going to open on

2     any of the issues that I have left open, but we will talk more

3     about those issues prior to trial.

4          MR. XIANG:  And, finally, I apologize.

5          THE COURT:  It's fine.

6          MR. XIANG:  The issue of Dr. Strange, we have

7     conferred with defense counsel.  I think we would be in a

8     position to the extent we need to move on Dr. Strange, which we

9     think is very likely, to do that by Monday, which would have

10    been a week since we received the actual expert disclosure.

11         We are cognizant that is two days before trial, but

12    given this is a defense expert, we would imagine that if things

13    need to be resolved even mid-trial, we could find time to do

14    it.  We are not expected to move in such a way that would

15    necessitate an evidentiary hearing as opposed to just

16    litigating the scope of her opinions on the papers.  We just

17    wanted to flag that for the Court.

18         THE COURT:  Again, if that's an open motion, it won't

19    be mentioned on opening.

20         MR. XIANG:  Thank you, your Honor.

21         MR. BALDASSARE:  Judge, I spoke to the government,

22    they asked if I was OK with getting if Monday.  That's fine.

23         One last quick issue which we feel strongly about is

24    if the Court decided on our objections to the verdict form or

25    if we were going to deal with that on Friday.

O4H4PADC

1    THE COURT:  I wasn't even going to deal with it on

2    Friday.  I was going to deal with it later in the trial.  But

3    if you think there was a need because of what you want to say

4    at opening to address it sooner, let me know that.  But I was

5    going to have a charging conference, address with the verdict

6    form and the charge, sufficiently in advance of your

7    summations, but I wasn't going to do it before the trial unless

8    you want me to.

9    MR. BALDASSARE:  No.

10    THE COURT:  We have plenty of things to talk about.

11    MR. BALDASSARE:  That's fine, Judge.  Thank you.

12    THE COURT:  Anything else we need to talk about

13    tonight?

14    MR. XIANG:  Not tonight.

15    THE COURT:  Thank you all.  Thank you so much to the

16    marshals to the court reporter to everyone who stayed late

17    tonight.  Have a good evening all.

18    (Discussion off the record)

19    THE COURT:  Can we just go back on the record.

20    Say it again, Mr. Baldassare.

21    MR. BALDASSARE:  Yes, my client has asked that the

22    Court waive his appearance on Friday and that the Court proceed

23    without him.  He would like to stay at MDC and continue to

24    review discovery.  I consulted with him and we're OK with that

25    if the Court is.

O4H4PADC

1          THE COURT:  Dr. Paduch, I just want to make you

2    understand that you have a right to be here and at every stage

3    of your trial but if you choose to waive this right, we will

4    just be talking about legal issues, you are free to do so.  Do

5    you understand that, and is what you would like to do?

6          THE DEFENDANT:  OK.  Yes, Judge.

7          THE COURT:  Just to confirm that's what you are

8    deciding to do?

9          THE DEFENDANT:  Correct.  I understand.  I would like

10   to stay at MDC.

11         THE COURT:  OK.  Since he is not going to be here on

12   Friday, I have two questions.  Number one, does he waive his

13   presence at sidebar, both during jury selection and during the

14   trial?

15         MR. BALDASSARE:  I have a question about that.  Do

16   they have the ear pieces so he can hear but not physically walk

17   over or does he just have no idea what's going on?

18         THE COURT:  I don't think so.

19         MR. BALDASSARE:  We are probably going to have to,

20   Judge.  Just so the record is clear and so everything is

21   protected, let me talk to him about that.  I actually was going

22   to ask about that.  I didn't know if he could hear them at all.

23   So let me talk to him about that.

24         THE COURT:  OK.  Let me know that.

25         And then the last thing is I do want to have the

O4H4PADC

1    government put on the record any plea offers that have been

2    made just to make sure Dr. Paduch has heard them and discussed

3    them with his attorney.

4              MS. XIANG:  We are happy to do that on Friday if

5    that's okay with your Honor.

6              THE COURT:  But he won't be here.  We could also do it

7    the morning of the trial.  It's fine to do it the morning of

8    trial.  Do you want to do it then?

9              MR. XIANG:  We're happy to do it the morning of trial.

10             THE COURT:  Just be prepared to do that because I just

11   want to make sure he's heard all of the offers and just make a

12   record of that.

13             MR. XIANG:  Understood, your Honor.

14             THE COURT:  All right.  Thank you.

15             (Adjourned)

16

17

18

19

20

21

22

23

24

25