UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                       :

  UNITED STATES OF AMERICA         :

                                       :

         - v. -              :

                                       :

  DARIUS PADUCH,               :         S2 23 Cr. 181 (RA)

                                       :

           Defendant.         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

**THE GOVERNMENT'S SENTENCING MEMORANDUM**

 

                              DAMIAN WILLIAMS
                              United States Attorney
                              Southern District of New York

Marguerite B. Colson
Elizabeth A. Espinosa
Ni Qian
Jun Xiang
Assistant United States Attorneys
   - *Of Counsel* -

**Table of Contents**

Table of Contents ........................................................................................................................ i

PRELIMINARY STATEMENT ................................................................................................ 1

   I. Background ............................................................................................................................ 2

      A. The Investigation and the Charges ................................................................................. 2

      B. Summary of Proof at Trial ............................................................................................. 4

      C. Non-Testifying Victims of the Defendant's Abuse ...................................................... 16

   II. The Pre-Sentence Report and Sentencing Guidelines ....................................................... 30

   III. The Section 3553(a) Factors Justify a Sentence of At Least Thirty Years ...................... 31

      A. Applicable Law ............................................................................................................. 31

      B. The Seriousness of the Offense and the Need for Just Punishment ............................... 31

          a.    The Nature and Seriousness of the Offense: The Sexual Abuse ............................. 31

          b.    The Nature and Seriousness of the Offense: The Lasting Damage ........................ 34

      C. The History and Characteristics of the Defendant ....................................................... 41

      D. The Need to Protect the Public and Afford Adequate Deterrence ................................. 45

   IV. Conclusion ....................................................................................................................... 49

## PRELIMINARY STATEMENT

Darius Paduch committed heinous crimes.  For years, the defendant sexually abused boys and young men entrusted to his medical care.  He capitalized on his expertise in urology and the prestige of a world-class hospital to violate his patients' bodies and their fundamental sense of safety.  Some barely teenagers and some suffering pervasive cognitive delays, victims sought out the defendant to treat their most sensitive health issues.  Purporting to treat those issues, the defendant instead gratified his own sexual desires.  His abuse was sweeping and sinister.  It robbed boys of their innocence.  It dashed their dreams of becoming fathers.  It inflicted irreparable damage on victims and their families.  It violated basic medical ethics and shattered public trust. It demands a substantial term of incarceration.

The Government respectfully submits this memorandum in connection with the sentencing of the defendant, which is scheduled for November 20, 2024, and in response to the defendant's November 8, 2024 sentencing memorandum and objections to the Pre-Sentence Investigation Report ("PSR") prepared by the United States Probation Office (the "Probation Office").  The Probation Office correctly calculated the applicable United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range as life imprisonment, with a mandatory minimum term of 120 months' imprisonment.  Under the relevant Section 3553(a) factors, a sentence of at least 30 years' imprisonment is sufficient, but not greater than necessary to achieve the aims of sentencing. Most important, such a term is needed to account for the egregious nature of the defendant's abuse, including the immeasurable harm inflicted on his victims—harm that will impact them for the rest of their lives.  The history and characteristics of the defendant, as well as the need to promote

respect for the law, protect the public, afford adequate deterrence, and provide just punishment
further compel a sentence of at least 30 years.  *See* 18 U.S.C. § 3553(a).[1]

## I.  Background

### A.  The Investigation and the Charges

In late 2022, the U.S. Attorney's Office for the Southern District of New York and the
Federal Bureau of Investigation ("FBI") began investigating the defendant in connection with his
sexual abuse and assault of numerous boys and young men entrusted to his medical care.  What
started as an interview with a single victim mushroomed into a sweeping investigation that
revealed the defendant's yearslong abuse of dozens of former patients.

On April 4, 2023, a federal grand jury in this District returned Indictment No. 23 Cr. 181
(RA), charging the defendant with two counts of inducing others to travel to engage in unlawful
sexual activity, in violation of  18 U.S.C. § 2422(a) and 2; and two counts of inducing minors to
engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(b) and 2, based on the
defendant's abuse of two victims ("Minor Victim-1" and "Minor Victim-2").  The defendant was
arrested on April 11, 2023.  Shortly thereafter, the defendant made two bail applications, both of

---

[1] The defendant urges this Court to consider only the abuse inflicted on the statutory victims as
proven at trial. Of course sentencing courts have "broad discretion both as to the type of
information they may consider in imposing sentence and the source from which that information
derives." *United States v. Smith*, 967 F.3d 198, 216 (2d Cir. 2020).  This principle is codified in
18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information
concerning the background, character, and conduct of a person convicted of an offense which a
court of the United States may receive and consider for the purpose of imposing an appropriate
sentence."  Regardless, the abuse inflicted on the statutory victims alone warrants a sentence of at
least 30 years.

which the Government opposed and both of which were denied.  In a written opposition, as well as during the two bail hearings, the Government proffered additional facts about the defendant's criminal conduct, including the clinical conditions that predisposed certain victims to abuse. (Transcript of Bail Hearing of April 20, 2023, 13:16-19) ("[W]e're talking about boys who suffer from conditions that make it clinically difficult for them to express their emotions, and he knew that in every instance."); (Transcript of Bail Hearing of May 24, 2023, 27:20-22) ("May 24, 2023 Tr.") ("[B]oys 13, 14, 15 years old with genetic problems, some of them that predispose them to language and learning delays).  On May 24, 2023, the Government also read into the record several statements from certain victims, detailing the abuse they suffered.[2]  (May 24, 2023 Tr. 30: 4-10 ("Dr. Paduch asked me what porn I liked to watch and instructed me to masturbate in the room with him to completion while simultaneously penetrating my anus. This was incredibly traumatic. I recall feeling afraid and ashamed following the procedure. However, I also thought that, as a doctor, he knew what was best, and I leaned into my trust in him that he was doing the right thing"); 31:2-4 ("He did not use gloves during the exam.  He continued to touch me multiple times when I told him to stop.")).  Meanwhile, the Government continued to locate and interview additional victims of the defendant's sexual abuse.  On January 16, 2024, a federal grand jury in this District returned superseding indictment S2 23 Cr. 181 (RA) ((Dkt. 49) the "S2 Indictment"), charging the defendant with seven counts of inducing a victim to travel interstate to engage in unlawful sexual activity, in violation of 18 U.S.C. §§ 2422(a) and 2, and with six counts of using an interstate facility to induce a minor to engage in unlawful sexual activity, in violation of 18 U.S.C.

_____

[2] The victim statements were anonymized with the exception of the statement by Tucker Coburn.

§§ 2422(b) and 2.  The charges were based on the defendant's sexual abuse of eight victims—including minors—who were patients of the defendant.

### B.  Summary of Proof at Trial

On April 24, 2024, the defendant proceeded to trial on the S2 Indictment.  The Government presented evidence on eleven counts of the S2 Indictment, pertaining to the defendant's abuse of the victims listed as Minor Victim-1, Minor Victim-2, Minor Victim-3, Victim-4, Minor Victim-5, Victim-7, and Minor Victim-8.  The Government elected not to proceed on Counts Six and Eleven, and the Court dismissed them. (Dkt. 121).  On May 8, 2024, the jury returned a verdict of guilty on all counts the Government presented.

The proof at trial established that, while employed as a urologist by Weill Cornell Medicine,[3] the defendant sexually abused patients under the guise of medical care.  (PSR ¶ 21). Victims visited the defendant to treat sexual dysfunction and genetic conditions, such as Klinefelter Syndrome.  Some were particularly vulnerable, owing to the nature of their conditions. Victims with Klinefelter Syndrome, for example, often experienced infertility following puberty. (Tr. 351 "So with Klinefelter Syndrome, the presence of the extra chromosome causes the cells that produce sperm cells to hit a kill switch." (Dr. Amin Herati)).  Hoping the defendant might preserve their fertility in the limited window that existed, adolescent victims—or more accurately their parents—sought the defendant's expertise.  At the same time, victims with Klinefelter Syndrome frequently faced cognitive impairments, "especially language and auditory processing," challenges that the defendant himself documented in the records of particular victims. (*E.g.*, GX

---

[3] The victims referred to the hospital where they visited the defendant as both "Cornell" and "New York Presbyterian Hospital."

205). These cognitive challenges, in turn, made it particularly difficult for victims with Klinefelter Syndrome to communicate their distress as the defendant abused them.  Other victims experiencing sexual dysfunction were similarly desperate for the defendant's help, often reluctant to discuss with others their most intimate problems.

Whatever the issue that brought them to defendant, his victims all endured the same horrific experience of being manually masturbated by their doctor without their consent and purportedly for medical purposes.  For many of the boys, the playbook was the same: The defendant physically examined them without a medical chaperone or guardian present. (PSR ¶ 22).  He directed patients to masturbate in front of him, often while pornography was playing.  Without warning and at times without gloves, the defendant would grab the victims' penises and begin to masturbate them himself, in some instances insisting they were masturbating incorrectly. (Tr. 746; Tr. 862-863; Tr. 985; PSR ¶¶ 48-49, 58).   He digitally penetrated certain victims' rectums.  (Tr. 1043); other victims observed or even felt what they believed to be the defendant's erect penis.  (Tr. 1138; PSR ¶ 63).  The defendant induced victims to ejaculate in his presence or, in some cases, directly on him.  (PSR ¶ 22).  None of the defendant's abusive tactics was medically appropriate, much less necessary.  (*E.g.* Tr. 303-304 (Dr. Amin Herati)).

Apart from targeting especially vulnerable patients, the defendant employed a variety of tactics to carry out and amplify his abuse.  (PSR ¶ 22). He leveraged his in-demand status as a renowned Klinefelter specialist.  (Tr. 429 ("He said he had a waiting list." (K. Bevin)).   He leveraged his affiliation with a world-class hospital.  (Tr. 200).  He found occasion to draw particular patients into his orbit—whether by hiring them as high-school interns, seeing them socially, sharing details of his personal life, or purporting to administer care outside the clinical

setting.  The defendant manufactured sexual dysfunction issues to facilitate his abuse, insisting his victims' issues required routine follow-ups and bespoke "programs" that involved either the defendant watching them masturbate or masturbating them himself.  (*E.g.*, Tr. 741, 1082).  The defendant also desensitized victims to the sexualization of their doctor-patient relationships by engaging them in explicit conversations about their sexual activity and the appearance of their genitalia, and by volunteering intimate information about his own sexual history, sexual orientation, and sexual activity. (PSR ¶ 23; Tr. 570 (Dr. Rocchio)).

Electronic evidence from the defendant's internet search history and iCloud account made clear that he sought sexual gratification when he masturbated victims or engaged them in explicit conversations. Specifically, the Government introduced two pornographic images from the defendant's iCloud, one capturing a naked young man standing behind a medical screen while looking at a medical gown.  The young man is seemingly unaware of being photographed.  (GX 608, 608M).  The other photograph captured several young men, nude and assembled in line behind a nude male, bent at the waist as a doctor examines his rectal area. (GX 609, 609M.).  Finally, the Government introduced evidence that the internet search history on the defendant's laptop listed a website entitled "Doctor fucking teen – XVIDEOS.COM." (GX 610).

The trial evidence included: (1) testimony from eleven former patients who were abused by the defendant and whose accounts are detailed below; (2) medical records of those patients; (3) electronic communications between the defendant and various victims; (4) testimony of two practicing urologists, one of whom specialized in the treatment of the same conditions that the defendant treated; (4) testimony from a practicing psychologist regarding sexual abuse in the doctor-patient setting; (5) testimony of a nurse who witnessed the defendant sexually assault a

patient; and (6) electronic evidence gathered from the defendant's iCloud account, including images and internet searches reflecting doctor-patient sexual fantasies.

<em>The Defendant's Abuse of Sam Lenox[4] (Counts One and Eight)</em>

Sam was the defendant's patient for two years, starting when he was 16 years old. (GX 201). He was a high-school student desperate for help with erectile issues. At appointments, the defendant would "practice" with Sam, meaning he masturbated Sam. Once, when Sam suggested he could self-stimulate, and even insisted he would be more comfortable doing so himself, the defendant placed his hand on Sam's stomach, told him to relax and proceeded to masturbate Sam to ejaculation. The defendant then smeared that ejaculate on Sam's face, incredulously remarking, "Don't tell me you've never tasted it." (Tr. 121-122; PSR ¶ 27-28)).

The defendant began texting Sam the night of his first appointment. (GX 1001). Later, the defendant asked for a live video of Sam "J[acking] O[ff]." He asked whether Sam had bought the Fleshlight vagina he recommended. He mused about playing with Sam's penis and ejaculating into Thanksgiving turkeys. He also admitted to "helping" Sam obtain a semi-erection in the defendant's office. (GX 401; PSR ¶ 30).[5]

Seeking opportunities to be close to Sam, the defendant hired him as a high-school summer intern. Once during that internship, when Sam mentioned he was continuing to have erectile

---

[4] By agreement of the parties and with permission of the Court, victims were permitted to testify under pseudonym. (Apr. 17, 2024 Tr. of Pretrial Conf. 10; Dkt. 115).

[5] By themselves, the text messages between Sam Lenox and the defendant establish that the defendant used his cellphone for "nefarious" means, and not because he "cared about his patients, plain and simple." (Paduch Sent'g Mem. at 10). That self-serving gloss is further belied by the overtly sexual text messages between the defendant and Evan Stewart (GX 407), James Brent (GX 410), and Tim Douglas (GX 405).

7

issues, the defendant rushed Sam into an empty examination room, directed him to drop his pants, and started masturbating Sam. (Tr. 122; PSR ¶ 31).

*The Defendant's Abuse of Luke Bevin (Counts Two and Nine)*

Luke was in seventh grade when he was diagnosed with Klinefelter Syndrome (Tr 425:19). After that diagnosis, Luke's mom Krista attended a medical conference where she met the defendant. He told Krista that he treated patients from all over the country and that he had a waiting list of prospective patients. When the defendant agreed to treat her son, Krista "felt relieved and hopeful." (Tr. 431).

Starting when Luke was just fourteen, Krista and Luke's dad would drive Luke up from Maryland for appointments with the defendant. During those appointments, the defendant sexually abused Luke. (Tr. 484; 505). On at least one occasion, the defendant conducted a physical exam that involved prodding Luke's rectum with his fingers. (Tr. 488). At most appointments, he would masturbate Luke, causing Luke to ejaculate into the defendant's hands or on the defendant's clothes. (Tr. 490; PSR ¶ 35). Waiting just outside the examination room, Luke's mother never imagined that the defendant was manually masturbating her son. Much less did he seek her consent to do so; in fact, Krista believed that on the occasions where her son was required to produce a semen sample, he would be afforded privacy and directed to drop his specimen through a small window or slot. (Tr. 449; PSR ¶ 34).[6]

---

[6] Cornell had a special-procedure room specifically designed for patients to produce semen samples in private. Without interacting with those patients, medical staff would retrieve their samples through a window slot in the collection room. (Tr. 525-527 (J. Alvarez)).

8

At Luke's first appointment, the defendant gave Luke his cellphone number and told him to text with anything. He explained to Krista, "all my boys text me," inviting Luke to call anytime. Later, he asked Krista if Luke—like Sam—might be his high-school intern, and suggested that Luke live with him over the summer. (Tr. 450-451).

Luke's genetic condition manifested in significant cognitive delays. As his mother explained, Luke experienced "extensive speech delays" growing up; his other siblings would joke that only their mother could understand Luke. (Tr. 425). In Luke's medical records the defendant himself noted fourteen-year-old Luke's "speech delay," "dyslexia," and issues with "expressive language." (Tr. 473; GX 205). The defendant then went on to note that individuals with Klinefelter Syndrome face "mild impairment of cognitive function, especially language and auditory processing." (GX 205; Tr. 473).

### The Defendant's Abuse of Evan Stewart (Counts Three and Ten)

Evan was fifteen when he was diagnosed with Klinefelter Syndrome. Seeking "to get the best" for their son, Evan's parents entrusted him to the defendant's care. (Tr. 636). For years, the defendant sexually abused Evan, beginning at the very first appointment where the defendant undid Evan's gown, put on pornography, and "jumped right into it." (Tr. 653). At fifteen, Evan had never had sex. He had never seen porn. He had never masturbated. (PSR ¶ 38).

The defendant frequently sent Evan sexually charged text messages, including to ask whether Evan had purchased the Fleshlight vagina the defendant recommended, a sex toy he claimed to have purchased for his "nephews" and "sons." He also directed Evan to practice

9

masturbating at home, encouraging Evan to, "stroke it slowly," just as the defendant claimed to be doing at that moment, while working from home (GX 407).[7]

Similar to Luke, Evan suffered from significant cognitive and expressive impairments. (Tr. 634). As a small child, "he couldn't communicate," Evan's mother, Beth, explained. "He couldn't tell me what he wanted." Beth took Evan to speech therapy and enrolled him in speech camp. Evan was enrolled in "a special class" and did not learn to read until he was twelve. The defendant never sought Beth's consent to masturbate her son. (Tr. 634; PSR ¶ 37).

*The Defendant's Abuse of Matthew "Matt" Cirillo (Count Four)*

Matt became the defendant's patient when he was 16, having been diagnosed with Klinefelter Syndrome. A few years later, after the defendant had performed a sperm extraction surgery to preserve Matt's fertility, appointments took a "weird sexual turn." (Tr. 1082). During physical exams, the defendant would encourage Matt to touch himself "down there." (*Id.*). He would watch Matt masturbate, telling him to focus on the porn the defendant was playing. Rather than provide Matt privacy to self-stimulate, the defendant would instead pull the privacy curtain around the both of them, enclosing himself and Matt in an already-cramped exam room.

The defendant also masturbated Matt with his bare hands. Matt has a clear memory of the first time this happened. Lying back on the examination table, Matt was self-stimulating at the defendant's direction. The defendant was leaning over Matt, his hip touching Matt's body. When Matt grew tired of masturbating and tried to give up, the defendant "took over," insisting that if

---

[7] Consistent with this exchange, the Court will recall various images—not admitted at trial—that were geo-tagged to Cornell / New York Presbyterian and featured the defendant exposing his penis.

they were going to proceed, he was going to "get it done." (Tr. 1084-1084). When Matt ejaculated into a cup, the defendant asked whether Matt had ever smelled his own semen before. When Matt said no, the defendant brought the cup of ejaculate to Matt's nose, inviting Matt to "take a whiff." (Tr. 1086; PSR ¶ 44).

*The Defendant's Abuse of Connor Gannick (Counts Five and Twelve)*

After being diagnosed with Klinefelter Syndrome, Connor became the defendant's patient at 13 years old. (Tr. 846; GX 214). Barely a teenager, he traveled with his mom from their home in New Jersey into New York City for appointments. During the second appointment, when Connor was still only 13, his mother left Connor alone in the exam room with the defendant. The defendant seized the opportunity, displaying pornography for Connor and then masturbating him *twice*. He claimed Connor was "doing it wrong," even though Connor had no issue masturbating and ejaculating on his own. Connor explained that the defendant's presence actually prevented him from producing a semen sample. Nevertheless, the defendant directed Connor to masturbate in his presence, leaving Connor to request privacy in nearly every appointment for the next several years. During one visit, the defendant caught Connor by surprise, stimulating Connor's penis with a vibrator while a bulge was visible beneath the defendant's pants. (Tr. 862-863; PSR ¶ 48-49).

*The Defendant's Abuse of James Brent (Count Seven)*

James started seeing the defendant in 2012, when he was twenty years old. (Tr. 898; GX 207). He was suffering with sexual side effects from a hair-loss drug and was sexually inexperienced. On the recommendation of his boss, James called Cornell for an appointment with another urologist and was referred to the defendant. (Tr. 897).

11

At the very first appointment, the defendant put on pornography and sexually abused James. He spent nearly an hour attempting to make James ejaculate, using his own hands, a Fleshlight, a vibrator, and lubricant. (Tr. 900-903; PSR ¶ 53). The defendant also gave James his cellphone number. When James experienced some bruising that night, he reached out. In the course of their conversation, the defendant offered James a job, doing data entry for a "research study" and cleaning his boat. (Tr. 909). A college student hoping to make some extra money for the summer, James accepted. (Tr. 909).

From there, the defendant developed a "program" to treat James's sexual dysfunction. As part of that "program," James traveled to appointments at Cornell, during which the defendant spent hours manually masturbating James—with his hands and a vibrator. Shortly after James came under his care, the defendant told James it was best to continue treatment on the defendant's boat, where they would have more time to "practice." The defendants assured James that his boat was a "safe space for us to practice without dealing with . . . appointment times." (Tr. 916; PSR ¶ 54).

On the boat, the defendant "treated" James by masturbating him. He administered heavy sedatives and bragged about doing the same to other patients. (Tr. 924). On one occasion, the defendant was masturbating James and brought his mouth so close to James's penis that James feared he might kiss it. The defendant told James, "I'll do whatever you need me to do." (Tr. 951). As James explained, "it almost felt like he was asking me if I wanted him to perform oral sex, and that made me feel extremely uncomfortable." (Tr. 951). The defendant watched James "practice" with an artificial vagina, and held that vagina for James while James attempted to

ejaculate. (Tr. 903). He watched James "practice" with a blow-up doll on his boat. (Tr. 929). The defendant exposed his own genitals to James. (Tr. 918).

James mistook the defendant's abuse for treatment. He accepted the defendant's "unorthodox" methods because he was "so desperate to get better" that he "would do anything." (Tr. 913; Tr. 974). He was led by the defendant to believe that "everything [they] were doing was under medical necessity" and that the defendant was heterosexual. (Tr. 952). When James eventually saw a photograph on the defendant's cellphone that led James to understand that the defendant was in fact gay, James felt "lied to and extremely violated," (Tr. 952). As James explained, he had been reassured that the defendant's methods were clinical because he understood that the defendant was straight and, like him, was uncomfortable touching another man's penis. (Tr. 952).[8] Discovering that the defendant may have derived sexual pleasure from "treating" James cast the defendant's conduct in a new "sinister" light for James (Tr. 963).

*The Defendant's Abuse of Matthew Colon (Count Thirteen)*

Matthew had just turned 13 when he saw the defendant for a hormone issue that ran in his family. (Tr. 979; GX 213). During appointments—alone with Matthew—the defendant displayed pornography for the boy and would instruct Matthew to masturbate: "[H]e would ask my father to leave the room to produce samples for examination for my low testosterone.[9] So, he would put on pornography for me to masturbate to and produce samples to provide for him. And there was a

---

[8] The defendant's longtime medical secretary testified that the defendant had told her that he lied to his patients about his sexuality. (Tr. Tr. 531-532).

[9] Dr. Amin Herati stated that a urologist would test a patient's testosterone through a morning blood-draw test, and that semen analysis is not a medically valid way of testing testosterone level. (Tr. 298-299).

point where he actually masturbated my penis for me." (Tr. 983). When that happened, the defendant insisted that Matthew was masturbating wrong and that he would show the boy a more pleasurable way to do it. (Tr. 985; PSR ¶ 58).

### The Defendant's Abuse of Nate Klavin (Rule 413 Victim)

When Nate was 17, his father took him to see the defendant for erectile issues. Alone with Nate, the defendant told Nate he needed to observe Nate's erection in order to conduct an ultrasound. Then, he claimed he needed to see Nate masturbate, providing Nate with ultrasound gel to use as lubricant. Within a few minutes, the defendant began to move a vibrating device up and down Nate's penis as Nate masturbated. (Tr. 1042). Meanwhile, with his other hand, the defendant inserted his finger inside Nate's rectum and urged him to "come," and to "relax." When Nate ejaculated, the defendant "scooped it off" Nate's bare stomach, using a plastic cup. (Tr. 1043; PSR ¶ 60).

### The Defendant's Abuse of Tucker Coburn (Rule 413 Victim)

Tucker was 17 when he first visited the defendant, a year after being diagnosed with Klinefelter Syndrome. During a follow up appointment, when Tucker visited the defendant with complaints of abdominal pain, the defendant insisted that he needed to watch Tucker masturbate. Lying back in the reclining exam chair, Tucker began to self-stimulate. The defendant then approached Tucker from the left and began to masturbate him, telling Tucker to use lubricant and try a specific technique. When Tucker moved to the other side of the chair to distance himself from the defendant, the defendant walked around to that side of the chair and continued to masturbate Tucker. As the defendant stroked Tucker's penis, Tucker could feel the defendant's own erect penis pressed against his right arm. (Tr. 1138; PSR ¶ 63). As with Nate, the defendant

14

directed Tucker to "relax." (Tr. 1139). Tucker described feeling physically helpless during this ordeal, unable to end the abuse "just by saying 'stop.'" (Tr. 1140). Worse, he thought he had no choice but to keep seeing the defendant afterward. He understood the defendant to be one of only a few doctors who performed a particular surgery that would give Tucker the hope of fathering children. (Tr. 1141).

*The Defendant's Abuse of Toran Chambers (Rule 413 Victim)*

Toran was 12 when he became a patient of the defendant. He had been diagnosed with Klinefelter Syndrome (Tr. 697; GX 208), and his parents hoped the defendant would assist in preserving Toran's fertility. At an early appointment, the defendant told the boy he needed to produce a semen sample and left him alone in the examination room to self-stimulate. Unable to maintain an erection and desperate to urinate, Toran was too embarrassed to leave the room wearing only a medical gown. On tiptoe, Toran tried to relieve himself in a wastebasket, when the defendant abruptly re-entered. (Tr. 705). Startled and ashamed to have failed in getting an erection, Toran asked the defendant for help, thinking the defendant might offer him a visual aid. Instead, the defendant masturbated Toran twice, pressing his chest and stomach against Toran. "[H]e was above me," Toran recounted, "I'm just, I'm looking down mostly, I'm looking at his white jacket, lab coat thing. And you know, I can hear his heartbeat and I can hear him breathing, and I look up and I see him closing his eyes and softly moaning." (Tr. 709; PSR ¶ 64).

Toran immediately recognized that he had been abused under the defendant's care. He alerted his parents, his friend, and another doctor. His parents confronted the defendant, and Toran never visited him again. (Tr. 713-714).

*The Defendant's Abuse of Tim Douglas (Rule 413 Victim)*

15

Tim began seeing the defendant when he was 19, after being diagnosed with Klinefelter Syndrome. (Tr. 725; PSR ¶ 65). His mother had conducted extensive research and understood the defendant to be a "world-renowned doctor" specializing in Tim's condition. Early appointments focused on preserving Tim's fertility through sperm banking, and he was given privacy to produce semen samples. (Tr. 734). Before long, however, the defendant—with bare hands—took to masturbating Tim at nearly every appointment, typically as pornography played. (Tr. 744; PSR ¶ 65). As with other victims, the defendant insisted that Tim was "doing it wrong," (Tr. 746), and that Tim ought to "practice" with him. (GX 405). The text messages the defendant sent to Tim paint a vivid picture of what his "practice" entailed. In one message, for example, the defendant asked, "are u relaxing more when spanking or do we need practice more Cos if so I am bringing safety googles [*sic*] to work Lmaof." (GX 405).

### C.   Non-Testifying Victims of the Defendant's Abuse[10]

The Government's investigation revealed numerous additional victims of the defendant's abuse. The defendant masturbated these boys and young men, just as he did the Statutory Victims and the Rule 413 Victims. He showed them pornography. He digitally penetrated their rectums. He exposed himself to at least one of them. In some cases, the victims' age or location meant the abuse they suffered did not meet each of the statutory elements of a federal crime. In other cases, the victims would have been statutory victims but for the fact that the Government located them after the deadline to supersede. In any event, they endured abuse just as horrific as the charged conduct.

---

[10] Notes from interviews with the non-testifying victims, as well as other statements made by the victims, were provided to the defense as part of the Government's § 3500 production, if not earlier.

*The Defendant's Abuse of Minor Victim B.B.*

B.B.[11] was a patient of the defendant from approximately 2005 until approximately 2018, beginning when B.B. was just eight years old.  During one appointment, when B.B. was 13 years old, the defendant, with ungloved hands, manually masturbated B.B. to ejaculation.  After some of BB's ejaculate landed on the floor, the defendant instructed B.B. to emit the rest into a specimen cup.  The defendant provided B.B. no warning or explanation as to why the defendant was manually masturbating B.B.; nor did he offer B.B. privacy to produce a semen sample.  At a subsequent appointment, when B.B. was still a young teenager, the defendant instructed B.B. to masturbate while the defendant observed, and then forced B.B's penis against a vibrating instrument, causing B.B. to cry out in pain.  During that episode, B.B. observed what he believed to be the defendant's erect penis beneath his pants.  On another occasion, the defendant complimented B.B.'s "big dick."  Over the years, B.B. grew increasingly uncomfortable and angry under the defendant's care. Indeed the defendant himself noted B.B.'s hostility in the boy's medical records.  Shortly after turning eighteen, B.B. ceased visiting the defendant.

*The Defendant's Abuse of Minor Victim S.R.*

S.R.[12] was a patient of the defendant around 2011, when he was 13 years old.  During an appointment, the defendant left S.R. alone in the examination room with a vibrating instrument, instructing S.R. to self-stimulate to ejaculation.  Unsure how to use the instrument, S.R. burned the tip of his penis before the defendant abruptly re-entered the room.  Remarking that S.R. had

---

[11] B.B. was identified as Victim-25 in the Government's motions *in limine*.  (Dkt. 74).

[12] S.R. was identified as Victim-20 in the Government's motions *in limine*.  (Dkt. 74).

injured himself with the vibrating instrument and had also failed to ejaculate, the defendant said something to the effect of "this is why we don't let kids use this alone," before applying lubricant to S.R.'s penis and masturbating him.

*The Defendant's Abuse of Minor Victim T.H.*

T.H.[13] was an adolescent when he came under the defendant's care for Klinefelter Syndrome.  At least once while T.H. was a minor, the defendant masturbated the boy to ejaculation both with bare hands and a vibrating device.  On one occasion, some of T.H.'s ejaculate landed on the defendant's shirt.  When T.H. apologized, the defendant assured T.H. that it happened all the time.  During other visits, the defendant would compliment the size of T.H.'s erect penis.

*The Defendant's Abuse of Minor Victim J.P.*

J.P.[14] was a patient of the defendant just once, when he was 17 years old and had been diagnosed with a varicocele.  During the sole appointment, the defendant told J.P. that J.P. needed to achieve an erection so the defendant could perform an ultrasound. J.P. was surprised, having undergone numerous ultrasounds without ever being directed to obtain an erection.  Nevertheless, J.P. followed the defendant's instructions and began masturbating.  Throughout the exam, the

---

[13] Statements of T.H. were produced to the defendant as part of the Government's 3500 production as series "3579."

[14] J.P. was identified as Victim-19 in the Government's motions *in limine*.  (Dkt. 74).

defendant repeatedly commented on the size of J.P.'s penis and, at one point, the defendant used his hands to masturbate J.P.

*The Defendant's Abuse of E.P.*

E.P.[15] became a patient of the defendant when E.P. was in his mid-twenties. During most office visits, the defendant directed E.P. to masturbate in the defendant's presence. On several occasions when E.P. was masturbating, the defendant would grab E.P.'s penis, insisting that the defendant be the one to stimulate E.P. Purporting to induce a more rigid erection in E.P., the defendant once inserted a finger into E.P.'s rectum, while E.P. was masturbating. On another occasion, the defendant drew so near to E.P. as he was masturbating, that E.P.'s ejaculate landed on the defendant's face. When E.P. apologized, the defendant said something to the effect of "it's okay; it happens all the time." E.P. did not recall ever being provided a collection cup for his ejaculate. Nor does he recall the defendant ever wearing gloves during examinations.

The defendant routinely displayed pornography for E.P., urging E.P. to be more "curious" about his taste in pornography. In addition to stimulating E.P. with an instrument that E.P. took to be a sex toy, the defendant also administered other tests and purported therapies. In one instance, the defendant took out his own penis in front of E.P. to demonstrate that a particular therapy was safe.

The defendant's abuse of E.P. continued outside of business hours and the clinical setting. On certain occasions, defendant would text E.P. to stop by the office after-hours for a visit, free of charge. On one occasion the defendant offered to pay E.P. a house-call, during which he directed

---

[15] Statements of E.P. were produced to the defendant as part of the Government's 3500 production as series "3561."

E.P. to masturbate in his presence.  As E.P. was masturbating, he noticed the defendant's face creep closer to E.P.'s penis, as if the defendant intended to perform oral sex on E.P.

<em>The Defendant's Abuse of P.O.</em>

P.O. [16] became the defendant's patient when P.O. was in his twenties.  Hoping for assistance with a sensitive health issue, P.O. conducted online research and settled on the defendant based on the defendant's area of specialized practice and credentials.  Prior to the defendant, P.O. had never been treated by a urologist.  During P.O.'s very first visit, the defendant played pornography for P.O. and insisted on conducting a rectal exam, despite P.O. questioning whether he was not too young for that procedure. The defendant also insisted on watching P.O. masturbate during that visit, at some point offering to do it himself.  During later visits, the defendant would direct P.O. to masturbate, on occasion grabbing P.O.'s penis with bare hands and masturbating P.O. until P.O. requested that he stop.  Once, while P.O. was masturbating at the defendant's direction, the defendant pressed his head against P.O.'s chest, so that P.O. could feel the defendant's beard hairs.

<em>The Defendant's Abuse of A.L.</em>

A.L. [17] was 30 years old when he became the defendant's patient.  Having been successfully treated at Cornell for a life-threatening condition, A.L. had faith in the hospital's reputation and was quick to accept an appointment with the defendant when an urgent urological issue arose. During one visit, the defendant instructed A.L. to select pornography and masturbate to

---

[16] Statements of P.O. were produced to the defendant as part of the Government's 3500 production as series "3559."

[17] A.L. was identified as Victim-16 in the Government's motions *in limine*.  (Dkt. 74).

20

ejaculation, purportedly to measure the blood flow in A.L.'s penis.  As A.L. was attempting to

self-stimulate, the defendant began to use a vibratory device on A.L.'s genitals, telling A.L. that

the defendant needed A.L. to "come."  At the same time as he was using the vibratory device, the

defendant digitally penetrated A.L.'s rectum with a sonogram probe.  When A.L. protested, the

defendant told A.L. that some men enjoy a rectal probe.  During the same encounter, the defendant

rubbed A.L.'s inner thigh, telling A.L. to "relax" and to "calm down."  Afterwards, when A.L.

asked the defendant why the defendant needed A.L. to ejaculate and produce a semen sample, the

defendant provided shifting explanations, ranging from STD testing to semen analysis for fertility

purposes, even though A.L. did not raise any concerns regarding fertility.

*The Defendant's Abuse of M.H.*

Around 2012, M.H.[18] was referred to the defendant for fertility treatment.  After an initial

visit, the defendant diagnosed M.H. with a varicocele and hydrocele, for which the defendant

performed corrective surgery.  During a follow-up visit to the surgery, the defendant displayed

graphic pornography for M.H. and, without warning, masturbated M.H. while M.H. was in a prone

position.

*The Defendant's Abuse of J.C.*

J.C.[19] also was referred to the defendant to support his and his wife's fertility treatments.

At an initial visit, the defendant shared his military background with J.C., who is a veteran.  During

a subsequent visit, the defendant, without warning, played graphic pornography for J.C. and

---

[18] M.H. was identified as Victim-24 in the Government's motions *in limine*.  (Dkt. 74).

[19] J.C. was identified as Victim-9 in the Government's motion *in limine.* (Dkt. 74).

instructed J.C. to obtain an erection, insisting that J.C. could trust the defendant as they had both served in the military. J.C. began to self-stimulate while the defendant watched. As J.C. was about to ejaculate, he alerted the defendant to the fact that he had not been given a collection cup. At that point, the defendant put his hand on J.C.'s penis, and J.C. inadvertently ejaculated on the defendant. J.C. was dismayed, but the defendant reassured him that patients ejaculated on him regularly. During another visit, the defendant used a vibratory device on J.C.'s testicles to "help" J.C. masturbate. After J.C. ejaculated, this time on a chair, the defendant grabbed J.C.'s penis and purportedly was able to discern that the testosterone the defendant had prescribed to J.C. was working.

*The Defendant's Abuse of J.K.*

When J.K.[20] became the defendant's patient, he was a college student new to New York City. At J.K.'s first appointment, the defendant played pornography and then masturbated J.K. to ejaculation, without providing J.K. a collection cup. At another early appointment, the defendant fondled J.K.'s genitals with one hand, while completing paperwork with the other. He also placed his head on J.K.'s thigh and brushed what J.K. thought was the defendant's erect penis against J.K.'s foot.

In September 2014, J.K. and the defendant engaged in sexually explicit communications, including the defendant offering J.K. romantic advice and "fatherly" wisdom, while touting his own accomplishments and experiences. In the exchange below, the defendant instructed J.K. not to send explicit photos to anyone *but him* for the next several months, explaining "[y]ou can send

---

[20] Statements of J.K. were produced to the defendant as part of the Government's 3500 production as series "3552."

me anything you want kid – cos I see in you a person." The defendant also insists that he meet and

"approve lol" any "good guy" that J.K. would meet:

Sent:        Tue 11/25/2014 10:16:30 PM (UTC)
Subject:     Re: What do you think...
From:        "Darius Paduch" <darius.paduch@mac.com>
Sent:        Tue 11/25/2014 10:16:30 PM (UTC)
To:          ████████████████████████████████

██████

My boy - both gay and bi sexual men have children same as straight guys  - remember this are only
labels and they don't define you or me or anybody else
YOU are ████ a super smart, intelligent, hard working, loyal and kind young man who happens to like
guys - that how you need to look at it
As a doctor, your friend, a man, and being father myself - I need to be sure I can help you to see how I
see you and anybody else see you - a great person you are and a young man with amazing gifts and
potentials.
I need to be sure I help you to grow, be confident, and also learn your value so you are safe. Yeah I am
natural dad lol - had great example from amazing men I met in my life who helped me become who I am
today.
So I really would like that you promise me not to send any butt or any x-rated pics to anybody else for
next 3-6 months - till I am sure you see yourself for a great person you are.
The other rule is 3 dates before u jump into bed with someone you don't know - so I want you to meet a
guy, go see a movie, do something together, meet him again, and only show your "privates"  on 3rd date
- guy who will not like it  - is not worth your time . I use this in therapy with both straight and gay men - not
that I dont want you to get sexual - but I want you to learn that you don't need to compromise anything
ever to get someone
Youth has most wonderful and most dangerous traits - impatience and inexperience - I care about you kid
and I want you to say one day - Darius thanks for helping me grow as a man - I don't need your advise
anymore - I see myself for who I am.
You got it ████ - think about it - I am one of most recognized names in my field, and have shitload to do
but I am taking time to text you, check on you, or type you an email - why - it's because I see an amazing
guy in you and I hope each day you see that in yourself more and more
Well ████████ told me - to say I would recommend - not I want you - that's why I love him - he is so dam
intuitive - but I think you got my point - I really dont want you to get hurt, I want you to see positive things
about you, and in life, and concentrate on your school,
I hope I am not coming across to harsh on you Josh - I just want to help you and kind of protect you from
going back to the negative thinking you had in the past.
You can send me anything you want kid - cos I see in you a person - and same with any good guy u meet
him  - share whatever you want - I just need to meet him first and approve lol

Look being in military I had to be a doctor, an officer, an older brother, and a father to my enlisted soldiers
who often just finished high school and came from broken homes and bad situations - so it comes to me
naturally to help and care - hope I don't sound like a paternalistic old man - but I am sure you understand
where I am coming from.

And yes - it will be fun to hang with you in few weeks - and I can't wait till one day we all can go on a boat
trip and you bring alone some good chap with you who will be your equal in all aspects LOL including tight
butt ;)
Hugs from an old dude kid
D

Eventually, J.K. and the defendant engaged in sexual conduct outside the hospital, including at the

defendant's home, where the defendant masturbated J.K. on the bed of the guestroom, urging J.K.

to ejaculate and claiming that his role was to teach J.K. about his sexuality.  Meanwhile, J.K.

continued to visit the defendant for appointments at Cornell.  Throughout this time, the defendant insisted that sexual encounters with J.K. were part of J.K.'s treatment.

*The Defendant's Abuse of J.L.*

J.L.[21] became the defendant's patient when he was 20 years old.  The initial appointment was "not as bad as the others."  The defendant commented about the J.L.'s physique and played gay pornography.  When J.L. stated that he would prefer to view pornography featuring women, the defendant responded, in sum and substance, "guys don't know what they like."  In subsequent appointments—some of which occurred after regular business hours, once the defendant's staff had departed—the defendant directed J.L. to masturbate and often masturbated J.L. himself, at times without wearing gloves. On certain occasions when the defendant was masturbating him, J.L. observed Paduch's own erections.

Early on, the defendant began telling J.L. that J.L. needed a father figure in his life, offering to spend time with J.L. outside the office, providing his personal cellphone number to J.L., and encouraging J.L. to contact him anytime.  By the summer of 2011, the defendant and J.L. were engaging in extracurricular activities, such as visits to the defendant's boat, where the defendant captured photographs of J.L. and followed up with an email remarking that J.L. was a "handsome lad," whose "parents must be really proud."

The defendant hosted J.L. on his boat several times, including for multiple overnight visits. Once aboard, the defendant would instruct J.L. to masturbate to pornography, purportedly to give the defendant a sense of how "everything was working." The defendant would also fondle J.L.'s

---

[21] J.L. is Victim-6 referenced in the S2 Indictment.

24

penis, allegedly to feel for scar tissue. On at least one occasion, while J.L. was masturbating on the boat, the defendant exposed his penis and masturbated himself to ejaculation, with some of the ejaculate landing on J.L.'s leg and torso. Alarmed, J.L. told the defendant that he was uncomfortable. The defendant apologized, saying something about "being a dad" and not "believe[ing] in incest."

During late summer 2011, the defendant invited J.L. to travel with him to Europe, where the defendant had scheduled meetings. The defendant offered to pay for J.L.'s ticket, as well as a new passport. In selling the trip to J.L., the defendant noted that there was a lot of pornography on French television. Ultimately, J.L. was not comfortable with the trip and declined the defendant's invitation. While in Europe, the defendant sent the below email to J.L., with the subject line "Hi youou," and a reference to his penis, which he called his "big polish kielbasy."



Upon his return from Europe, the defendant continued to invite J.L. for sleepovers on his boat.



In 2015, J.L. suffered a priapism, a painful and dangerous side-effect of a medication the defendant had supplied him. J.L. reached out to the defendant, who stated that he could help and proceeded to travel to J.L.'s home, where J.L. lived with his mother. During his visit to J.L.'s home, the defendant instructed J.L. to strip naked and enter a cold shower, where the defendant—also naked—joined him. In the shower, the defendant purported to administer treatment that involved manipulating J.L.'s penis. Ultimately, the condition required J.L. to visit the emergency room. The defendant insisted that he could treat the damage that J.L. had suffered to his penis, so J.L. attended numerous appointments with the defendant at Cornell, which the defendant wrote-off. During these appointments, the defendant would administer various treatments and also masturbate J.L. On several occasions, the defendant directed J.L. to travel to the defendant's home in New Jersey for "treatment." There, the defendant would employ sex toys and a penis pump on J.L, and also feel J.L.'s penis for scar tissue. At least once, the defendant told J.L. that he could see scar tissue on J.L.'s penis and instructed J.L. to undress and lie down on the bed, at which point the defendant proceeded to massage J.L.

26

*The Defendant's Abuse of T.M.*

T.M.[22] was twenty-six when he became a patient of the defendant, desperate for help with erectile issues.  During multiple appointments, the defendant masturbated T.M. with his ungloved hands and with a vibrating tool.  The defendant would masturbate T.M. to ejaculation, directing T.M. to watch pornography that the defendant had displayed and permitting T.M. to ejaculate directly into the defendant's hands.

*The Defendant's Abuse of JE. L.*

JE.L.[23] was 24 years old when he began seeing the defendant for urinary issues.  During several appointments, the defendant would grab JE.L.'s penis and—with bare hands—masturbate JE.L. While JE.L. was masturbating or the defendant was assisting him, the defendant's body would be very near JE.L.'s, and the defendant would make gestures inviting JE.L. to move closer to him. The defendant would press up against JE.L., touching JE.L.'s chest and abdomen. On at least one occasion, JE.L. could feel the defendant becoming aroused as he pressed up against JE.L., and JE.L. then saw the defendant's erection beneath his clothing.  The defendant also inserted his finger into JE.L.'s rectum on a few occasions, once during a prostate exam but in all other instances without warning and while the defendant was masturbating JE.L.

*The Defendant's Abuse of R.S.*

R.S.[24] was a patient of the defendant in 2013, when he was 24 years old.  Once inside the examination room with R.S., the defendant displayed pornography, and directed R.S. to

---

[22] T.M. was identified as Victim-18 in the Government's motion *in limine.* (Dkt. 74).

[23] JE.L. was identified as Victim-17 in the Government's motion *in limine.* (Dkt. 74).

[24] R.S. was identified as Victim-23 in the Government's motion *in limine.* (Dkt. 74).

masturbate.  At times, the defendant used his own hand to masturbate R.S. and at other points during the examination, the defendant inserted his finger into R.S.'s rectum for the purpose of further stimulating R.S.

*The Defendant's Abuse of DN.G.*

DN.G.[25] became a patient of the defendant when DN.G. was 21 years old.  During office visits, the defendant would observe DN.G. masturbating or masturbate DN.G. barehanded.  As DN.G. neared climax, the defendant would express excitement and move closer to DN.G.'s penis. In one instance, the defendant's rolling stool was so near to DN.G.'s genitals that the defendant's lips grazed DN.G.'s penis.  On another occasion, the defendant's face was just a few inches from DN.G.'s penis as DN.G. was about ejaculate.  Afraid of ejaculating on the defendant, DN.G. moved away.  The defendant admonished DN.G., instructing DN.G. to trust him and not pull away, and insisting that the defendant's reasons for observing DN.G. were medical.  DN.G. told the defendant that he was specifically afraid to ejaculate on the defendant, to which the defendant explained that he brings "two shirts to work" for that reason.  On another occasion, during a physical exam, the defendant inserted a finger into DN.G.'s rectum.  When DN.G. asked why the defendant had not warned DN.G., the defendant said something to the effect of "if I had told you, you would have said no."  Twice, in response to questions from DN.G. about a particular aspect of his own genitalia, the defendant offered to display his own penis to prove that DN.G.'s was normal.  During appointments, the defendant would also play pornography, usually of his choosing.  On one occasion, the defendant played gay pornography, prompting DN.G. to express

_____

[25] Statements of DN.G. were produced to the defendant as part of the Government's 3500 production as series "3543."

surprise and hesitation.  In response, the defendant made a derogatory comment about the pornography and quickly shut it off, leading DN.G. to believe that the defendant was heterosexual. The defendant also encouraged DN.G. to purchase sex toys, including a Fleshlight vagina.

*The Defendant's Abuse of D.G.*

D.G.[26] became a patient of the defendant when D.G. was in his late twenties. During the very first appointment, the defendant instructed D.G. to "whack off" into a cup, explaining that he would also be present, not because he was a "pervert" but because that was simply how the defendant did things.  The defendant proceeded to play pornography, and D.G. attempted to masturbate but was uncomfortable with the defendant present.  Sensing D.G.'s discomfort, the defendant placed his hand on D.G.'s stomach and legs, encouraging D.G. to relax.  The defendant also complimented D.G. about the size of his legs, inquiring whether D.G. played sports.  During at least one later appointment, the defendant directed D.G. to get on all fours and masturbate, while the defendant inserted a finger into D.G.'s rectum, purportedly to perform a prostate massage. During this alleged massage, the defendant displayed pornography.  The defendant encouraged D.G. to purchase a Fleshlight vagina and engaged D.G. in text communications about D.G.'s masturbation habits, including a message in which he asked, in substance, whether D.G. was "stroking that big hog."

---

[26] Statements of D.G. were produced to the defendant as part of the Government's 3500 production as series "3544."

## II. The Pre-Sentence Report and Sentencing Guidelines

The Probation Office recommends a sentence of 30 years' imprisonment. That recommendation accounts for the defendant's "predatory" and "unconscionable" abuse, which "undoubtedly caused substantial and irreparable psychological harm to the victims." (PSR at 49-50). According to Probation, "[t]he crux of this case is that Paduch's sexual gratification and abuse of power outweighed his regard for his patients' personal wellbeing, health, or safety without apparent fear of the consequences." (*Id.* at 50).

The PSR reflects an applicable sentencing range under the advisory United States Sentencing Guidelines of life imprisonment, based on a total offense level of 43. [27] The Government agrees with the total offense level and resulting sentencing range calculated by Probation, noting only that the vulnerable-victim enhancement under U.S.S.G. § 3A1.1(b)(1) should apply to Luke Bevin (Minor Victim-2) and Evan Stewart (Minor Victim-3). [28] Both victims faced pervasive learning and speech delays, about which their mothers testified at trial, and which also were reflected in the victims' respective medical records. (Tr. 425; Tr. 634; GX 205, GX 209). Accordingly, the offense level for Group Two is properly calculated as 38, while the offense level for Group Three is properly calculated as 36. Probation agrees that such an enhancement applies to these two victims and will amend the PSR following sentencing, should the Court concur.

---

[27] In the PSR, the Probation Office applied an enhancement under Chapter Four of the Guidelines, accounting for the fact that the defendant is a "repeat and dangerous sex offender against minors" and resulting in an offense level of 45. § 4B1.5(b)(1). Pursuant to Chapter 5, Part A (comment n.2), the defendant's level is capped at 43, which is the maximum offense level. (PSR at 21).

[28] The Government's responses to the defendant's objections to the PSR are reflected on pages 36 to 47 of that report. The Government adopts those responses herein.

Application of the enhancement does not alter the grouping analysis under Chapter Three of the Guidelines, the defendant's offense level, or the applicable Guidelines range of life imprisonment.

## III.   The Section 3553(a) Factors Justify a Sentence of At Least Thirty Years
### A.   Applicable Law

In addition to the Guidelines, which are not mandatory but must be consulted prior to sentencing, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall v. United States*, 552 U.S. 32, 50 & n.6 (2007).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B.   The Seriousness of the Offense and the Need for Just Punishment

#### a.   *The Nature and Seriousness of the Offense: The Sexual Abuse*

31

The gravity of the defendant's crime is difficult to overstate. For years, the defendant—a renowned urologist—sexually abused boys and young men entrusted to his medical care. He masturbated them with his bare hands. He digitally penetrated them. He invited victims to ejaculate on him. He smeared semen on Sam Lenox's face. He encouraged Evan Stewart to buy sex toys and to join him over text in a mutual masturbation session. He induced James Brent to his boat where he used sex toys on him, exposed himself to James, and administered psychotropic medication.

When the defendant did those sordid things to his victims, he was not providing clinical care. He was gratifying his own sexual desires that he had documented in various ways. The defendant searched the internet for doctors having sex with teens. Pornographic pictures on his iCloud account featured medical patients in sexually compromising positions. Several "selfies" captured the defendant exposing his penis in the workplace. (Dkt. 74 at 29; Dkt. 104 at 6-9). In an electronic note drafted to a romantic partner, the defendant catalogued highly specific sexual fantasies that he, in turn, carried out on his patients. (Dkt. 74 at 28; Dkt. 104 at 6-9).

The defendant's abuse was not aberrant or spontaneous. It was serial and calculated, inflicted after relating to his victims and capitalizing on the trust inherent in the doctor-patient relationship. *See United States v. Ray*, 20 Cr. 110 (LJL) (Sent'g Tr. at 49) (noting that Ray's crimes were not "aberrant," but instead "occurred over years, tracking well-honed models of grooming."). At trial, Dr. Lisa Rocchio explained why patients' ingrained faith in doctors can make sexual abuse in the clinical setting particularly difficult to detect. Most obvious, patients may be led to believe that the abuse they suffer is medically necessary. (Tr. 581). That is particularly true for minor patients whose "parents are telling the child . . . do what the doctor said,

32

or this is a good person, he is going to help you to feel better." (Tr. 582). Krista Bevin taught her boy to "respect his elders and to trust the caregivers that [Luke's] father and [Krista] chose for him." (Ex. A-1 (Statement of Krista Bevin)). Even when Luke pleaded with Krista not to go back to the "Zombie Hospital," she insisted that he return. (*Id.*).

Making matters worse, the defendant facilitated his patients' deception by leveraging his association with a world-class hospital. Asked whether his opinion of the defendant was influenced by the defendant's title at Weill Cornell Medicine, Sam Lenox answered, "Yes, sir. That's a huge hospital. It's a big hospital, a big physician in a big hospital. I thought he would—I had a lot of faith in him." (Tr. 200). Describing the quality of care she expected from Cornell, Krista Bevin testified, "I'd heard of it, so I assumed it was a top-tier hospital, maybe not only in the city, but in New York and beyond." (Tr. 436). Another victim writes:

> *"Somehow, in the moment, my disbelief in what was happening was still countered by this idea that he was "a doctor". That we're standing inside a major medical institution therefore maybe I'm wrong in thinking he is wrong. I thought 'this must be part of it, let's just get through this so I can get the help I need.' I thought 'they must ask everyone these questions' and 'they must have everyone do this, what do I know?'"* (Exhibit A-2)

More than that, the defendant leveraged his sensitive and specialized practice area. He used his urology credentials as cover to "access the most intimate parts of a patient's body." (Ex. A-3). To state the obvious, victims would not have permitted a cardiologist or audiologist to masturbate them. At the very least, they would have recognized such conduct as abuse. But those same victims—many who had never before seen a urologist—did not know to question the defendant when he grabbed their genitals and insisted on showing them how to masturbate correctly. They followed the bespoke "plans" the defendant devised, requiring them to "practice"

either by masturbating in front of him or allowing him to masturbate them.  The defendant found further cover in the legitimate medical treatment he mingled with the abuse.  He performed surgeries.  He issued prescriptions. He ordered tests.  Doing those "good things" as part of the doctor-patient relationship only served to make the defendant's abuse more confusing.  (Tr. 583 (Dr. Lisa Rocchio)).

Finally, the defendant's abuse was especially pernicious for its selection of vulnerable victims.  The defendant preyed on victims' youth, their sexual inexperience, and their anxieties. Many boys had never had sex.  Some had never masturbated before visiting the defendant.  Some had never seen pornography.  Others, like Sam and James, were desperate to resolve their sexual dysfunction.  Perhaps most heartbreaking, the defendant abused boys with Klinefelter Syndrome, a genetic condition associated with cognitive and expressive delays.  Krista Bevin testified about Luke's "extensive speech delays" and how he had undergone "a lot of intervention from a young, young age."  (Tr. 425).  Beth Stewart took Evan to speech therapy and enrolled him in speech camp.  (Tr. 634).  She testified that he was enrolled in a "special class" and did not learn to read until he was 12 years old.  Even if Luke and Evan could register the abuse, the defendant knew they would struggle to find the words to report it.

### b.  *The Nature and Seriousness of the Offense: The Lasting Damage*

Years after leaving the examination room, victims bear the mental and emotional scars of the defendant's abuse.  They grapple with post-traumatic stress disorder, anxiety, and addictions that derail their daily lives.  (Ex. A-4 (Statement of Matt Cirillo).  They suffer from significant issues with intimacy and trust.  (Ex. A-5 (Statement of Luke Bevin).  They question their masculinity.  (Ex. A-6 (Statement of G.B.)).  They have avoided seeking medical treatment, even

34

for urgent issues.  (Ex. A-5 (Statement of Luke Bevin); Ex. A-2; Ex. A-39).  They have required yearslong therapy to process anger and humiliation stemming from the defendant's abuse.  They suffer flashbacks and invasive memories on repeat.  (Ex. A-5 (Statement of Luke Bevin);  A-44 (Statement of Evan Stewart); Tr. 227 (Sam Lenox)).  They are "trapped" in their trauma.  (Ex. A-6 (Statement of G.B.)).  They live with the unshakeable guilt that their silence and their inability to recognize what was happening to them as abuse may have allowed the defendant to harm other boys and young men.

Sam Lenox's pain was visceral.  Shattered and visibly shaking on the witness stand, Sam could barely look up from the rubber bands he was tugging as he recounted the defendant masturbating him and inserting a finger into his rectum.  His voice breaking, Sam read aloud text-message exchanges with the defendant, in which the defendant asked whether Sam had ejaculated into his Thanksgiving Day turkey and complimented the size of the teenager's penis.  Nearly a decade has passed since the defendant physically abused Sam, and he remains in therapy, continuing to face a "really hard time with these memories and these recurring thoughts and memories." (Tr. 227).

Luke Bevin was barely a teenager when he became a victim of the defendant.  Luke "had never had a previous sexual experience" and "had no idea what was normal in a urological appointment."  (Ex.A-5 (Statement of Luke Bevin)).  He was a "good boy" who "followed the rules." (Ex. A-1 (Statement of Krista Bevin)).   Masturbating Luke at appointment after appointment, the defendant destroyed Luke's innocence and depleted his trust in doctors and the medical institutions he must rely on to manage his genetic condition.  Luke felt the torment of his "treatment" even before he understood it for the abuse that it was.  He begged his parents not to

visit the defendant, and when he was forced to go, he endured the four-hour trip in silence. Now, in the wake of realizing he had been abused, Luke lives with depression, struggling to come to grips with his reality as a survivor and to maintain intimate relationships. Memories of the abuse "haunt" him at night and "replay[]" in his head during the day. (Ex.A-5 (Statement of Luke Bevin)).

Luke's mother, Krista Bevin, lives with the searing guilt of entrusting her "gentle, kind and caring" boy to the defendant's care. (Ex. A-1 (Statement of Krista Bevin)). At trial, Krista described how "grateful" she felt after the defendant agreed to treat her son. She would have done anything for Luke, including traveling hours with him to attend his appointments. (Tr. 429, 447). While Krista sat just outside in a waiting room—unbeknownst to her and "absolutely" without her consent (Tr. 449)—the defendant manually masturbated Luke and digitally penetrated his rectum. Krista did not learn the full measure of what the defendant had done to her youngest child until shortly before trial. And when she did, it "nearly killed" her. (Tr. 472). Krista is "forever traumatized by the horror and regret of [her] decisions" to let the defendant treat her son. Hers is a pain that only a parent can know:

> "Knowing what this doctor did to my son stabs me with a million knives every day, every single day since the day his depraved and criminal acts were exposed. I would have preferred physical wounds to my body because those wounds would have had a shot at physically healing. There may have been scars left behind, but the bleeding would have been staunched, the wounds would have eventually closed. However, instead I am left with open bleeding, gaping wounds, which now inhabit my body, mind, and soul, wounds that only a mother who loves her child can know, wounds that no amount of therapy has been able to touch.
>
> . . .
>
> I truly hope my son can survive this. It's ironic, I was so worried from the time I learned of his diagnosis that he would not survive the complications

36

*of his condition. Never would I have thought that I would live in daily fear*
*of him surviving the trauma of his own doctor's criminal abuse of him, my*
*beautiful, sweet, innocent boy. It is a true nightmare. I am beyond anger.*
*What I feel is a feeling for which there are no words. I am decimated to my*
*core as a parent for what my son was subjected to under the care of a*
*physician that I chose for him."*

(Ex. A-1 (Statement of Krista Bevin)).

Toran Chambers testified in the throes of an anxiety attack. Forgoing the witness chair, Toran winced and paced as he detailed the horrors of being twice masturbated by the defendant when he was just 12 years old. Over a decade has passed since the defendant abused Toran. But Toran's suffering has not abated. If anything, it has intensified despite—or perhaps due to—his efforts to dismiss the defendant's abuse as "not that bad" and to convince himself he was making too much of it. Toran suffers from PTSD, "pure O OCD, and emotional dysregulation in the form of heightened anxiety and emotional detachment." He has developed multiple phobias that make everyday interactions terrifying. Asked to change his clothes, Toran becomes anxious, nauseous, and physically cold. Confronted with people of similar build to the defendant, Toran experiences "brace for impact" anxiety. (Ex. A-15 (Statement of Toran Chambers). Toran's fear of the defendant was so great that he declined a medical procedure that could potentially preserve his fertility, concerned the defendant might be involved.

At trial, Matthew Colon testified about being masturbated by the defendant when he was 13 years old, while pornography played. That abuse altered the course of young Matthew's life, leaving scars that will "always be part of [his] story and are now deeply embedded into who [Matthew] has become." To this day, he wrestles with "severe waves of depression, anxiety, doubt, and lack of self-confidence." (Ex. A-7 (Statement of Matthew Colon)). Although 15 years have passed for Evan Stewart, he still has "flashbacks" from his very first appointment. "I was only a

15 year old boy," Evan writes, "I can't erase those disturbing moments." (Ex. A-44 (Statement of Evan Stewart)).

       The pain of the testifying victims and their parents merely scrapes the surface of the defendant's depravity and the lasting damage it inflicted. Like Luke, even before B.B. understood that he was being abused, he *felt* that what the defendant did to him in their medical appointments was wrong. Yet B.B. was forced to continue visiting the defendant for necessary Klinefelter treatment, leading B.B. to rebel, misbehave, and look for ways to self-medicate. Like Toran Chambers, B.B. suffers panic attacks. (Ex. A.-37 (Statement of B.B.'s mother)). B.B. has also experienced homelessness and unemployment, after being abused by the defendant as a young teenager. B.B.'s mother, in turn, bears the weight of putting her child "in the hands of such evil for eleven years," describing B.B.'s trauma as a "chain reaction" and "cancer" that spread throughout their family. (*Id.*). S.R. was diagnosed with PTSD after experiencing intrusive sensations and memories stemming from the defendant masturbating him when he was only 13. J.K. fell into "dark" depressive episodes prompting two stays in a psychiatric ward. J.K. still fears people touching him. The defendant's abuse "created in [D.S.] a complete distrust in humans, a hypervigilance of strangers['] behaviors, the inability to see the innocence in every day kind of actions, the inability to trust men—especially one on one or with me or my family." (Ex. A-41 (Statement of D.S.)). In letter after letter, other victims have detailed the indelible effects of the defendant's abuse:

- *"I may be just a little part of what you have done, but you hurt me mentally and physically. . . . I'm still trying to piece together everything trying to come to the conclusion that everything will be okay. Even with you[] gone i have so much to put back together. you took away so much and did so little to help. . . . You gave a little boy hope, []ripped it away. Every day he lived."* (Ex. A-8).

38

- *" One of the most challenging aspects of this ordeal has been the daily internal struggle with the shame and stigma surrounding male-on-male sexual assault. Society's unspoken expectation for men to simply 'man up' effectively silenced me for a long time. This made it incredibly difficult to reach out for help or even begin to process the trauma I experienced. . . .   There have been times when I've questioned whether things can ever really get better. Shortly after the abuse, I began experiencing sudden episodes of panic and anxiety that would leave me incapacitated and unable to speak. This marked the beginning of a downward spiral in my life, characterized by self-destructive behavior and poor decision-making. I turned to substance abuse, physical aggression, and other harmful coping mechanisms in a misguided attempt to numb the pain. . . . Perhaps my greatest regret is how this trauma has affected my roles as a husband and father. My sense of masculinity has been deeply shaken, leaving me constantly stressed and fearful of failing as the man and provider I believe I should be. This experience has robbed me of countless moments that should have been filled with love and connection, leaving me unable to be fully present for my family. I now struggle with an overwhelming, unhealthy obsession to protect my son from predators, while my marriage suffers from the anxiety and inadequacy I feel in moments of physical and emotional intimacy."*  (Ex. A-9).

- *"I am unable to forget the memories from my visits with Dr. Paduch. My whole body was violated by him in a humiliating manner. . . . I dispelled any feelings of hesitation and doubt because he was a credentialed doctor at a top tier institution. I let him touch and penetrate my body during our appointments, and then afterwards I would go to the office manager to book my next appointment because that is what patients do after they see their doctor. . . . I wish I could go back to my 23 year old self and tell him to run as far away from Dr. Paduch and never go back. I wish I could protect my younger self and take him out of Dr. Paduch's examination room. I wish some of the staff at Cornell would have stopped him. But unfortunately, I cannot. So, I continue to live with these painful and traumatic memories that I cannot get out of my head and body."* (Ex. A-10).

- *"This ordeal has had a devastating effect on my life. Despite therapy and my efforts to move forward, the anxiety, fear, and loss of trust are constant companions. It has affected my relationships and made it difficult for me to feel safe in situations where I should feel protected... I hope the sentence you pass down reflects the full weight of the damage that was allowed to continue unchecked for so long."* (Ex. A-11).

- *"As a healthcare professional, that I fully trusted, you took advantage of my sensitive health issue and used this to sexually abuse me for your own pleasure. You violated me in the most damaging way possible . . Although I'm changed forever, the only solace I have is that you can never do this to anyone again."* (Ex. A-12).

- *"Although my physical wounds may heal, my spirit will remain broken by the added knowledge that I was among his first victims. The thought that i may have done something to stop him will haunt me. The law is all that can help bring closure to this humiliating experience."* (Ex. A-13).

39

- *"Dr. Paduch he had me undress and get onto the exam table. Unaware of what was happening, Dr. Paduch began masturbating me. He began getting very aggressive, going faster and faster causing my penis to become very irritated and raw.. . .The fear of reporting this incident and not knowing who to confide in, due to the fact that I was continuing to receive medical treatment [for aggressive prostate cancer] with other doctors at New York Presbyterian Weill Cornell, prevented me from moving forward."* (Ex. A-14).

- *"I retired from NYPD in 2000 as a Lieutenant, Commanding Officer of various Manhattan Detective Squads. I have been a Special Investigator at the Nassau County District Attorney's Office since. I've earned a Bachelor's Degree in Behavioral Science from NYIT and a Master's in Public Administration from NYU.  As he was quite interested in my law enforcement background, I'm quite sure that, on some unspeakable level, he found it particularly gratifying to be able to victimize me. We will never know of all his victims. Not even close. Please stop him for as long as you can."* (Ex. A-16).

- *"You have caused immense damage: mentally, physically, and emotionally. And as I stand here now, I find it difficult to find words powerful enough to express the depth of the pain and destruction you've caused.  You robbed people of their dreams, their futures, and their sense of safety. But despite the pain and loss, we—the victims—will endure. We will find a way to move forward, though it will never be easy. True redemption will only come when we know, without a doubt, that you will never harm another person again."* (Ex. A-17).

- "*Dr. Paduch asked me what porn I liked to watch and instructed me to masturbate in the room with him to completion, while simultaneously penetrating my anus for an extended period of time. This was incredibly traumatic - I was afraid something terrible had transpired the moment he left the room, and I felt deeply ashamed following the procedure. However, I also thought that as a doctor he knew what was best and I leaned into my trust in him that he was doing the right thing.*"  (Ex. A-39).

- *"He was a doctor and I trusted that whatever he did was medically necessary, because we should trust our doctors (or at least so I thought) . . . I should have been old enough to know better, but I didn't."* (Ex. A-18).

- "*When you started to sexual abuse me and perform unspeakable acts, it brought back memories of when I was sexually abused by an acquaintance in the 90's. When you started to touch me, I froze in fear, not knowing what to do and would anyone believe me. You had authority and I did not. You were the physician, and I was a patient.*" (Ex. A-40).

- "*It feels as if I went to sleep after a staggeringly terrible day and have not woken from the torment yet.*" (Ex. A-30).

40

- *"I will never forget how repulsive, afraid, and violated I felt. I know that I will need therapy for the rest of my life."* (Ex. A-19)

- *"It is depressing. It is emasculating. It was entirely avoidable."* (Ex. A-20 (Statement of E.M.)).

- *"I have felt as if I was a burden to those who loved me."* (Ex. A-6 (Statement of G.B.))

- "*Dr. Paduch used my greatest dream against me – my hope of one day being a father and having a family. . . No matter how much counseling and personal effort I put in I cannot get back who I was when I first met Dr. Paduch.*" (Ex. A-41 (Statement of D.S.)).

- *"How stupid could I be?"* (Ex. A-21).

- *"I wish Dr. Paduch had let me keep my innocence a little longer."* (Ex. A-37 (Statement of B.B.'s mother)).

The victims will never get back what the defendant took from them.  They will never erase the memory of being violated in their most vulnerable state.  The Government joins them in asking this Court for a sentence that adequately reflects the lifelong harm the defendant inflicted.[29]

## C. The History and Characteristics of the Defendant

The defendant displays a remarkable lack of remorse for his insidious crimes.  Instead he devotes his sentencing submission to touting his professional acclaim, maligning the victims and their counsel, and seeking this Court's sympathy.

---

[29] The defendant insists that given his age of 57, a sentence of 30 years is tantamount to a life sentence.  Not so. *See, e.g.*, *United States v. Chase*, 695 Fed. Appx. 601, 605 (2d Cir. 2017)(below-Guidelines sentence of 50 years "not the same as life" and allowed for "real possibility" that defendant would outlive his prison term); *see also United States v. Lopez-Imitalo*, 305 Fed. Appx. 818 (2009) (rejecting argument that 60-year sentence sought by Government breached its commitment not to seek a life sentence).

The defendant describes his professional accolades at length. He details his educational and military background, including a string of prestigious positions held at Oregon Health and Science University, Weill Cornell, and Northwell. (Paduch Sent'g Mem. at 4-6, 11-12). He catalogues his scholarly works, appending to his submission several articles he has authored and citing Dr. J.B's opinion of the defendant's brilliance. (Paduch Sent'g Mem. 4-6).

The Government does not dispute the defendant's account of his education, military background, or professional prestige. But it is lost on the defendant that those very accolades and experiences facilitated his abuse. The defendant capitalized on his academic prowess, his affiliation with a world-class hospital, and his military background to gain access to victims and garner their trust. That trust, in turn, caused victims to attend follow-up appointments at the defendant's direction. It caused them to dismiss their doubts and second-guess themselves when the defendant serially abused them. The defendant assured Matt Cirillo that he could take care of any red tape that Matt's genetic condition might create for a future military career. The defendant bonded with J.C. over their shared military service before urging J.C. to trust him as he masturbated J.C. The defendant's research bona fides gave Krista Bevin confidence that she had found an expert to manage her boy's genetic condition.

In boasting of his clinical acumen and experience, the defendant tacitly takes aim at the credibility of the victims who testified at trial, as well as the dozens of other young men similarly subjected to his abuse. The defendant offers the account of E.Z., whose cancer the defendant detected during a routine test. After crediting the defendant with saving his life, E.Z. continues, "As an older adult you have a different kind of take on these things where you understand certain things are going to happen in an exam that you're maybe not comfortable with but are necessary,

42

and I'm sure that if I were a younger person, if I were 10, 15, maybe even in my 20s, I probably would have had a different reaction . . . and more discomfort around some of those exams." (Paduch Sent'g Video). E.Z.'s observation is equal parts inaccurate and insulting. To begin, the Government interviewed—and shared with the defendant—the accounts of several victims who were abused by the defendant in their late 20s and well into their 30s. More to the point, the victims did not misinterpret medical care. They did not experience mere "discomfort." What they experienced—being manually masturbated, digitally penetrated, smeared with their own semen, and subjected to the defendant's obscene texts and emails—was sexual abuse. Their "take on these things" would not have changed, no matter their age. A.S. claims that the defendant always explained his actions to A.S., and Dr. J.B.—who worked with the defendant only during the defendant's residency—states that he never knew of a complaint against the defendant. Maybe so.[30] But victim after victim testified in open court that the defendant masturbated them without warning or explanation, and a jury unanimously credited them. What is more, the Government interviewed numerous non-testifying victims who offered the same details.

Nor does Dr. J.B.'s version of a "normal" urological exam for a fifty-year-old undermine the victims' accounts of abuse. According to Dr. J.B., such an exam would feature a thorough manual inspection of the patient's genitals. From that, the defendant asks the Court to infer that the victims mistook routine urological examinations for abuse. Leaving aside that certain tests for a hypothetical 50-year-old would not have been appropriate for a child, the defendant's abuse bore no resemblance to the inspections and tests outlined by Dr. J.B. Unsurprisingly, Dr. J.B.'s "normal

---

[30] The Government never asserted that the defendant abused every patient at every appointment.

exam" nowhere mentions manual masturbation of an unchaperoned minor while graphic pornography played in the background. In fact, Dr. J.B. told the Government in no uncertain terms that he would never have trained a doctor to manually stimulate a patient's genitals or otherwise perform a physical exam that involved stroking a patient's penis.[31]

At the same time as he attacks the victims' credibility, the defendant also impugns their motives. The defendant's sentencing video features an individual who speculates that the victims and their attorneys are after the "big pockets" of the institutions that employed the defendant. To underscore the point, the defendant goes so far as to submit television advertisements featuring victims' counsel. It is ludicrous to suggest that Sam Lenox and Toran Chambers were willing to endure the agony of the witness stand for a payday. It similarly absurd to suggest that Krista Bevin, whose family could afford to fly privately to appointments with the defendant, would not have *paid* any amount of money to spare her child from the defendant's abuse.

In this warped rendition of events, the only victim of the defendant's conduct is himself. He rails against the "hyperbolic press and the aggressive advertising campaigns by plaintiff lawyers" (Paduch Sent'g Mem. at 16). He claims to have been "vilified . . . since the moment of his arrest." (Paduch Sent'g Mem. at 31). Years earlier, after he had been confronted with his abuse of J.L., the defendant wrote to his former supervisor at Cornell, "my mistake was [] being painfully naïve, trying to fix and help everyone, and not keeping boundaries to protect *myself*." (May 12, 2021 e-mail from Darius Paduch (emphasis added)). In 2022, the defendant claimed to Northwell that victim Tucker Coburn had been harassing *him* and texting *him*.

---

[31] The notes of the Government's interviews with Dr. J.B. were produced to the defense as 3588-01 and 3588-05.

The defendant's penchant for self-victimization and outright dishonesty was not limited to justifying his abuse. Those traits pervaded even mundane aspects of the defendant's life. In a 2019 email with a potential research collaborator, the defendant wrote, "My grandson has bad pneumonia and my son and his wife are on science expedition somewhere between Mongolia and Lake Baikal and we don't expect any contact with them for next 7-10 days till they get back to their station in Irkutsk. They and their students are expected to come back to USA on May 26th." (Ex. B (May 5, 2019 email from Darius Paduch). As is clear from the PSR, the defendant did not have a grandson in 2019.[32] He told Luke that his heart was "failing badly" and that he was "in and out of atrial fibrillation." (Ex. C (text messages with Luke Bevin). He claimed to have been undergoing "chemo for years." (Ex. D (June 13, 2017 email from Darius Paduch)). In short, hyperbole, distortion, and deceit characterize the defendant, not his victims, and the Court should treat his many self-serving statements with skepticism.

### D. The Need to Protect the Public and Afford Adequate Deterrence

The defendant fails to appreciate the gravity of his conduct, much less express a shred of remorse for his actions or the harm he has caused. A sentence of at least 30 years is necessary to keep at bay the threat he presents today and will continue to present for years to come.

---

[32] The Government provided the Probation Office with documents demonstrating that the defendant made claims about his personal history that are inconsistent with details reported in the PSR. The defendant alleges that the adoption paperwork he submitted does not reflect his own statement and that he cannot explain why the report would be erroneous. PSR at 37. The adoption paperwork is clear that personal-history information had been obtained directly from the defendant. More to the point, the paperwork was merely illustrative of the defendant's chronic dishonesty.

The defendant's age does nothing to diminish the threat he poses. He committed his heinous crimes well into his fifties, even as he purportedly experienced chronic health conditions. (PSR ¶ 157). There is therefore no reason to suppose the defendant has "aged" out of criminal conduct or would lack the psychological tools to re-offend once released. *See United States v. Ray*, 20 Cr. 110 (LJL) (Sent'g Tr. at 50-51) ("[T]here is no reason to believe Mr. Ray will age out of criminal behavior," having "engaged in his late 50s" and demonstrating "he is capable of manipulating others with his mind and words alone."). Indeed, the defendant capitalized on his maturity and years of professional experience to develop a rapport with his victims and establish himself as a mentor and authority figure.

Nor is the public protected by solely removing the defendant from patient care. For one thing, the defendant's abuse was not confined to the examination room. Multiple victims— including James Brent, J.L., J.K., and E.P.—recounted being sexually abused by the defendant outside the hospital setting. Moreover, the defendant's criminal sexual appetite for the vulnerable extends beyond medical patients to the outright helpless. In addition to possessing numerous sexual images of boys and young men who appear under the age of 18,[33] in early 2016, the defendant filmed a video of his pet dog performing oral sex on him.[34] The defendant's predilection for powerless victims, together with his total lack of remorse, certify him as a public danger well into old age.

---

[33] These images were discussed in the Government's motions *in limine* (Dkt. 74 at 30) and furnished to the Court on or about April 9, 2024.

[34] The Government produced this video—located on the defendant's iCloud account—in discovery and also discussed it in the presence of both the defendant and defense counsel on December 22, 2023. Should the Court request it, the Government will furnish a copy of the video.

Apart from abating the threat of the defendant, a significant incarceratory sentence is necessary to deter would-be predators in the medical community and other vaunted professions from engaging in similarly heinous crimes. Crimes of this nature are difficult to detect and difficult to prosecute. Victims blame themselves, are fearful of being disbelieved, of being forced to face powerful abusers, and to relive their darkest days in a public forum and in the media. Owing to these fears, countless victims—particularly young men—remain silent, and perpetrators of sexual abuse go unpunished. In this case, brave boys and young men came forward and put an end to the defendant's appalling, yearslong abuse. Theirs were the "voices of justice." (Ex. A-43 (Statement of James Brent)).

But the defendant is not the first doctor to sexually abuse his patients, and, sadly, he will not be the last.[35] A sentence of at least 30 years is consistent with the significant terms of incarceration imposed in comparable cases involving sexual abuse by physicians.[36] Larry Nasser,

---

[35]  *See,  e.g.*,  https://www.nytimes.com/2023/08/07/nyregion/queens-doctor-rape-sexual-abuse.html (sexual abuse by Queens-based gastroenterologist)  (last visited Oct. 29, 2024); https://www.npr.org/2023/10/14/1205991106/george-tyndall-former-usc-gynecologist-accused-of-sexual-misconduct-found-dead (sexual abuse by Los Angeles-based gynecologist) (last visited Oct. 29, 2024); https://www.cbsnews.com/chicago/news/lawsuit-filed-gynecologist-accused-of-sexual-abuse/ (sexual abuse by Chicago-based gynecologist) (last visited Oct. 29, 2024).

[36] While not a physician, Ghislaine Maxwell was recently convicted of several counts involving sexual abuse of minors, including 18 U.S.C. § 2422, and therefore provides another point comparison. *See* 20 Cr. 330 (AJN). The Guidelines Range applicable to Maxwell was 360 to 660 months' imprisonment, and the defendant ultimately received a sentence of 20 years' imprisonment. The defendant warrants a significantly harsher sentence than Maxwell for reasons beyond his markedly higher Guidelines range. Most obvious, Maxwell herself was not the principal actor engaging in abusive sexual contact with victims. Rather, she primarily facilitated transporting those minors and making them available for her co-conspirator, Jeffrey Epstein, to abuse. Furthermore, the Government presented evidence of six victims during Maxwell's trial, as compared to seven statutory victims and four Rule 413 victims the Government presented at the defendant's trial.

an osteopathic sports physician at Michigan State University and USA Gymnastics, was sentenced to 40 to 175 years' imprisonment after pleading guilty to ten felony counts in connection with his yearslong sexual abuse of former patients. *See* https://www.michigan.gov/ag/ initiatives/msu/recent-news/judge-sentences-larry-nassar-to-40-to-175-years-in-prison-for-sexual-assault (last visited Nov. 5, 2024). Robert Hadden, a gynecologist affiliated with Columbia University Irving Medical Center and New York-Presbyterian Hospital, was sentenced in this District to 20 years' imprisonment. S2 20 Cr. 468 (RMB). It bears mention that Probation calculated the Guidelines range for Hadden to be 51 to 63 months' imprisonment. In part, that range reflected the absence of minor victims. Here, the defendant's conduct involved multiple minors, some with cognitive delays, and, in striking contrast, his applicable Guidelines range is *life imprisonment*. For those reasons alone, the defendant warrants a sentence considerably steeper than the 20 years Hadden received. Most important, a sentence of at least 30 years' imprisonment will send an urgent message to predators in the medical community that their victims have a voice and that the perversion of the doctor-patient relationship will be met with swift and significant justice.

48

**IV.  Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose

a sentence of at least 30 years' imprisonment.  Such a sentence would be sufficient but not greater

than necessary to serve the legitimate purposes of sentencing.


Dated:  New York, New York
        November 15, 2024

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney


                             By:   /s_____
                                        Marguerite B. Colson
                                        Elizabeth A. Espinosa
                                        Ni Qian
                                        Jun Xiang
                                        Assistant United States Attorneys